**KING & SPALDING LLP**
Dale J. Giali (SBN 150382)
dgiali@kslaw.com
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

**KING & SPALDING LLP**
Michael L. Resch (SBN 202909)
mresch@kslaw.com
Anne M. Voigts (SBN 220783)
mvoigts@kslaw.com
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1200
Facsimile: (415) 318-13000

Attorneys for Defendants
BELLRING BRANDS, INC. and
PREMIER NUTRITION COMPANY, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA KRYSTOFIAK, et al. | Case No. 3:23-cv-2819-AGT |
| Plaintiffs, | **REPLY IN SUPPORT OF MOTION TO DISMISS COMPLAINT** |
| v. | |
| BELLRING BRANDS, INC. et al. | Date:  October 20, 2023 |
| Defendants. | Time:  10:00 a.m. |
| | Dept.:  By videoconference absent Court order otherwise [Ctrm A, 15th Floor] |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     ARGUMENT ....................................................................................................... 3

        A.      Plaintiffs Lack Standing To Pursue Their Claims ............................................ 3

        B.      Plaintiffs May Not Challenge Products Not Purchased ................................... 5

        C.      Plaintiffs Also Fail To Plausible Allege Deception or Materiality ................. 6

        D.      Plaintiffs' Claims Are Barred By The Consent Judgment .............................. 8

        E.      Plaintiffs Failed To Comply With Prop 65 Requirements ............................ 10

        F.      Plaintiffs' Claims Fall Under FDA's Primary Jurisdiction .......................... 10

        G.      Plaintiffs' Claims Are Preempted ................................................................... 11

        H.      Plaintiffs' Claims Fail For Additional, Independent Reasons ...................... 12

        I.      Defendants' Request For Judicial Notice Is Routine And Should
                Be Granted ....................................................................................................... 14

III.    CONCLUSION ................................................................................................... 15

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Astiana v. Hain Celestial Grp., Inc.*,

5
    783 F.3d 753 (9th Cir. 2015) ..................................................................10

6

*Balistreri v. McCormick & Co., Inc.*,
    2023 WL 5988600 (N.D. Cal. Sept. 13, 2023) ...........................1, 2, 3, 7

7

8

*Barnes v. Natural Organics, Inc.*
    2022 WL 4283779 (C.D. Cal. Sept. 13, 2022) ...................5, 7, 8, 9, 11, 14

9

*Beasley v. Lucky Stores, Inc.*,

10
    400 F. Supp. 3d 942 (N.D. Cal. 2019) ....................................................11

11

*Cohen v. Apple Inc.*,
    46 F.4th 1012 (9th Cir. 2022) .................................................................11

12

*Colpitts v. Blue Diamond Growers*,

13
    527 F. Supp. 3d 562 (S.D.N.Y. 2021) .....................................................14

14

*Consumer Advocacy Grp., Inc. v. ExxonMobil Corp.*,

15
    168 Cal. App. 4th 675 (2008) .................................................................10

16

*Eidson v. Medtronic, Inc.*,
    981 F. Supp. 2d 868 (N.D. Cal. 2013) ....................................................15

17

*ESG Cap. Partners, LP v. Stratos*,

18
    828 F.3d 1023 (9th Cir. 2016) ................................................................13

19

*Farina v. Nokia*

20
    625 F.3d 97, 124 (3d Cir. 2010) .........................................................11, 12

21

*Freightliner Corp. v. Myrick*,
    514 U.S. 280 (1995) ...............................................................................11

22

*Gagetta v. Walmart, Inc.*,

23
    646 F. Supp. 3d 1164 (N.D. Cal.) .......................................................4, 14

24

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000) ...............................................................................11

25

26

*Grausz v. The Hershey Co.*,
    2023 WL 6206449 (S.D. Cal. 2023) .................................1, 2, 7, 9, 13

27

*Greene v Gerber Prods. Co.*,

28
    262 F. Supp. 3d 38 (E.D.N.Y. 2017) ...................................................5, 14

*Gutierrez v. Johnson & Johnson Consumer, Inc.*,
  2020 WL 6106813 (S.D. Cal. Apr. 27, 2020) ..............................................................9, 10

*Gutierrez v. Johnson & Johnson Consumer, Inc.*,
  2021 WL 822721 (S.D. Cal. Jan. 22, 2021) ...........................................................................13

*Hughes v. Ester C Co.*,
  930 F. Supp. 2d 439 (E.D.N.Y. 2013) ...................................................................................14

*In re Johnson & Johnson Talcum Powder Products Mktg. Sales Pracs. & Prods.*
  *Liab. Litig.*,
  903 F.3d 278 (3d Cir. 2018)......................................................................................................4

*LeGrand v. Abbott Lab'ys*,
  2023 WL 1819159 (N.D. Cal. Feb. 8, 2023) ............................................................................6

*Maya v. Centex Corp.*,
  658 F.3d 1060 (9th Cir. 2011) ...............................................................................................4, 5

*McGee v. S-L Snacks Nat'l*,
  982 F.3d 700 (9th Cir. 2020) .....................................................................................3, 4, 5, 8

*In re McNeil Consumer Healthcare*,
  877 F. Supp. 2d 254 (E.D. Pa. 2012) .......................................................................................4

*Moore v. Trader Joe's Co.*,
  4 F.4th 874 (9th Cir. 2021) .......................................................................................................8

*Paradowski v. Champion Petfoods USA, Inc.*,
  2023 WL 3829559 (2d Cir. June 6, 2023) ................................................................................8

*In re Plum Baby Food Litig.*,
  2022 WL 16640802 (N.D. Cal. Jan. 12, 2022) ...........................................................5, 10, 11

*Reitman v. Champion Petfoods USA, Inc.*,
  2019 WL 1670718 (C.D. Cal. Feb. 6, 2019).............................................................................8

*Riffel v. Regents of Univ. of Cal.*,
  2021 WL 3633840 (N.D. Cal. Aug. 17, 2021) .........................................................................4

*Syntek Semiconductor Co. v. Microchip Tech., Inc.*,
  307 F.3d 775 (9th Cir. 2002) ..................................................................................................10

*In re Vaccine Cases*,
  134 Cal. App. 4th 438 (2005) .................................................................................................10

*Victor v. R.C. Bigelow, Inc.*,
  2014 WL 1028881 (N.D. Cal. Mar. 14, 2014)..........................................................................6

*Villacres v. ABM Indus. Inc.*,
    189 Cal. App. 4th 562 (2010) ....................................................................................9

*Von Grabe v. Sprint PCS*,
    312 F. Supp. 2d 1285 (S.D. Cal. 2003)...............................................................14, 15

*Weaver v. Champion Petfoods USA Inc.*,
    2019 WL 2774139 (E.D. Wis. July 1, 2019) ...........................................................7

*Winters v. Ridgewood Indus., Ltd.*,
    2020 WL 3035217 (E.D. Cal. June 5, 2020) ...........................................................4

*Yu v. Dr Pepper Snapple Grp., Inc.*,
    2020 WL 5910071 (N.D. Cal. Oct. 6, 2020)...........................................................6

*Zeiger v. WellPet LLC*,
    304 F. Supp. 3d 837 (N.D. Cal. 2018) (Opp. 5:17) ........................................4, 5, 8

**Statutes**

21 U.S.C. § 343-1(a)(5) ....................................................................................................12

21 U.S.C. § 343(r)(1)(A)...................................................................................................12

Cal. Health & Saf. Code § 25249.7(d)(1) .........................................................................10

**Other Authorities**

21 C.F.R. § 1.21(a)............................................................................................................12

21 C.F.R. § 101.65.............................................................................................................12

21 C.F.R. § 101.65(d)(2)....................................................................................................12

Fed. R. Civ. P. 9(b) ...........................................................................................................13

Fed. R. Evid. 201(b)(2)......................................................................................................15

1

2

## I.    INTRODUCTION

Plaintiffs' claims require plausible allegations that the lead levels in defendants' products are dangerous. By any measure and as a matter of law, however, plaintiffs fail to allege dangerous levels. The complaint should be dismissed on this basis alone.

Defendants demonstrated in their motion that the lead levels *alleged by plaintiffs based on their own testing* range from 1.53 to 4.27 parts per billion ("ppb"). *See* Mtn. at 9, App'x A. Plaintiffs do not dispute these calculations. Defendants also demonstrated that these lead levels are below the levels permitted under the Environmental Law Foundation ("ELF") Consent Judgment covering these and other protein products (9.22 – 18.31 ppb), and less than the FDA acceptable lead levels for bottled water (5 ppb), baby food (10 or 20 ppb), and candy (100 ppb). *Id*. Plaintiffs do not dispute these calculations either.

Instead, plaintiffs argue that the Court should not consider this information on a motion to dismiss and must accept their conclusory allegations that lead generally can be harmful. Plaintiffs are wrong. As two courts ruled just last month, plaintiffs in these cases must plausibly allege that the specific amount of lead in the products at issue is dangerous. *See Grausz v. The Hershey Co.*, 2023 WL 6206449, at *10 (S.D. Cal. 2023) ("Plaintiff does not plead that **the amounts of the substances** in Hershey's Products have caused harm or create an unreasonable safety hazard") (emphasis added); *Balistreri v. McCormick & Co.*, *Inc.*, 2023 WL 5988600, at *1 (N.D. Cal. Sept. 13, 2023) ("The Court finds Plaintiffs have failed to plead facts to plausibly show the Products contained a level of Heavy Metals rendering the products unfit for human consumption").

Plaintiffs go to great lengths in their opposition to distance themselves from Prop 65. *See, e.g.*, Opp. at 13-14 (arguing the ELF Consent Judgment is "irrelevant"). But plaintiffs affirmatively used Prop 65 in their complaint as a basis to evaluate safety. *See* Compl. ¶ 73 (comparing the alleged lead levels to Prop 65's maximum allowable dose levels ("MADLs")). Having done so, they can't now avoid a proper analysis under the *correct* Prop 65 levels. *See Hershey*, 2023 WL 6206449, *10 ("MADLs are not cutoffs indicating the point where lead [] content becomes a health risk" and "[m]oreover, the Consent Judgment displaced the default MADLs … and substituted new limits").

Against this backdrop, plaintiffs have no plausible basis to allege that the alleged lead levels are dangerous. This is fatal to their omission and misrepresentation theories.

**Plaintiffs have abandoned their omission theory.** In footnote three of the opposition, plaintiffs acknowledge that *Hershey* held there was no "duty to disclose because the amount of lead alleged did not present an unreasonable safety hazard." Opp. at n.3. Plaintiffs make no effort to argue *Hershey* was wrongly decided, opting instead to highlight that it was addressing a "pure omissions theory." *Id*. Likewise, in other parts of the opposition, plaintiffs confirm that their claims are *not* based on a failure to disclose or warn but rather defendants' affirmative "healthy" representations. *See*, *e.g.*, Opp. at 14 (plaintiffs' claims "do not depend on … *any* duty to warn") (emphasis in original). Taken together, these statements reflect plaintiffs' abandonment of their omission theory (which, in any event, fails for the reasons explained herein).

**Plaintiffs' misrepresentation theory also fails because plaintiffs have not plausibly alleged dangerous lead levels.** By distinguishing *Hershey* as they do, plaintiffs erroneously suggest that their challenge to defendants' "healthy" representations is somehow insulated from the need to plausibly allege dangerous lead levels. A healthy product doesn't somehow become unhealthy by virtue of having trace, benign levels of naturally occurring elements. Otherwise, virtually no food product would be permitted to be described as healthy since almost all fruits, vegetables, and grains (and derivative products like frozen foods and soups) contain some heavy metals like lead. Significantly, FDA expressly allows a product to be labeled as "healthy" without a requirement that it must be free of heavy metals or declare the possible presence of heavy metals.

A closer review of the opposition reveals that plaintiffs agree that the "healthy" representations are actionable only if the alleged lead levels are dangerous. Specifically, plaintiffs accurately identify that defendants' "primary argument" is based on plaintiffs' inability to plausibly allege that 1.53 – 4.27 ppb of lead is dangerous. Opp. at 9. In response, plaintiffs never argue that defendants' "healthy" representations could be deceptive based on the presence of *safe* levels of lead; rather, plaintiffs simply repeat the erroneous argument that they have plausibly alleged the levels are dangerous and that issue is now off limits on a motion to dismiss. *Id*. *Hershey* and *McCormick* appropriately decided otherwise.

1    To be sure, plaintiffs cite other heavy metal cases that have been allowed to proceed past

2  the motion to dismiss stage. But plaintiffs cite no case (and there is none) where claims have been

3  allowed to proceed based on allegations of specific levels of lead as low as those alleged here. By

4  alleging specific levels that are so low—and adopting Prop 65 as a safety baseline—plaintiffs

5  cannot plausibly allege these protein products are dangerous or unhealthy.

6    Defendants' other, independent grounds for dismissal are addressed in more detail below.

7  **II.    ARGUMENT**

8    **A.    Plaintiffs Lack Standing To Pursue Their Claims**

9    As plaintiffs readily acknowledge, their purported injury-in-fact sufficient to support

10  Article III standing—*i.e.*, "overpayment"—requires an actionable "false representation[]." Opp. at

11  5; *see also id.* ("Defendants' affirmative . . . statements"). The effort to shoehorn their complaint

12  into a false representation case is no surprise. Plaintiffs know that without affirmative

13  representations to anchor their claims, they would have to demonstrate a duty to disclose. *Id.* at

14  n.3. They also know they cannot plausibly allege a duty to disclose the presence (or risk of the

15  presence) of lead in the protein products because, among other things, the level of lead in the

16  products does not create a safety issue as their own allegations establish.

17    Plaintiffs then move to supporting the general principle that an overpayment can be a

18  sufficient injury-in-fact, as if defendants challenge the point. But defendants don't doubt that

19  overpayment can be a sufficient injury-in-fact under the right circumstances. Defendants' point is

20  that plaintiffs fail to allege the right circumstances *here*. They cannot point to any relevant

21  representations by defendants, let alone *mis*representations. *See* Mtn. at 9-10, 16-17, n.33. In short,

22  representations about healthiness are not representations about the presence of heavy metals.

23    Once plaintiffs' misrepresentation theory is properly rejected as not plausible, *McGee v. S-*

24  *L Snacks Nat'l*, 982 F.3d 700 (9th Cir. 2020) unambiguously forecloses plaintiffs' theory of injury-

25  in-fact. As *McGee* puts it, "a key element of [Ninth Circuit] overpayment cases—a defendant's

26  misrepresentation about a product—is absent here." 982 F.3d at 707. Plaintiffs cannot demonstrate

27  that any of defendants' products "was worth objectively less than what one could reasonably

28  expect," because plaintiffs got exactly what would be expected. *Id.* at 707-08.

1   McGee also favorably cites *In re Johnson & Johnson Talcum Powder Products Mktg. Sales*
2   *Pracs. & Prods. Liab. Litig.*, 903 F.3d 278, 283 (3d Cir. 2018), which held that where, as here, a
3   plaintiff does not plausibly allege an affirmative misrepresentation or consumed the product
4   without experiencing any actual adverse effect, claimed economic injury based on a belief the
5   product is "unsafe" is not sufficient for standing.

6       Plaintiffs' reliance on *Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837 (N.D. Cal. 2018) (Opp.
7   5:17, 7:3), is misplaced. As an initial matter, *Zeiger* predates *McGee*. Moreover, *Zeiger*, which is
8   unquestionably a duty to disclose/omission case, relies heavily on *Maya v. Centex Corp.*, 658 F.3d
9   1060 (9th Cir. 2011) for its injury-in-fact/standing holding. But as *McGee* makes clear, *Maya*'s
10  overpayment injury-in-fact analysis is tied to an affirmative misrepresentation theory and,
11  therefore, does not and cannot support standing in a case like *Zeiger* that is not based on an
12  affirmative misrepresentation. *McGee*, 982 F.3d at 707.

13      As confirmed in a recent decision finding no overpayment injury-in-fact for standing in a
14  false advertising case, the distinguishing factor in *Maya* is a *false affirmative representation*.
15  *Winters v. Ridgewood Indus., Ltd.*, 2020 WL 3035217, at *3 (E.D. Cal. June 5, 2020); *Riffel v.*
16  *Regents of Univ. of Cal.*, 2021 WL 3633840, at * 3 (N.D. Cal. Aug. 17, 2021) ("In [*Maya*], unlike
17  in the present matter, the plaintiffs alleged individual economic harm directly created by the
18  defendants' *representations* that the property at issue had features or value that the property
19  ultimately did not have") (emphasis added); *In re McNeil Consumer Healthcare*, 877 F. Supp. 2d
20  254, 272 (E.D. Pa. 2012) ("The *Maya* plaintiffs alleged that *misrepresentations* . . . rendered their
21  homes worth less") (emphasis added).

22      When placed in proper context, *Maya* does not support the standing holding in *Zeiger*. And
23  without *Maya* as support, the standing holding in *Zeiger* collapses. Indeed, *Zeiger* appears never
24  to have been a correct statement of the law with respect to injury-in-fact in cases without plausible
25  allegations of affirmative misrepresentations. *Gagetta v. Walmart, Inc.*, 646 F. Supp. 3d 1164
26  (N.D. Cal.), similarly does not support plaintiffs' standing due to its heavy reliance on *Zeiger*
27  (which does not survive *McGee*) and *Maya* (which, as we detail above, is not applicable on this
28  record).

Plaintiffs' reliance on *In re Plum Baby Food Litig.*, 2022 WL 16640802 (N.D. Cal. Jan. 12, 2022) is also misplaced. That 1½-page order devotes a single paragraph to standing, without providing any analysis. *Id*. Moreover, the *Plum* court later explained its order as arising in the peculiar scenario where plaintiffs were not suing over a safety issue at all. 2023 WL 3493319, at *3 (N.D. Cal. May 3, 2023). That is not the case plaintiffs bring here.

Plaintiffs' attempts to distinguish defendants' authorities fail. For example, *In re Gerber* does not "reject[] Ninth Circuit law," and *Kimca* does not "differ from California and Ninth Circuit law." Opp. at 6. To be sure, the decisions reject the Northern District of California's decision in *Plum,* but that skeleton order is not Ninth Circuit law and the *In re Gerber* and *Kimca* decisions are entirely consistent with *McGee* and with *In re Johnson & Johnson*. 982 F.3d at 706 (which *McGee* cites with approval). Moreover, standing is a federal principle flowing the Constitution, not a function of "California law." Opp. at 6.

Finally, the standing holding in *Barnes v. Natural Organics, Inc.* relies on the questionable holding in *Zeiger* and the affirmative misrepresentation holding in *Maya* (again, inapplicable here given the lack of plausible allegations of affirmative misrepresentations). Moreover, had lead been the only alleged contaminant, as is the case here, *Barnes* suggests that defendant's standing argument may have prevailed there given that the lead levels were safe. 2022 WL 4283779, at *5 (C.D. Cal. Sept. 13, 2022).

### B.    Plaintiffs May Not Challenge Products Not Purchased

In response to defendants' straightforward point that plaintiffs can only sue over products they purchased (Mtn. at 13), plaintiffs reflexively argue that the substantial similarity of the protein products means they can sue on all 20 products even if they specifically alleged the purchase of only the chocolate protein powder (Opp. at 22). Plaintiffs' argument stretches the substantial similarity doctrine beyond the breaking point.

Nothing about plaintiffs' theory applies in a substantially similar manner to the 20 products. First, irrespective of what products they purchased, plaintiffs only allege test results for 4 shakes and 2 powders. There is *no* factual allegation of lead levels, let alone dangerous ones, as to the other 14 products. Moreover, the test results for the 6 products demonstrate that the lead

levels vary, as to the same product (*e.g.*, 0.498μ to 0.833μ) and between products (*e.g.*, 0.498μ to 1.39 μ). Chart at Compl. p. 24 (¶ 73). Indeed, one of plaintiffs' test results shows lead levels *below* even plaintiffs' inapplicable higher MADL. *See id.* at 1st Vanilla Shake test.

Second, plaintiffs' theory hinges on an untold number of alleged affirmative misrepresentations (Compl. ¶ 32-72), which vary widely by product and by media (*e.g.*, on-label, commercials, internet, website, print, etc.). Significantly, none relates to heavy metals, and plaintiffs rely on only "High Protein," "Immune Health Support," and "Plant Protein." *Id*. ¶¶ 107-109. There are no decisions permitting challenges to non-purchased products on remotely similar records; the decisions plaintiffs rely on don't. *See Victor v. R.C. Bigelow, Inc*., 2014 WL 1028881, at *8 (N.D. Cal. Mar. 14, 2014) (*all* products contained the *identical* objective label statement); *LeGrand v. Abbott Lab'ys*, 2023 WL 1819159, at *5-6 (N.D. Cal. Feb. 8, 2023) (*all* products challenged based on amount of added sugar, which was clearly stated on *each* product label).

**C.    Plaintiffs Also Fail To Plausible Allege Deception or Materiality**

In the motion, defendants demonstrated that plaintiffs' own allegations defeat their effort to plead deception or materiality for two reasons: (1) plaintiffs' alleged lead levels are so low that they cannot support a theory that the products are dangerous and unhealthy, and (2) having alleged the existence of widespread, general public knowledge regarding the ubiquity of lead in food, plaintiffs cannot pursue a theory that they (or the reasonable consumer) are unaware that defendants' products may contain trace amounts of lead. *See* Mtn. at 14-17. In response, plaintiffs ignore defendants' case law and rely on cases that are easily distinguishable.

**1.    Plaintiffs cannot plausibly allege deception or materiality given the low lead levels alleged in the complaint.** Defendants explain in detail in their motion and above why plaintiffs are unable to plausibly allege that lead levels of 1.53 – 4.27 ppb are dangerous and unhealthy. Defendants will not repeat those arguments here, but highlight three important points.

***First***, defendants cited numerous cases supporting the proposition that the reasonable consumer would not believe that a product is free of lead. *See*, *e.g.*, *Yu v. Dr Pepper Snapple Grp., Inc.*, 2020 WL 5910071, at *5 (N.D. Cal. Oct. 6, 2020); *see also* Mtn. at 14-17, n.37. One district court went so far as to indicate that this "absurd" theory would lead to a "truly preposterous" result:

1

> The Court emphasized that [plaintiff] did not "plead . . . that [Defendants' pet food] is misleadingly advertised as healthy because of [the] mere presence of any heavy metals." She did not, the Court surmised, because that theory is "absurd."

2

> \* \* \*

3

> [Plaintiff] insists that the mere presence of heavy metals defeats Defendants' quality claims. If this were true, the result would be truly preposterous. No one would sell foodstuffs in Wisconsin. If they had the audacity to claim that their products were "tasty," or "fresh," or in any other way of high quality, they would be quickly slapped with a [] lawsuit based on the lead, arsenic, mercury, and cadmium indisputably present in their products.

4

5

6   *Weaver v. Champion Petfoods USA Inc.*, 2019 WL 2774139, at *2-3 (E.D. Wis. July 1, 2019)

7   (internal citations omitted). Having no response to the rationale underpinning *Weaver* and

8   defendants' other cases, plaintiffs ignore the decisions altogether. And, importantly, if plaintiffs'

9   claims were allowed to proceed based on testing showing only 1.53 – 4.27 ppb of lead, that's the

10  equivalent of endorsing the "absurd" theory described in *Weaver—i.e.*, a claim that food is

11  "misleadingly advertised as healthy" because of the "mere presence of *any* heavy metals." *Id.*

12      **Second**, after defendants filed their motion, courts decided *Hershey* and *McCormick*. As

13  detailed above, plaintiffs argue *Hershey* only applies to cases alleging an omission theory. There

14  is no basis for that narrow reading, but the important point for present purposes is that, like the

15  other cases cited by defendants, *Hershey* demonstrates that the safety analysis is appropriate on a

16  motion to dismiss. But that's not all. *Hershey* also explains that the Prop 65 MADLs alleged by

17  plaintiffs here—lead levels that defendants' products come nowhere near—"are not cutoffs

18  indicating the point where lead [] content becomes a health risk." *Hershey*, 2023 WL 6206449, at

19  *10. And finally, *Hershey* holds that heavy metal claims cannot survive where, as here, the alleged

20  levels are below the levels agreed upon in an applicable Prop 65 Consent Judgment (not to mention

21  beneath the lowest FDA levels as well).[1] *Id.* These conclusions apply with equal force to plaintiffs'

22  "healthy" claims, and plaintiffs provide no rationale to suggest otherwise.

23      **Third**, plaintiffs cite cases that are easily distinguishable for a simple reason: none of them

24  involved lead levels nearly as low as the levels alleged here. *Barnes v. Nat. Organics, Inc.*

25  illustrates the point. As a preliminary matter, in their parenthetical describing *Barnes*, plaintiffs

26

---

27  [1] Significantly, the *Hershey* plaintiff made the same general allegations regarding the dangers of lead as plaintiffs allege here. *See, e.g.*, *Hershey*, 2023 WL 6206449, at *10 (reviewing lead allegations). Such general allegations were not persuasive there and are no more persuasive here.

28

state that the case included a finding that representations "were actionable where *protein shakes* contained lead and cadmium." Opp. at 9 (emphasis added). *Barnes*, however, involved prenatal vitamins, *not* protein shakes. *See* 2022 WL 4283779 at *1-2.

More significantly, the prenatal vitamins in *Barnes* had *substantially* greater levels of heavy metals than the 1.53 – 4.27 ppb of lead at issue here. Specifically, based on testing conducted by plaintiff's counsel, plaintiff alleged *lead levels of 104.26 ppb*, 552.73 ppb of arsenic, 96.43 ppb of cadmium, and 36.86 ppb of mercury. *Id*. at *2. After acknowledging that FDA had not set limits for heavy metals in prenatal supplements, the court in *Barnes* expressly referenced one of the FDA levels identified by defendants here—*i.e.*, "FDA requires that bottled water cannot contain more than 5 ppb of total lead." *Id*. In stark contrast to the lead results alleged here (*i.e.*, below the FDA limit even for bottled water), the alleged results in *Barnes* were more than 20 times the FDA lead level for bottled water. Against this backdrop, *Barnes* is of no help to plaintiffs.

The same is true of plaintiffs' other cases. *See e.g.*, operative complaints in *Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837, 842 (N.D. Cal. 2018) (No. 17–cv–04056–WHO) (alleging over 200 ppb of lead and 1,000 ppb of arsenic) and *Reitman v. Champion Petfoods USA, Inc*., 2019 WL 1670718, at *1 (C.D. Cal. Feb. 6, 2019) (No. CV 18-1736 DOC (JPRx)) (alleging lead levels as high as 489.8 ppb and other heavy metals as well).

**2.      Plaintiffs' own allegations make it implausible that they (and the reasonable consumer) would be unaware of the presence of lead in defendants' products.** Relying on plaintiffs' own allegations, defendants argued that "plaintiffs' alleged ignorance of the ubiquitous nature of lead is implausible." *See* Mtn. at 17,  n.31 (citing Compl. nn.1-6, n.26, ¶¶ 85, 86, 90). In doing so, defendants relied on *Moore v. Trader Joe's Co.*, 4 F.4th 874, 882 (9th Cir. 2021), *McGee* 982 F.3d at 707-708, and *Paradowski v. Champion Petfoods USA, Inc*., 2023 WL 3829559, at *3 (2d Cir. June 6, 2023).

Plaintiffs' opposition to this argument is really no opposition at all, addressing *none* of the decisions cited by defendants or the points defendants make.

**D.      Plaintiffs' Claims Are Barred By The Consent Judgment**

Plaintiffs make two arguments why the Consent Judgment should not bar their claims.

**First**, plaintiffs argue that their claims are unrelated to Prop 65. Opp. at 13-14. Plaintiffs' say-so aside, "the claims asserted in the initial complaint . . . are entirely derivative of an unspoken Proposition 65 violation." *Gutierrez v. Johnson & Johnson Consumer, Inc.*, 2020 WL 6106813, at *4 (S.D. Cal. Apr. 27, 2020) (citation and internal quotations omitted). Plaintiffs' claims are "inextricably bound up" with Prop 65 because plaintiffs use Prop 65 to evaluate safety.[2] *Id*. at *5.

Moreover, the doctrine of res judicata should be applied broadly. *Villacres v. ABM Indus. Inc.*, 189 Cal. App. 4th 562, 575-77 (2010). Res judicata applies if two actions "involve the same injury to the plaintiff and the same wrong by the defendant" even if the second suit seeks "different forms of relief" or raises different legal theories. *Id*. at 595-96. As defendants highlighted in their motion (Mtn. at 18), *Barnes* concluded that res judicata would have applied to plaintiff's claims had her case been based solely on lead. 2022 WL 4283779 at n.2. Plaintiffs offer no response.

And even if plaintiffs' claims are unrelated to Prop 65, plaintiffs cannot escape application of the Consent Judgment because it legally displaced the default MADLs and instituted new limits for lead for defendants' products. If plaintiffs compare levels of lead in defendants' products to Prop 65 requirements (which they do), they must compare the levels against the *correct* limits established in the Consent Judgment. *See Hershey*, 2023 WL 6206449 at *10 ("the Consent Judgment displaced the default MADLs . . . and substituted new limits").

**Second**, plaintiffs argue that the Consent Judgment could not have released any claims against the entities or products at issue in this case because the Consent Judgment is internally inconsistent. Opp. at 14-16. Such argument is improper here. As members of the public, plaintiffs could have attempted a direct attack to the settlement agreement, but they didn't do so. And the plain terms of the Consent Judgment clearly state that the Consent Judgment covers all current and future protein products manufactured by, sold by, or distributed directly or indirectly by Dymatize Enterprises, Inc. and its affiliates—which includes BellRing Brands and Premier Nutrition Company ("PNC"). *See* Mtn., Appendix B at 17, Attachment A. Considering the clear terms of the

---

[2] *See*, *e.g.,* Compl. ¶ 1 (defendants' products contain lead levels "almost three times the legal limit under California's Proposition 65[.]"); ¶ 73 (defendants' products contain lead levels "in excess of the 0.5 µg MADL (*i.e.*, daily limit) under California's Proposition 65").

Consent Judgment, BellRing and PNC should be "free from a series of additional suits from members of the public, the same class that was represented in the first suit." *Consumer Advocacy Grp., Inc. v. ExxonMobil Corp.*, 168 Cal. App. 4th 675, 690 (2008).

### E.    Plaintiffs Failed To Comply With Prop 65 Requirements

As stated above, plaintiffs affirmatively alleged Prop 65 throughout their complaint. Having done so, plaintiffs cannot avoid Prop 65's requirement to provide at least 60 days' notice to defendants and state prosecutors and provide a certification of merit before filing their action. Cal. Health & Saf. Code § 25249.7(d)(1); *In re Vaccine Cases*, 134 Cal. App. 4th 438, 456 (2005). Plaintiffs are bound by Prop 65 notice and certification requirements and the failure to comply with these foundational requirements "cannot be [] cured," and requires dismissal "with prejudice" of the complaint. *Gutierrez*, 2020 WL 6106813, at *3.

### F.    Plaintiffs' Claims Fall Under FDA's Primary Jurisdiction

Plaintiffs do not dispute that the primary jurisdiction doctrine applies when there is "(1) need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Syntek Semiconductor Co. v. Microchip Tech., Inc.,* 307 F.3d 775, 781 (9th Cir. 2002); *accord Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 760 (9th Cir. 2015).

Plaintiffs do not deny that the safety and labeling of the protein products "has been placed by Congress within the jurisdiction of" FDA "pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority." *Syntek,* 307 F.3d at 781. Nor do they deny that that this an issue that requires "uniformity in administration." *Id.*

Plaintiffs argue only that this issue does not require FDA's expertise. Opp. at 18-19. But FDA and its many scientists are uniquely situated to consider the scientific and policy considerations in determining how to address heavy metals in foods. Plaintiffs' argument does not address the compelling rationale that has caused numerous other courts to defer to FDA in heavy metal cases. *See* Mtn. at 20-21. Rather, it is largely based on *Plum*. Opp. at 19; 2022 WL 16640802 at *1. Setting aside that there is no analysis in the 1½ page *Plum* order—in contrast to decisions

applying primary jurisdiction in other baby food cases—plaintiffs' reliance is misplaced. The court in *Plum* declined to apply the doctrine because plaintiffs there were not directly challenging the safety of the products. 2023 WL 3493319 at *3. Here, product safety is plaintiffs' *core* allegation.

Additionally, plaintiffs contend that the doctrine should not apply because FDA's current Closer to Zero initiative is focused on *baby food* and will not address labeling. Not only is such an argument irrelevant to the primary jurisdiction analysis, it fails to appreciate the wide-reaching impact Closer to Zero will have on FDA's regulation of the food supply as a whole.[3]

### G.    Plaintiffs' Claims Are Preempted

**Implied Preemption.** Defendants argued that plaintiffs' claims are impliedly preempted because they conflict with "FDA's considered judgment that food with these levels of lead is safe and that labels do not need to disclose lead." Mtn. at 21-22. In support, defendants cited *Geier v. Am. Honda Motor Co*., 529 U.S. 861, 881-82 (2000), *Cohen v. Apple Inc.*, 46 F.4th 1012, 1028-29 (9th Cir. 2022), and *Farina v. Nokia*, Inc. 625 F.3d 97, 124-27 (3d Cir. 2010). Mtn. at 22. Plaintiffs does not address *Geier*, *Cohen*, or *Farina*, and entirely misses the point of defendants' argument.

***First***, plaintiffs devote the bulk of their argument to the notion that the Nutrition Labeling and Education Act of 1990 ("NLEA") cannot impliedly preempt their claims given the NLEA's express preemption provision and savings clause. Opp. at 10-11. Plaintiffs are wrong. *See*, *e.g*., *Beasley v. Lucky Stores, Inc*., 400 F. Supp. 3d 942, 951-54 (N.D. Cal. 2019) (collecting cases holding that UCL claims may not be based on presence of ingredient that federal law allows).[4]

***Second***, defendants do not rely on the NLEA but rather FDA's judgment that foods with

---

[3] *See* FDA, *Closer to Zero: Reducing Childhood Exposure to Contaminants from Foods*, https://www.fda.gov/food/environmental-contaminants-food/closer-zero-reducing-childhood-exposure-contaminants-foods (discussing research, monitoring, and compliance action items for lead not just specific to baby foods); FDA, *Lead in Food, Foodwares, and Dietary Supplements*, https://www.fda.gov/food/environmental-contaminants-food/lead-food-foodwares-and-dietary-supplements (same).

[4] Plaintiffs cite *Freightliner Corp. v. Myrick*, 514 U.S. 280, 286 (1995) for the proposition that "the absence of a regulation does not have preemptive force." Opp. at 11. The cited portion of *Myrick*, however, is in the *express* preemption section of the decision. Just one page later, the Supreme Court specifically *rejects* the notion that "implied pre-emption cannot exist when Congress has chosen to include an express pre-emption clause in a statute." *Id*. at 287.

lead levels ranging from 1.53 – 4.27 ppb are safe and do not require any special labeling. Such judgment is reflected in FDA's decisions to allow such foods to be sold (without lead disclosures) and to set even higher lead levels for foods that are consumed by more vulnerable populations (*e.g.*, 10 and 20 ppb for baby food) and are consumed more frequently (*e.g.*, 5 ppb for bottled water). As such, plaintiffs' claims conflict with FDA's judgment, and permitting plaintiffs' claims would "disrupt the expert balancing underlying the federal scheme." *See Farina*, 625 F. 3d at 126.

**Express Preemption.** Plaintiffs' arguments with respect to express preemption (Opp. at 11, et seq.) also fail. First, 21 C.F.R. § 1.21(a) provides no help in answering the specific question presented here, *i.e.*, what *is* "[m]aterial in light of other representations" and, therefore, should be revealed. It's no wonder that plaintiffs cite no court decisions in support of this argument, let alone any that apply that regulation in a manner remotely analogous to the scenario here.

Second, plaintiffs confuse the relevant question when they argue that "Defendants have not carried their burden" to demonstrate that they may use the word "healthy." Opp. at 11. Express preemption is concerned with a *plaintiff* imposing food label requirements that are *different from or not identical to* federal requirements. *See* 21 U.S.C. § 343-1(a)(5) (as it incorporates 21 U.S.C. § 343(r)(1)(A)). Here, plaintiffs seek to impose a requirement on the use of the word "healthy" that is different from or not identical to the federal requirements regarding healthy labeling found at 21 C.F.R. § 101.65(d)(2). Namely, plaintiffs are imposing a requirement that "healthy" may not be used if the food contains lead—but 21 C.F.R. § 101.65(d)(2) contains no such requirement.

Finally, plaintiffs make a confusing argument that they are not alleging that defendants are making a healthy claim under 21 C.F.R. § 101.65 because defendants don't use healthy to refer to nutrients in the products. Opp. at 12. Whatever they may mean by the argument, plaintiffs' complaint clearly alleges that defendants refer to the products as healthy *because* of the products' nutrients, including that they contain protein. *See, e.g.*, Compl. ¶ 41; *see also id.* ¶ 69 ("contains a variety of healthy ingredients"); ¶ 107 ("Plaintiff" associated "healthy" with "'High Protein'").

**H.    Plaintiffs' Claims Fail For Additional, Independent Reasons**

***Breach of Warranties.*** Plaintiffs argue they state a claim for breach of warranty because they have plausibly alleged deception and a breach of the implied warranty of merchantability

because they allege the products were unsafe. Opp. at 20 (citing *Barnes*, 2022 WL 4283779 at *8). Both arguments fail for the same reason discussed above—plaintiffs do not state claims for deception (no misrepresentations) or lack of merchantability (no dangerous lead levels).

***Fraud Claims.*** Plaintiffs argue that they fulfilled the particularly standard under Rule 9(b) because they pled the bare minimum of the "who" (*i.e.*, Defendants), "what" (*i.e.*, the challenged messaging), "when" (*i.e.*, the last four years), and "where" (*i.e.*, on the product labels) of the case. Opp. at 4. But plaintiffs must also plausibly allege which particular advertisement on which product induced their reliance. *Gutierrez v. Johnson & Johnson Consumer, Inc.*, 2021 WL 822721, at *5 (S.D. Cal. Jan. 22, 2021). Nowhere in their complaint do they provide these details.

***Unjust Enrichment & Equitable Claims.*** Plaintiffs argue that their unjust enrichment claim is not derivative, and even if it were, it is irrelevant as "[t]he Ninth Circuit has found that California recognizes an independent cause of action for [u]njust enrichment." Opp. at 20. It remains unclear if unjust enrichment is available as a cause of action in California courts. *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016) ("Some California courts allow … unjust enrichment, while others have maintained that California has no such cause of action").

In any event, plaintiffs fail to "allege a lack of adequate legal remedies, which . . . is a prerequisite to the pursuit of an equitable claim." *See Hershey*, 2023 WL 6206449, at *14. Plaintiffs argue that they lack an adequate remedy at law because their equitable claims "sweep more broadly" than their legal claims. Opp. at 23. Both claims, however, rest on the same alleged conduct resulting in the same alleged injury. In other words, plaintiffs fail to show how "restitution would go beyond the damages available" to them and fail to allege "any specific facts showing that damages are 'inadequate or incomplete.'" *Hershey*, 2023 WL 6206449, at *16.

***Negligent Misrepresentation.*** Plaintiffs argue that they can establish the existence of a special relationship by "emphatically" alleging that defendants (1) "held or appeared to hold unique or special expertise" and (2) were "aware of the use to which the information would be put and supplied it for that purpose" Opp. at 21. On the first factor, plaintiffs point to a handful of statements made by defendants relating to their work to develop nutritious products that can help support healthy lifestyles as well as quotes from one doctor on their website regarding the benefit

of protein. But these statements do not involve "scientific, technical, or non-public information, i.e., subjects of which a regular consumer normally would be unaware of and therefore more likely to rely on the provided information." *Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 588 (S.D.N.Y. 2021). The cases on which plaintiffs rely are also readily distinguishable on this basis. *See Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 475 (E.D.N.Y. 2013) (finding a special relationship where seller claimed to have "good clinical research"); *Greene v Gerber Prods. Co.*, 262 F. Supp. 3d 38, 76 (E.D.N.Y. 2017) (finding a special relationship where seller discussed specific scientific information to which Plaintiffs did not have access).

For the second factor, plaintiffs simply declare that defendants knew that plaintiffs would rely on those claims. Opp. at 22. Such a conclusory allegation is inadequate for establishing a special relationship. *See Blue Diamond Growers*, 527 F. Supp. 3d at 588 (plaintiffs failed to show that defendant was aware of how the information would be used and supplied it for that purpose).

Plaintiffs have not alleged facts that give rise to a special relationship—a contrary ruling would mean that manufacturers *always* have a special relationship with their customers.

## I.    Defendants' Request For Judicial Notice Is Routine And Should Be Granted

Defendants properly requested judicial notice of public documents available on government websites.[5] These are the types of documents that are judicially noticed all the time, including in cases cited by plaintiffs.[6] *See* Mtn. at 24-25. Plaintiffs argue that the Court should not grant judicial notice of these public documents because they involve facts that are disputed and/or are irrelevant. Opp. at 1-4. Neither of these arguments has merit.

***First***, the governmental materials involve facts (*e.g.*, FDA's lead levels) that plaintiffs cannot, and do not, dispute. Plaintiffs rely on *Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285, 1312 (S.D. Cal. 2003) in arguing that taking judicial notice would effectively prevent plaintiffs from "participating in the adversary process" because, they argue, the documents involve disputed

---

[5] Plaintiffs do not oppose defendants' request for judicial notice of court records.

[6] The court in *Gagetta* for example, took judicial notice of the existence of FDA and USDA materials. 646 F. Supp. 3d at 1171-72. Similarly, the court in *Barnes* recognized that "documents publicly accessible on the FDA website . . . are . . . subject to judicial notice." *Id.*

facts. Opp. at 2. *Von Grabe*, however, did *not* relate to information on a government website. 312 F. Supp. 2d at 1312. In contrast, defendants here ask the Court to take judicial notice of public documents available on government websites, including FDA and other governmental agencies' statements relating to lead in food products. Plaintiffs cannot dispute that these governmental agencies made these opinions or statements. These facts are "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Additionally, defendants only ask the Court to take notice of "the authenticity and existence" of these materials and "not the veracity or validity of [their] contents." *Eidson v. Medtronic, Inc.*, 981 F. Supp. 2d 868, 878 (N.D. Cal. 2013).

**Second**, the governmental materials are relevant. Plaintiffs argue that aspects of the documents relate to toxic elements generally (and not lead specifically) or discuss lead in food generally (and not lead in protein shakes specifically). Opp. at 2-3. But this is a game of semantics as FDA has publicly stated that its use of the word "toxic elements" includes the element "lead."[7] Additionally, the fact that FDA has set lead levels for bottled water and baby food, for example, that are higher than the alleged lead levels here is plainly relevant.

Plaintiffs also argue that the websites are not regulations and do not provide safety conclusions. Opp. at 3. But in the cases cited by plaintiffs, the courts either granted judicial notice or were not asked to take judicial notice at all. *See id.*

## III.    CONCLUSION

For the foregoing reasons, defendants respectfully request that the motion be granted.

---

[7] *See, e.g.*, FDA, *Environmental Contaminants in Food*, https://www.fda.gov/food/chemical-contaminants-pesticides/environmental-contaminants-food.

1    Dated: October 6, 2023                    KING & SPALDING LLP

2                                              Dale J. Giali
                                               Michael L. Resch
3                                              Anne M. Voigts

4

5
                                          By:   /s/ Dale. J. Giali
6                                               Dale J. Giali

7                                               Attorneys for Defendants
                                                BELLRING BRANDS, INC. and
8                                               PREMIER NUTRITION COMPANY,
                                                LLC
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---