UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA KRYSTOFIAK, et al., | Case No. 23-cv-02819-AGT |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |
| BELLRING BRANDS, INC., et al., | Re: Dkt. No. 16 |
| Defendants. | |

Plaintiffs filed this putative class action, asserting consumer protection, warranty, misrepresentation, and unjust enrichment claims against Defendants, alleging that Defendants' labeling is deceptive because there is lead found in certain protein powders and shakes. Defendants move to dismiss Plaintiffs' complaint. For the following reasons, the Court grants in part and denies in part the motion, with leave to amend.

## I.   BACKGROUND

Plaintiffs Patricia Krystofiak, Luis Carreno, and Jonathan Zimmerman brought this suit against defendant BellRing Brands, Inc. and Premier Nutrition Company, LLC, alleging claims under California and New York consumer protection laws, claims for breach of warranty, misrepresentation, and unjust enrichment. Dkt. 1, Compl. Plaintiffs allege that Defendants' "Premier Protein Shakes and Premier Protein Plant Powders (together, the 'Premier Protein Products' or 'Products') contain high levels of lead." *Id.* ¶ 1. There are "at least 18 flavors" of the Premier Protein shakes, in both 11 and 11.5 ounce sizes, that are packaged either individually or in cases of 4, 8, 12, 15, or 18 bottles. *Id.* ¶ 33. There are two flavors of the Premier Protein powder, chocolate and vanilla. *Id.* ¶ 34.

Plaintiff Krystofiak alleges that she "regularly purchased the Premier Protein Shakes, in various flavors, online through Walmart.com," relying on the claims of "High Protein" and "Immune Health Support." *Id.* ¶ 107.  Plaintiff Carreno alleges that he "regularly purchased the Premier Protein Plant Powder, in the chocolate flavor, from Walmart in Chula Vista, California and from GNC locations throughout San Diego County," based on the "High Protein" and "Plant Protein" claims. *Id.* ¶ 108.  Plaintiff Zimmerman allege that he "regularly purchased the Premier Protein Shakes, in various flavors, from BJ's wholesale in Westbury, New York." *Id.* ¶ 109.

## II.    LEGAL STANDARD

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a defendant may attack the complaint for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12.  Specifically, a lack of Article III standing, or constitutional standing, "requires dismissal for lack of subject matter jurisdiction." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).

Under Rule 12(b)(6), a defendant may assert a defense that the plaintiff has failed to state a claim.  Fed. R. Civ. P. 12.  To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when the claimant "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  Facts that are "merely consistent with a defendant's liability" are insufficient to show plausibility. *Twombly*, 550 U.S. at 557.  In determining whether the plaintiff's claims are plausible, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

## III.    DISCUSSION

Defendants raise issues of standing, preemption, and Proposition 65 ("Prop 65")

requirements, in addition to challenging the sufficiency of Plaintiffs' allegations under California and New York law.  The Court will address each argument in turn.

## A.    Standing

In order to establish Article III standing, a plaintiff must show that she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, as revised (May 24, 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Plaintiffs must establish standing to pursue claims based on past purchases as well as injunctive relief (e.g., prospective purchases).

### 1.    Past Economic Injury – Overpayment Theory

Defendants contend that Plaintiffs "fail to allege an injury in fact." Dkt. 16 at 23.  Plaintiffs assert an overpayment theory of injury, alleging that "Premier Protein Products were worth less than what Plaintiffs [] paid for them" and that they "lost money as a result of Defendants' omissions and unfair practices."   Compl.  ¶¶ 115, 116.   The Ninth Circuit has recognized overpayment as "a viable theory of economic injury," noting "that a plaintiff can satisfy the injury in fact requirement by showing that she paid more for a product than she otherwise would have due to a defendant's false representations about the product."  *McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 706–07 (9th Cir. 2020) (declining to decide, however, whether overpayment is a viable theory without misrepresentation); *see Maya v. Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011) (recognizing "a quintessential injury-in-fact" where "plaintiffs spent money that, absent defendants' actions, they would not have spent").[1]   The alleged overpayment is related to lead

---

[1] Other district courts in this Circuit have found Article III standing based on the overpayment theory.  *See, e.g.*, *Rodriguez v. Mondelez Global LLC*, No. 3:23-cv-00057-DMS-AHG, Dkt. 23 at 12 (S.D. Cal. Nov. 22, 2023); *Barnes v. Natural Organics, Inc.*, 2022 WL 4283779, *4–5 (C.D. Cal. Sept. 13, 2022); *Grausz v. Hershey Co.*, 2023 WL 6206449, at *4 (S.D. Cal. Sept. 11, 2023); *Bland v. Sequel Nat. Ltd.*, 2019 WL 4658361, at *2 (N.D. Cal. Jan. 18, 2019).

levels found in the product.  Disputed heavily at this point is the acceptable level of lead.  Issues of what level of lead may be safe or unsafe and what reference level is appropriate to use are questions of fact and need not be resolved at the pleading stage.[2]  Here, the Court finds that an overpayment theory is viable.

### 2.     Products Purchased and Not Purchased

While the Court finds that the overpayment theory is a viable basis for Plaintiffs' claims, the Court now evaluates Plaintiffs' standing to pursue claims regarding the full suite of Premier Protein Products.  Plaintiffs have alleged that the suite of Premier Protein Products includes, during the class period, "at least 18 flavors" of Premier Protein shakes and two flavors of Premier Protein Plant Powders.  Compl. ¶¶ 33–34.  Plaintiffs provide test results for four flavors of shakes and two flavors of powders.  *Id.* ¶ 73.  The Court finds that the allegations fail to establish standing for Krystofiak and Zimmerman because it is not clear which products they actually purchased.  Additionally, the lead levels of the untested products cannot confer standing here.

Plaintiffs have standing to pursue claims regarding unpurchased products if Plaintiffs can establish substantial similarity between the purchased and unpurchased products.  *See Cimoli v. Alacer Corp.*, 546 F. Supp. 3d 897, 907–08 (N.D. Cal. 2021); *Astiana v. Dreyer's Grand Ice Cream, Inc.*, 2012 WL 2990766, at *13 (N.D. Cal. July 20, 2012) (finding standing where "Plaintiffs are challenging the same kind of food products [] as well as the same labels for all of the products").  Plaintiffs' allegations here of having purchased the shakes in "various flavors," however, do not identify which products were actually purchased.  Krystofiak and Zimmerman, have not specified a single flavor, container size, or pack size that they purchased.  For example, it is unclear whether the purchased shakes are among any combination of flavor, container size,

---

[2] *See, e.g.*, *Rodriguez*, No. 3:23-cv-00057-DMS-AHG, Dkt. 23 at 10; *Bland*, 2019 WL 4658361, at *2; *Grausz*, 2023 WL 6206449 at *7.

and pack size listed in paragraph 33 of the complaint.  The Court will not consider the issue of whether the flavors of the unpurchased shakes are substantially similar until Plaintiffs have sufficiently alleged what they purchased.  The Court finds that the two flavors of protein powder are substantially similar because they are alleged to be sold using the same challenged representations (compl. ¶ 41), with the flavor not being material to Plaintiffs' claims.

Plaintiffs also argue the Premier Protein Products "all contain unsafe levels of lead" (Dkt. 23 at 31 citing compl. ¶ 73), but the table of results does not support this conclusory allegation — there is no indication of the lead content in the other 14 untested flavors of protein shakes.  There is sizable difference in alleged lead content among flavors, ranging from 0.498–1.39 µg per serving in the table, straddling Plaintiffs' alleged Prop 65 reference level of 0.5 µg per serving.  Compl. ¶ 73.  While inferences are to be made in Plaintiffs' favor at this stage, the Court will not infer the lead content of the untested flavors of protein shake.  Relatedly, for the shakes, it is unclear if the purchased products overlap with the testing results presented at paragraph 73 of the complaint.

Defendants cite to *Boysen v. Walgreen Co.*, involving arsenic and lead in fruit juice, where dismissal was granted for lack of standing because that plaintiff failed to establish an injury in fact. Dkt. 16 at 25; *Boysen v. Walgreen Co.*, 2012 WL 2953069, at *7 (N.D. Cal. July 19, 2012).  In that case, the plaintiff's complaint cited to FDA regulations for bottled water.  *Id.* at *1.  The court in *Boysen* noted that the FDA had provided guidance regarding fruit juice, and the alleged lead levels were less than levels indicated by the FDA for fruit juice.  *Boysen*, 2012 WL 2953069 at *5. Additionally, the court in *Boysen* referred to a case consolidated by the Multi District Litigation (MDL) panel of similar claims involving fruit juice products.  *Id.* at *4.  Here, the FDA has not issued guidance on protein products, and there is some factual dispute as to application of FDA guidance for other products to the products at issue here.  Dkt. 16 at 18; dkt. 23 at 11–12; dkt. 24 at 6.  The Court will not resolve these issues at the pleading stage.

Defendants' motion to dismiss for lack of standing by plaintiffs Krystofiak and Zimmerman is granted with leave to amend.  Defendants' motion is denied as to plaintiff Carreno and for both flavors of protein powder.

### 3.   Injunctive Relief – Future Injury

In order to seek injunctive relief to prevent future injury, "the threat [to the plaintiff] must be actual and imminent, not conjectural or hypothetical."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  Plaintiffs may establish the threat of injury in the context of false advertising by showing that they "will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to," or that they "might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved."  *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969–70 (9th Cir. 2018).

Defendants contend that Plaintiffs' future plans to purchase the product are "too vague and uncertain to establish a likelihood of imminent harm."  Dkt. 16 at 27.  Plaintiffs allege that "they still wish to purchase protein products" and "would purchase the Premier Protein Products in the future if [] they could be assured that, by the absence of a disclosure, the Premier Protein Products no longer contained unsafe levels of toxic metals, including lead."  Compl. ¶ 117.  This allegation would otherwise be sufficient under *Davidson*, but plaintiffs Krystofiak and Zimmerman must allege what they purchased.  889 F.3d at 969–70; *see also Bland v. Sequel Nat. Ltd.*, 2019 WL 4658361, at *2 (N.D. Cal. Jan. 18, 2019); *Grausz v. Hershey Co.*, 2023 WL 6206449, at *4 (S.D. Cal. Sept. 11, 2023).  Under *Davidson*, a "previously deceived consumer" may have standing. *Davidson*, 889 F.3d at 969.  The Court finds that plaintiffs Krystofiak and Zimmerman must allege what they purchased in order to be previously deceived consumers.  The Court denies the motion as to plaintiff Carreno's standing to pursue injunctive relief, and grants the motion for plaintiffs Krystofiak and Zimmerman, with leave to amend.

**B.     Rule 9(b) Pleading Requirements**

Defendants contend that "Plaintiffs' complaint sounds in fraud [] and must, but fails to, meet the particularity requirement of Rule 9(b)."  Dkt. 16 at 36–37 (citing Fed. R. Civ. P. 9(b)). Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  As stated by the Ninth Circuit, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged."  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).  Defendants contend these pleading requirements apply to Plaintiffs' UCL (fraudulent prong) and intentional misrepresentation claims.  Dkt. 16 at 36.

Here, Defendants manufacture and market the Premier Protein Products.  The alleged class period specified in the complaint is "at least four years preceding filing of this Complaint."  Compl. ¶ 32.  The alleged misrepresentation is the product labeling, including "a healthy snack" and "with nutrients for ENERGY & IMMUNE health support."   Plaintiff Krystofiak points to these representations at paragraph 107 of the complaint; Plaintiff Carreno alleges he relied on claims suggesting the protein powder was healthy at paragraph 108, which the complaint alleges includes the representations in paragraph 41; and plaintiff Zimmerman alleges he purchased the shakes "based on the totality of the products' labeling that they were healthy" (paragraph 109), which includes the representations referred to in the complaint at paragraph 38.  Plaintiffs' allegations have not, however, provided Defendants notice of what Krystofiak and Zimmerman actually purchased.  *Compare Surzyn v. Diamond Foods, Inc.*, 2014 WL 2212216, at *5 (N.D. Cal. May 28, 2014) (finding Rule 9(b) requirements were not satisfied where plaintiff alleged that they "purchased one or more of the Products during the Class Period"), *with Johnson-Jack v. Health-Ade LLC*, 587 F. Supp. 3d 957, 973 (N.D. Cal. 2022) (finding Rule 9(b) was satisfied where a specific flavor was not alleged but the container size was specified).

Defendants' motion to dismiss is granted, with leave to amend, as to Rule 9(b) heightened

pleading requirements for plaintiffs Krystofiak and Zimmerman.  Defendants' motion is denied as to Rule 9(b) for plaintiff Carreno.

### C.    Preemption

Defendants next argue that Plaintiffs' claims are both expressly and implicitly preempted. Dkt. 16 at 33–36; *see Oxygenated Fuels Ass'n Inc. v. Davis*, 331 F.3d 665, 667 (9th Cir. 2003) ("The Supreme Court has recognized three types of preemption: express preemption, field preemption, and conflict preemption" where implied preemption encompasses the latter two). Defendants also contend that Plaintiffs' claims are subject to the FDA's primary jurisdiction. Defendants carry the burden to establish preemption.  *Cohen v. ConAgra Brands, Inc.*, 16 F.4th 1283, 1289 (9th Cir. 2021).  At the pleading stage, Defendants may only successfully assert preemption if "no disputed issues of fact" are raised.  *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1194 (9th Cir. 2018).

### 1.    Express Preemption

Defendants' motion claims express preemption as to two labels in particular: "High Protein" and "healthy."  Dkt. 16 at 35–36.  The Court finds that claims based on the "High Protein" label are expressly preempted by federal law, but not those based on the phrase "healthy snack."

<u>"High Protein"</u>

Plaintiffs concede that a "direct challenge to 'High Protein' would be preempted."  Dkt. 23 at 20.  As Defendants point out, the "FDA's requirement to make a 'High Protein' label statement regarding food can be found at 21 C.F.R. § 101.54."  Dkt. 16 at 35.  The Federal Food, Drug, and Cosmetic Act (FDCA), as amended by the Nutritional Labeling and Education Act of 1990 (NLEA), prohibits any State requirement "made in the label or labeling of food that is not identical to the requirement of section 343(r) of this title."  21 U.S.C. § 343-1(a)(5).

Here, Plaintiffs argue that the "High Protein" label conveys other information (e.g., a "health halo") and that Defendants are thus required to disclose further information.  Dkt. 31 at 8.

Plaintiffs contend that they may "point to the phrase," which under federal regulations "shall be deemed to be misleading if it fails to reveal facts that are: (1) [m]aterial in light of other representations made or suggested by statement, word, design, device or any combination thereof." Dkt. 23 at 20 (citing 21 C.F.R. § 1.21(a)). It appears Plaintiffs seek an additional labeling requirement to accompany a "High Protein" label, based on lead content. Federal law does not require additional information for the "High Protein" label and Plaintiffs point to no authority that states Congress intended such a label to reference the presence or absence of heavy metals such as lead. The Court is not persuaded that lead content is a material fact in light of a "High Protein" label. *See* 21 C.F.R. § 1.21(a). Protein and lead are different, and Plaintiffs draw no reasonable nexus between the two. Defendants cite three cases that find express preemption where the resulting labeling would not be identical to the federal requirement.[3] Dkt. 32 at 7. The same result applies here. Plaintiffs' claims based on "High Protein" are expressly preempted by the NLEA.

 "Healthy Snack"

The term "healthy" may be considered an implied nutrient claim when used in conjunction with a claim about a nutrient. 21 C.F.R. § 101.65(d). Paragraph (d)(1) states:

> (d) General nutritional claims.
>> (1) This paragraph covers labeling claims that are implied nutrient content claims because they:
>> (i) Suggest that a food because of its nutrient content may help consumers maintain healthy dietary practices; and
>> (ii) Are made in connection with an explicit or implicit claim or statement about a nutrient (e.g., "healthy, contains 3 grams of fat").

21 C.F.R. § 101.65(d)(1). The word "healthy" need not be "directly adjacent to the discussion of

---

[3] *Peviani v. Hostess Brands, Inc.*, 750 F. Supp. 2d 1111, 1118 (C.D. Cal. 2010) (finding preemption where plaintiff sought to "enjoin the use of the very term permitted by the NLEA . . ."); *Red v. The Kroger Co.*, 2010 WL 4262037, at *2 (C.D. Cal. Sept. 2, 2010) (finding preemption where the results under state law would not be identical to requirements under the FDCA); *Yumul v. Smart Balance, Inc.*, 2011 WL 1045555, at *8–10 (C.D. Cal. Mar. 14, 2011) (finding claims directed to "No Cholesterol," and "healthy" as an implied nutrient claim, were preempted under the NLEA).

a nutrient to create an implied nutrient content claim," but "there must be connection given the words, their placement, and their context." *LeGrand v. Abbott Lab'ys*, 655 F. Supp. 3d 871, 888 (N.D. Cal. 2023) (quoting *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 571 (N.D. Cal. 2020)). Defendants do not argue that the term "healthy snack" is connected to a nutrient or otherwise provide any support for this product claim being an implied nutrient claim. Here, the label states "enjoy as a healthy snack" but this is not connected to any particular nutrient and thus does not satisfy 21 C.F.R. § 101.65 (d)(1)(ii). Defendants' use of "healthy" is not an implied nutrient claim and is not expressly preempted. *See Red v. Kraft Foods, Inc.*, 754 F. Supp. 2d 1137, 1142 (C.D. Cal. 2010) (recognizing that if claims "are not implied nutrient claims within the regulatory meaning . . . then there would be no obvious argument for express preemption.").

### 2.    Implied Preemption

To the extent Plaintiffs' claims are not expressly preempted, Defendants assert implied preemption based on FDA guidance and judgment. Dkt. 32 at 8. Implied preemption can take the form of field preemption, where federal law exclusively occupies the field, or conflict preemption, where state law actually conflicts with federal law, and may arise even if state law is not explicitly preempted. *Oxygenated Fuels Ass'n Inc. v. Davis*, 331 F.3d 665, 667–68 (9th Cir. 2003). First, regarding field preemption, the NLEA includes a savings clause, stating: "The Nutrition Labeling and Education Act of 1990 shall not be construed to preempt any provision of State law, unless such provision is expressly preempted under section 403A of the Federal Food, Drug, and Cosmetic Act." Nutrition Labeling and Education Act of 1990, Pub. L. No. 101–535, 104 Stat

2353, § 6(c)(1) (21 U.S.C. § 343-1 note).[4]  There is no field preemption here.

To the extent Defendants argue that Plaintiffs' claims are based on food safety, the NLEA addresses safety warnings.  *See* Dkt. 16 at 34–35.  "The amendment made by subsection (a) and the provisions of subsection (b) shall not be construed to apply to any requirement respecting a statement in the labeling of food that provides for a warning concerning the safety of the food or component of the food."  NLEA, PL 101–535, 104 Stat 2353, § 6(c)(2) (21 U.S.C. § 343-1 note). For example, the court in *Sciortino* recognized that "[w]here the safety determination sets only a floor it does not preclude state law causes of action, particularly in view of the presumption against preemption."  *Sciortino v. Pepsico, Inc.*, 108 F. Supp. 3d 780, 802 (N.D. Cal. 2015) (citing *Wyeth*, 555 U.S. at 573–74).  Defendants cite to a number of FDA references, which specify lead levels for various products. Dkt. 32 at 8.  The FDA, however, has not set regulated lead levels for the products at issue, and without such a standard, state law is not preempted.  *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 286, (1995) ("We hold that the absence of a federal standard cannot implicitly extinguish state common law").  Defendants may very well be correct in their analysis of lead levels, but the Court does not weigh evidence nor resolve factual disputes at the pleading stage.  Plaintiffs' claims are not impliedly preempted under the NLEA.

### 3.    FDA Primary Jurisdiction

Defendants next contend that lead regulation in the food supply and product labeling are under FDA's primary jurisdiction and therefore this Court lacks jurisdiction. Dkt. 16 at 33.  Under the primary jurisdiction doctrine, "courts may route the threshold decision as to certain issues to

---

[4] *See Lockwood v. Conagra Foods, Inc.*, 597 F. Supp. 2d 1028, 1032 (N.D. Cal. 2009) ("Thus, Congress has explicitly stated that it does not intend to occupy the field of food and beverage nutritional labeling; instead, it permits states to regulate subject matters covered by the NLEA and its regulations provided that such state laws do not fall within the FDCA's express preemption provisions."); *Sciortino v. Pepsico, Inc.*, 108 F. Supp. 3d 780, 807 (N.D. Cal. 2015) (quoting *Lockwood*, 597 F. Supp. 2d at 1032) ("The NLEA's savings clause reflects that Congress 'disavow[ed] any implied preemption.'").

the agency charged with primary responsibility for governmental supervision or control of the particular industry or activity involved." *United States v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1362 (9th Cir. 1987) (quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 68 (1970)). The primary jurisdiction doctrine is applied when there arises "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." *Id*. Efficiency is the most important factor in the inquiry. *See Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 760 (9th Cir. 2015).

Here, Plaintiffs' claims do not require the expertise of the FDA. *See Jones v. ConAgra Foods, Inc.*, 912 F. Supp. 2d 889, 898–99 (N.D. Cal. 2012) (concluding for deceptive labeling claims, "this case is far less about science than it is about whether a label is misleading"). There are no facts or authority that the FDA is setting lead levels for the products at issue here, nor that any FDA action would address the labels at issue here. *See In re Plum Baby Food Litig.*, 2023 WL 3493319, at *2 (N.D. Cal. May 3, 2023) (differentiating between FDA "action levels" for heavy metals and product labeling). There is no indication that applying the primary jurisdiction doctrine would improve efficiency or even address the representations that are the subject of Plaintiffs' claims. This Court finds that the primary jurisdiction doctrine does not apply here.

### D.     Proposition 65

Defendants characterize Plaintiffs' claims as a Prop 65 action and refer to the general Prop 65 notice requirement as well as a Prop 65 consent judgment. *See Env't Law Found. v. Abbott Lab'ys*, 2014 WL 13065197 (Cal. Super. Ct. Feb. 18, 2014) (hereinafter "consent judgment"). Claims for misrepresentation are distinguishable from failures to warn under Prop 65. *See, e.g., Sciortino*, 108 F. Supp. 3d at 794 (distinguishing between a "misstatement [] related to Proposition 65" and "a failure to warn under Proposition 65"). While Plaintiffs reference Prop 65 MADL

values in the complaint, their claims are based on harms that are different than, or in addition to, Prop 65's focus of carcinogens and reproductive toxins.  *See* Compl. ¶ 110.  The Court is satisfied that Prop 65 requirements don't apply to Plaintiffs' claims.

Second, Defendants contend that the consent judgment sets a higher lead level than the Prop 65 MADL.  Dkt. 16 at 18–20.  The consent judgment is directed to Prop 65 violations rather than misrepresentations unrelated to Prop 65.[5]  The Court finds that neither the Prop 65 notice requirements nor the consent judgment apply.

### E.    California Consumer Protection Claims

Plaintiffs bring claims on behalf of the Nationwide Class California Subclass for misrepresentations and omissions under California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200 et seq.; (2) False Advertising Law (FAL), Cal. Bus. & Prof. Code §§ 17500 et seq.; and (3) Consumer Legal Remedies Act (CLRA), Cal. Bus. & Prof. Code §§ 1750 *et seq*. A claim for fraudulent misrepresentation or omission under these California statutes requires "(1) misrepresentation or omission, (2) reliance, and (3) damages."  *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1081 (N.D. Cal. 2022).  Reliance is required for standing to bring CLRA, FAL, and UCL claims.  *Gagetta v. Walmart, Inc.*, 646 F. Supp. 3d 1164, 1175 (N.D. Cal. 2022).

The misrepresentation or omission requirement under the UCL, FAL, and CLRA is "governed by the 'reasonable consumer' test."  *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (citing *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir.1995)).  The reasonable consumer test requires that a plaintiff show "members of the public are likely to be deceived."  *Freeman*, 68 F.3d at 289 (quoting *Bank of the W. v. Super. Ct.*, 2 Cal. 4th 1254, 1267 (1992)).  A

---

[5] "This Consent Judgment is a final and binding resolution between [the parties] of any violation of Proposition 65 . . . ." *Env't Law Found.*, 2014 WL 13065197 at \*10; *see also Grausz*, 2023 WL 6206449 at \*7 (finding that a consent judgment directed to Prop 65 violations did not foreclose plaintiff's claims under California's consumer protection laws under the doctrine of *res judicata*).

consumer's "unreasonable assumptions" do not support a misrepresentation claim. *See Thomas*, 2022 WL 636637, at *2; *Moore v. Trader Joe's Co.*, 4 F.4th 874, 883 (9th Cir. 2021). The reasonable consumer standard "raises questions of fact that are appropriate for resolution on a motion to dismiss only in "rare situations." *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015) (citing *Williams*, 552 F.3d at 938). Claims that amount to puffery, however, are not actionable under these statutes. *Consumer Advocs. v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1361 (2003).

<u>Alleged Misrepresentations in Protein Shake Labeling</u>

Defendants present two arguments regarding Plaintiff's misrepresentation claims: that consumers are not deceived by the labeling, and that the reasonable consumer knows "that heavy metals are present in food." Dkt. 16 at 27, 30.

A plaintiff need not "demonstrate individualized reliance on specific misrepresentations to satisfy the reliance requirement." *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009). Plaintiffs point to the following labeling for the shakes: "a healthy snack," "HIGH PROTEIN SHAKE," "with nutrients for ENERGY & IMMUNE health support" or "with nutrients for IMMUNE HEALTH support," "NO ARTIFICIAL GROWTH HORMONES used to produce (on some flavors)." Compl. ¶ 38. Notably, however, none of these representations refer to lead or otherwise heavy metals explicitly. The representation regarding growth hormones is not related to lead and conveys only the absence of "artificial growth hormones" and not any other constituent. The Court has already found that "High Protein" is expressly preempted. The remaining representations are "immune health support" and "healthy snack." The immune health claim is more specific than just "healthy snack" alone. *See Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990) ("The common theme that seems to run through cases considering puffery in a variety of contexts is that consumer reliance will be induced by specific rather than general assertions."). Plaintiffs contend that this representation is deceptive because

"the immune system appears to be exquisitely sensitive to lead."  Dkt. 23 at 10 (citing Compl. ¶ 18).  It is reasonable at the pleading stage to assume that a reasonable consumer's decision might draw a connection between the "healthy snack" and "immune health" representations on the label, as both include "health" or a derivative.  At minimum, plaintiff Krystofiak explicitly alleges she relied on this specific representation, and plaintiff Zimmerman alleges reliance on the "totality" which includes the "immune health" representation.  Compl. ¶¶ 107, 109.  Whether or not the reasonable consumer would be deceived is a factual inquiry, unsuitable for resolution at the motion to dismiss stage.  *See Williams*, 552 F.3d at 938–39.

Defendants contend that the alleged lead levels themselves are too low to support a claim. For example, Defendants refer to the "only 1.53 – 4.27 ppb of lead."  Dkt. 24 at 12.  Defendants cite to *Weaver* to discount the proposition that food is 'misleadingly advertised as healthy' because of the 'mere presence of *any* heavy metals.'"  Dkt. 24 at 12 (quoting *Weaver v. Champion Petfoods USA Inc.*, 2019 WL 2774139, at *3 (E.D. Wis. July 1, 2019)).  Plaintiffs here, however, are not basing their claim on "any" level but rather levels as tested by "ISO-accredited laboratories." Compl ¶ 73.  Plaintiffs themselves argue that their claims "turn on whether the challenged labeling statements and omissions are misleading *given the amount of lead* in the Products."  Dkt. 23 at 11 n.2 (emphasis added).  Defendants challenge the use of the Prop 65 MADL and contend that this MADL "is not the threshold at which a particular substance poses a danger to human health." Dkt. 16 at 19.  While such factual determinations are not resolved at the pleading stage,[6] Plaintiffs must plausibly connect the representations of immune health or health(y) to the alleged lead levels they rely on in the complaint.  In short, while the Court does not pick which threshold is correct to apply

---

[6] *See Barnes v. Nat. Organics, Inc.*, 2022 WL 4283779, at *6 (C.D. Cal. Sept. 13, 2022) ("Defendant provides a sampling of calculations to show that Plaintiff's testing results do not violate the relevant NSRLs and MADLs under Proposition 65. Factual challenges are not typically adjudicated at this stage of litigation."); *Grausz*, 2023 WL 6206449 at *7.

at this stage, Plaintiffs must allege what constitutes a high level of lead.

Plaintiffs contend that their claims are not "based on defendants' alleged failure to disclose lead at levels alleged to be in excess of Proposition 65's MADLs," but rather affirmative misrepresentations. Dkt. 23 at 21 (quoting Dkt. 16 at 33). Plaintiffs also argue that their claims are independent of Prop 65. Dkt. 23 at 21. Curiously, Plaintiffs then compare measured lead levels to the Prop 65 MADL to support the proposition that the Products "contain high levels of lead." Compl. ¶¶ 1, 22 n.7, 73. Further, in their opposition, Plaintiffs state that the "healthy" and "immune health" claims are "misleading because the Products *contain levels of lead* that can 'cause anemia, hypertension, renal impairment, immunotoxicity, toxicity to the reproductive organs, type 2 diabetes, and cancer.'" *Id.* (quoting compl. ¶ 18) (emphasis added). The complaint does not actually allege the level associated with these harms, but rather includes citations to reference material in a footnote. Compl. ¶ 18 n.3. While this is Plaintiffs' argument, paragraph 18 does not include a table or other numerical comparison (e.g., as is included in paragraph 73) to show that the measured lead values exceed some relevant threshold or range that is "independent of Prop 65." It is unclear whether Plaintiffs' allegations are merely conclusory or if the measured values support this conclusion. For example, paragraphs 17, 18, and 20 of the complaint refer to "high levels of exposure," "lower levels of exposure," and "extremely low levels." The complaint does not allege how the measured values in paragraph 73 compare to these thresholds, or how these thresholds compare to the MADL. If the complaint was "stripped of any reference" to Prop 65, the shortcoming would remain. Dkt. 23 at 22 (quoting *Bland*, 2019 WL 4658361 at *4). And because Plaintiffs' compare the measured values to the Prop 65 MADL, which itself is not alleged as connected to any other threshold, no reasonable inference can be drawn. At minimum, Plaintiffs must clearly allege why the level of lead is deceptive. Otherwise, a conclusory allegation that lead content, measured at *any* level (e.g., even well below the MADL), is "low" or "high" could support a claim, which could produce a "preposterous" result. *See Weaver*, 2019 WL 2774139 at *3. As

an example, using the World Health Organization's declaration that there is no safe lead level as a reference is too conclusory and would render FDA guidance moot in all circumstances, rendering literally *any* alleged level of lead actionable.  Compl. ¶ 21.  If the threshold happens to be the MADL even for non-Prop 65 claims, that allegation is not clear from the complaint.

Plaintiffs have not stated a plausible claim for misrepresentation based on the labeling of the protein shakes.  Because the same alleged conduct underpins the unlawful and unfair prongs of the UCL claim, the Court finds these theories also to be insufficiently pleaded.

<u>Alleged Misrepresentation in Protein Powder Labeling</u>

Plaintiffs point to the following labeling for the powders: "plant protein," "packed with plant protein," "plant based," "plant-based protein," "a powerful nutrition boost," "High Protein," and "NO DAIRY OR SOY INGREDIENTS, GLUTEN FREE, LACTOSE FREE."  *Id.* ¶ 41. Similar to the shakes, none of the representations on the powder product labels directly refers to lead or heavy metals.  Unlike the shakes, the powder labeling contains no reference to immune health or health(y).  The "plant" references are not alleged as being false, and do not reasonably convey information to a consumer about lead content.  Plant protein is objective and refers to the source of a specific nutrient of interest to the consumer of the product — protein.  The same reasoning applies to the "NO DAIRY OR SOY INGREDIENTS, GLUTEN FREE, LACTOSE FREE" labeling for those respective constituents.[7]  Here, Plaintiffs have not sufficiently alleged that such representations regarding dairy, gluten, soy, or lactose have any bearing on lead content.

The remaining representation relied on by Plaintiffs is "a powerful nutrition boost."  This

---

[7] *See Lam v. Gen. Mills, Inc.*, 859 F. Supp. 2d 1097, 1103–04 (N.D. Cal. 2012) ("The Court finds that the statement 'gluten free' cannot support Plaintiff's claims under the UCL, CLRA, or FAL. The statement is objectively true and communicates nothing more than the absence of gluten in the product . . . A reasonable consumer is unlikely to interpret the statement "gluten free" to mean that the Fruit Snacks contain no partially hydrogenated oils, low amounts of sugar or corn-syrup, or that the Fruit Snacks are otherwise healthful.").

representation does not stand alone but rather is the last phrase of a paragraph on the labeling. Compl. ¶ 42 (left hand image). The paragraph generally discusses the properties and uses of the product. The paragraph does not, however, reference lead or health, and instead appears to focus on the protein content. The "powerful nutrition boost" appears to describe protein, and there is no plausible basis to assume that a consumer purchasing the product for its claims of plant protein would infer a lead content of the product or otherwise be deceived in terms of lead content. Plaintiffs argue that statements regarding the protein source somehow convey information about lead level. Plaintiffs, however, have not sufficiently alleged any connection between protein source and lead. The Court is not persuaded that there is a plausible claim here, as currently pleaded.

Additionally, phrases such as "packed with plant protein" are too general to support a claim here; Plaintiffs claims are unrelated to plants, protein, or plant protein. *See Forrett v. Gourmet Nut, Inc.*, 634 F. Supp. 3d 761, 765 (N.D. Cal. 2022) (granting dismissal for claims based on the representation "Protein Packed" for trail mix, where the plaintiff's claims were directed to the product's protein content). The Court additionally finds that the phrase "powerful nutrition boost" is puffery, which is "precisely the type of generalized boasting upon which no reasonable buyer would rely." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997). This phrase includes an adjective that is hard to quantify, amounting to "generalized, vague, and unspecified assertions." *See Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1084 (N.D. Cal. 2017) (quoting *Anunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133, 1139 (C.D. Cal. 2005). Defendants motion is granted as to the California consumer protection claims for the powders, with leave to amend.

<u>Alleged Omissions in Labeling</u>

Defendants challenge Plaintiff's omission theory and also argue that Plaintiffs have abandoned the omission theory. *See* dkt. 24 at 7. An omissions claim requires either the omission

be (i) contrary to an actual representation or (ii) of a fact for which the defendant had a duty to disclose. *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 861 (9th Cir. 2018).  Plaintiffs differentiate their claims from a "pure omissions theory" because they challenge "affirmative statements."  Dkt. 23 at 18 n.3.

Regarding the first prong, Plaintiffs contend that "Defendants misrepresented the healthfulness of the Products through affirmative misrepresentations" and that those claims "do not depend on Proposition 65 or *any* duty to warn."  Dkt. 23 at 23.  Defendants argue that Plaintiffs have abandoned their omission theory.  Dkt. 24 at 7.  As discussed above, Plaintiffs must allege more to establish an omission contrary to actual representations made in connection with the Products.

As to the second prong, Plaintiffs refer generally to a duty independent of Prop 65 but do not sufficiently allege any basis for that duty based on the measured lead levels and alleged misrepresentations regarding health.   As Plaintiffs note, their claims "turn on whether the challenged labeling statements and omissions are misleading *given the amount of lead* in the Products."  Dkt. 23 at 11 n.2 (emphasis added).  As previously discussed, Plaintiff must allege the connection between the alleged amount of lead in the Products and the representations on the Products.  Plaintiffs have failed to establish Defendants' duty to disclose as a basis for the omission theory.

Defendants' motion is granted as to the omission theory, with leave to amend.

### F.    Express Warranty Claim

Plaintiffs advance a claim for breach of express warranty under California Commercial Code § 2313(1), on behalf of the Nationwide Class California Subclass.  Section 2313 states that express warranties arise from "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" and "[a]ny description of the goods which is made part of the basis of the bargain creates."  Cal. Com. Code §§ 2313(1)(a),

2313(1)(b).  A breach of express warranty claim requires: "(1) the seller's statements constitute an affirmation of fact or promise or a description of the goods; (2) the statement was part of the basis of the bargain; and (3) the warranty was breached." *DiGiacinto v. RB Health (US) LLC*, 668 F. Supp. 3d 950, 966 (N.D. Cal. 2023) (citing *Weinstat v. Dentsply Int'l., Inc.*, 180 Cal. App. 4th 1213, 1227 (2010)).  Plaintiffs refer to three representations in their complaint: "healthy snack," "IMMUNE health support" or "IMMUNE HEALTH support," and "a powerful nutrition boost." Compl. ¶ 160.

Regarding the protein shakes, the Court finds that the allegations cannot support a breach of express warranty claim for the same reasons they cannot support a claim under California consumer protection laws.  Also, plaintiff Krystofiak alleges reliance on the representation immune health support, but no specific representation is alleged for plaintiff Zimmerman.  Compl. ¶¶ 107, 108.  Paragraph 161 merely provides a general statement of "reasonable reliance" without specifying who relied on what, which is also insufficient to state a claim.  Regarding the powders, the Court finds that none of the representations can support an express warranty claim.  For example, representations including "plant" or directed to "protein" do not make any promise to the consumer about lead.  *Cf. Forrett*, 634 F. Supp. 3d at 766–67 (finding that the representation "protein packed" did not establish a warranty "that the Products contained an excellent source of protein").  Here, lead content is even further attenuated from such representations regarding protein than the claims directed generally to the actual protein content in *Forrett*.  Defendants' motion is granted as to the express warranty claim, with leave to amend.

### G.    Implied Warranty of Merchantability Claim

Defendants contend that plaintiffs have failed to allege privity, and also that Plaintiffs failed to allege the Products are "defective or not fit for the ordinary purpose for which the products are used."  Dkt. 16 at 36.  California's implied warranty of merchantability requires that goods "[p]ass without objection in the trade under the contract description," "[a]re fit for the ordinary

purposes for which such goods are used" and "[c]onform to the promises or affirmations of fact made on the container or label if any."  Cal. Com. Code § 2314.  While generally "a plaintiff asserting breach of warranty claims must stand in vertical contractual privity with the defendant," an exception applies to "foodstuffs."  *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) (citations omitted).

Plaintiffs' conclusory allegations the Products are "unsafe" and "would not pass without objection in the trade or industry" do not state a plausible implied warranty claim.  Compl. ¶ 170; *see Grausz*, 2023 WL 6206449 at *11 (granting a motion to dismiss for lack of facts showing the products at issue differed from "safe" products).  Without more, the Court is not persuaded that the Products are any different from other products in the market or would otherwise be objected to in the trade or industry.

The Products here are foodstuffs, and the ordinary purpose of the Products is to be consumed.  *See Rodriguez v. Mondelez Global LLC*, No. 3:23-cv-00057-DMS-AHG, Dkt. 23 at 22 (S.D. Cal. Nov. 22, 2023).  Plaintiffs can support their claim by alleging "the product lacks 'even the most basic degree of fitness for ordinary use.'"  *Birdsong v. Apple, Inc.*, 590 F.3d 955, 958 (9th Cir. 2009) (quoting *Mocek v. Alfa Leisure, Inc.*, 114 Cal.App.4th 402, 406 (Cal.Ct.App.2003)).  For "human food" products, for example, Plaintiffs can allege "that the product was unsafe for consumption, contaminated, or contained foreign objects."  *Barnes*, 2022 WL 4283779, at *8 (citing *Thomas v. Costco Wholesale Corp.*, 2014 WL 5872808, at *3 (N.D. Cal. Nov. 12, 2014)).  Plaintiffs' conclusory allegations the Products are "unsafe" and were "not fit for the ordinary purpose for which they are used" do not state a plausible implied warranty claim.  Compl. ¶ 170; *see Grausz*, 2023 WL 6206449, at *11 (granting a motion to dismiss for lack of facts showing the products at issue differed from "safe" products).  Again, without more, the Court does not find the Products were unfit for consumption.

Lastly, Plaintiffs contend that "in the sale, marketing, and promotion of the Premier Protein

Products bearing statements 'healthy snack,' 'immune health support,' or 'a powerful nutrition boost' [Defendants] made representations, that [] the Premier Protein Products are healthy, including for the immune system."  Compl. ¶ 166.  As discussed in the context of the California consumer protection claims and express warranty claim, plaintiffs have not sufficiently alleged facts to support a claim based on these representations.  Defendants' motion is granted as to the implied warranty claim, with leave to amend.

### H.      Claims under New York Law

New York law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York state.  N.Y. Gen. Bus. Law § 349(a).  Additionally, Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in New York state.  N.Y. Gen. Bus. Law § 350.  The Court has already considered Plaintiffs' allegations of deception.  For those same reasons, the motion is granted as to claims under New York Law, with leave to amend.

### I.       Negligent Misrepresentation

The Court has already considered Plaintiffs' allegations of deception and found they have not stated a plausible claim.  This extends to Plaintiffs' negligent misrepresentation claim as well.  Defendants additionally argue that a claim for negligent misrepresentation under New York law requires a special relationship between the parties.  Dkt. 16 at 37.  In New York, such a claim requires "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information."  *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 474 (E.D.N.Y. 2013) (citing *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 910 F. Supp. 2d 543, 546 (S.D.N.Y. 2012)).  For a commercial transaction, such as is implicated by the facts here, Plaintiffs must sufficiently plead "justifiable reliance."  *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 623 (S.D.N.Y. 2011), *aff'd*, 478 F. App'x 679 (2d

Cir. 2012).

Plaintiffs cite to *Kimmel* regarding justifiable reliance based on the relationship, which is a factual inquiry determined by considering "[1] whether the person making the representation held or appeared to hold unique or special expertise; [2] whether a special relationship of trust or confidence existed between the parties; and [3] whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (1996).  If a special relationship is insufficiently alleged, then Plaintiffs must "emphatically allege" the first and third factors. *Greene v. Gerber Prod. Co.*, 262 F. Supp. 3d 38, 75 (E.D.N.Y. 2017) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 188 (2d Cir. 2004)).  Plaintiffs contend they have alleged facts sufficient for all three factors.  Plaintiffs cite *Hughes* (concerning vitamin products) and *Greene* (concerning infant formula) where respective negligent misrepresentation claims were allowed to proceed.  Dkt. 23 at 30–31.  Defendants distinguish the facts of *Hughes* and *Greene* from those here, on the basis that the representations in those cases involved either "clinical research" or "specific scientific information."  Dkt. 24 at 19.  Defendants also cite to *Colpitts*, wherein that district court dismissed a negligent misrepresentation claim based on a lack factual support that the defendant had "unique and special knowledge of which a regular consumer would be unaware." *Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 588 (S.D.N.Y. 2021).

Here, Plaintiffs refer to statements from Premier's website to establish that Defendants "hold themselves out as having expertise in health and specialized knowledge regarding the impact of consuming the Products."  Dkt. 23 at 30; *see* compl. ¶¶ 47, 49, 67, 93.  For example, Plaintiffs refer to advice from "Dr. Applegate" and the representation that "[t]he team at Premier Nutrition is dedicated to researching and developing a variety of products."  Compl. ¶ 49.  While some of the representations are directed to protein, some of the representations are directed to nutritional needs and the products as part of a diet to "stay healthy."  The fact that "Dr. Applegate" provides

the advice lends more scientific or specialized gravitas to these claims.  Further, the Premier's social media page is alleged to represent that "the team at Premier Nutrition is dedicated to researching and developing a variety of products with exceptional nutritional values." *Id*.  This representation does convey a level of scientific knowledge to consumers as to the nutritional composition of Defendants' products and how the products fit into a healthy diet or lifestyle. Plaintiffs' claims are directed to such representations of "healthy" and "immune health support" and how the presence of lead in the products may render these claims misleading.  Regarding the third factor, whether Premier "was aware of the use to which the information would be put and supplied it for that purpose," Plaintiffs' allegations are insufficient as to the representations being related to lead.  *Kimmell*, 89 N.Y.2d at 264.  Lastly, Plaintiffs have not alleged that they relied on or viewed the representations by "Dr. Applegate" or the representation regarding "researching and developing" in making their purchases.  For these reasons, Defendants' motion to dismiss is granted as to the negligent misrepresentation claim to the extent it arises under New York law, with leave to amend.

### J.        Intentional Misrepresentation

Defendants move to dismiss Plaintiffs' intentional misrepresentation claim for the same reasons as the California consumer protection claims, as well as a failure to plead with particularity.  Dkt. 16 at 2.  These issues have already been addressed herein, and accordingly Defendants' motion is granted as to the intentional misrepresentation claim, with leave to amend.

### K.        Unjust Enrichment and Equitable Relief

Plaintiffs bring an unjust enrichment claim on behalf of the Nationwide Class.  There is some uncertainty among California courts as to whether unjust enrichment is recognized under

California law.  *See ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016).[8]

However, the Ninth Circuit has clarified that "this Circuit has construed the common law to allow

an unjust enrichment cause of action through quasi-contract."  *Id*.  Unjust enrichment claims are

construed as quasi-contract claims, seeking restitution for benefits conferred "through mistake,

fraud, coercion, or request."  *Astiana*, 783 F.3d at 762 (quoting 55 Cal. Jur. 3d Restitution § 2).  A

"quasi-contract" claim requires that Plaintiffs show Defendants "received and unjustly retained a

benefit at Plaintiffs' expense."  *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir.

2016).  This Court will not categorically reject a stand-alone "quasi-contract" claim.

Here, Plaintiffs purchased Defendants' products, and allege "[i]it would be inequitable,

unconscionable, and unjust for Defendants to be permitted to retain these economic benefits

because the benefits were procured as a direct and proximate result of their wrongful conduct."

Compl. ¶ 205.  The purchase conferred a benefit to Defendants and the inequitable prong of

Plaintiffs' claim is based on the same conduct as the California consumer protection claims, which

the Court found are insufficiently plead.  Accordingly, the Court grants Defendants' motion as to

the unjust enrichment claim for those same reasons, with leave to amend.

Defendants also contend that "[a]ll equitable claims must [] be dismissed because Plaintiffs

fail to plead that they lack an adequate remedy at law."  Dkt. 16 at 37 (citing *Sonner v. Premier*

*Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020)).  While equitable relief requires there be

inadequate legal remedy, Plaintiffs are pursuing claims of varying scope and have alleged so in

---

[8] *Compare Bruton v. Gerber Prod. Co.*, 703 F. App'x 468, 470 (9th Cir. 2017) (reversing a
dismissal based on unjust enrichment not being a standalone cause of action, for an insurance
dispute); *Hart v. TWC Prod. & Tech. LLC*, 526 F. Supp. 3d 592, 605 (N.D. Cal. 2021)
(recognizing an unjust enrichment cause of action); *LeGrand v. Abbott Lab'ys*, 655 F. Supp. 3d
871, 898 (N.D. Cal. 2023) (recognizing an unjust enrichment cause of action); *Grausz*, 2023 WL
6206449 at *8 (recognizing an unjust enrichment cause of action); *with Baiul-Farina v. Lemire*,
804 F. App'x 533, 537 (9th Cir. 2020) (finding unjust enrichment is not a cause of action).  The
California Supreme Court has recognized an independent unjust enrichment claim in an
insurance case.  *Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal. 4th 988, 998 (2015).

the complaint.  *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020); Compl. ¶¶ 141, 150.  Damages are available under CLRA but not the UCL or FAL.  *Nacarino v. KSF Acquisition Corp.*, 642 F. Supp. 3d 1074, 1082 (N.D. Cal. 2022).  The UCL and FAL provide for "injunctive relief and restitution."  *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 130 (2009).  The "unfair" prong of the UCL applies more broadly than the CLRA.  Compl. ¶ 141; *Allen v. Hylands, Inc.*, 773 F. App'x 870, 874 (9th Cir. 2019).  The "unfair" prong may also apply to other conduct not covered by the fraudulent or unlawful prongs, and for which there is no remedy under the CLRA.  Plaintiffs are not merely pleading alternative forms of relief but rather that equitable relief may apply to conduct for which damages are not available.  *See Colucci v. ZonePerfect Nutrition Co.*, 2012 WL 6737800, at *10 (N.D. Cal. Dec. 28, 2012); *Goldstein v. Gen. Motors LLC*, 517 F. Supp. 3d 1076, 1095 (S.D. Cal. 2021).  The Court is persuaded that Plaintiffs' claims for equitable relief, including injunctive relief, should not be categorically dismissed as alternative relief.[9]  If Plaintiffs choose to amend their claims sufficient to survive dismissal, then Plaintiffs may be entitled to equitable relief.  Defendants' motion is granted as to Plaintiffs' claims for equitable relief, with leave to amend.

### L.    Request for Judicial Notice

Defendants request the Court take judicial notice of records referenced in footnotes 1, 2, 3, 5, 6, 8–10, 14, 16–18, 20–24, 26, 39, and 40 of the motion.  Dkt. 16 at 24.  In resolving a motion to dismiss, the Court may consider evidence if "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion."  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).  If the Court takes judicial notice, such documents are assumed true in resolving the motion to dismiss.  *Id.*

---

[9] This does not mean that Plaintiffs will be able to recover under both theories for the same harm. *Colucci v. ZonePerfect Nutrition Co.*, 2012 WL 6737800, at *10 (N.D. Cal. Dec. 28, 2012); *Riordan v. W. Digital Corp.*, 2023 WL 6462857, at *10 (N.D. Cal. Sept. 29, 2023).

Footnotes 1, 2, 3, 5, 6, 8–10, 14, and 16–18 correspond to FDA webpages and links to those webpages.  Footnotes 20, 21, and 40 correspond to OEHHA webpages and links to those webpages.  Footnote 39 corresponds to 60-day notice of intent to sue issued to the Defendants by Plaintiffs' counsel in a Prop 65 action involving different plaintiffs, as included on the State of California Department of Justice website.  The Court may take judicial notice of "undisputed and publicly available information displayed on government websites." *King v. Cnty. of Los Angeles*, 885 F.3d 548, 555 (9th Cir. 2018).  Under Rule 201, a court may take judicial notice of facts that are "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.  This includes "matters of public record." *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).  The Court takes judicial notice of the existence of the FDA webpages, OEHHA webpages, and the 60-day notice, but not the facts asserted within them nor does the Court rely on them in resolving the pending motion to dismiss.  *See Gagetta*, 646 F. Supp. 3d at 1171–72.

Footnote 23 refers to the Consent Judgment in *Environmental Law Foundation v. Abbott Laboratories*, 2014 WL 13065197, at *1, *10 (Cal. Super. Ct. Feb. 18, 2014).  The Consent Judgment has "direct relation to [the] matters at issue" and this Court takes judicial notice.  *See U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (citation omitted).  Similarly, footnotes 22, 24, and 26 refer to proceedings in other courts that are related to matters at issue, and the Court takes judicial notice of those materials.

## IV.    CONCLUSION

The Court denies the motion as to plaintiff Carreno regarding Article III standing and Rule 9(b) requirements, and grants Defendants' motion to dismiss as to plaintiffs Krystofiak and Zimmerman for lack of Article III standing and failure to satisfy Rule 9(b) requirements, with leave to amend.

The Court denies the motion as to Prop 65 requirements and the consent judgment.

The Court grants Defendants' motion as to express preemption based on the "High Protein" representation.  The Court denies the motion as to express preemption for the "healthy snack" representation.   The Court denies the motion as to implied preemption and FDA primary jurisdiction.

The Court grants Defendants' motion to dismiss as to Plaintiffs' claims under California and New York law, express and implied warranty claims, negligent misrepresentation claim, intentional misrepresentation claim, and claims for unjust enrichment and equitable relief, for the reasons discussed, with leave to amend.

The Court grants Defendants' request for judicial notice for the reasons stated herein.

The amended complaint is due by July 5, 2024.

**IT IS SO ORDERED.**

Dated: June 14, 2024

Alex G. Tse
United States Magistrate Judge