**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD (SBN 257370)
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE (SBN 275423)
*mmonroe@fmfpc.com*
TREVOR FLYNN (SBN 253362)
*tflynn@fmfpc.com*
PETER GRAZUL (SBN 342735)
*pgrazul@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Counsel for Plaintiffs***

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PATRICIA KRYSTOFIAK, LUIS CARRENO, and JONATHAN ZIMMERMAN, on behalf of themselves, all others similarly situated, and the general public,<br><br>          Plaintiffs,<br><br>    v.<br><br>BELLRING BRANDS, INC. and PREMIER NUTRITION COMPANY, LLC,<br><br>          Defendants. | Case No: 3:23-cv-02819-AGT<br><br><u>CLASS ACTION</u><br><br>**FIRST AMENDED COMPLAINT FOR CONSUMER FRAUD; BREACH OF WARRANTY; NEGLIGENT & INTENTIONAL MISREPRESENTATION; AND UNJUST ENRICHMENT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiffs PATRICIA KRYSTOFIAK, LUIS CARRENO, and JONATHAN ZIMMERMAN, on behalf of themselves, all others similarly situated, and the general public, by and through their undersigned counsel, hereby bring this First Amended Complaint against Defendants BELLRING BRANDS, INC. ("BellRing") and PREMIER NUTRITION COMPANY, LLC ("Premier"), and allege the following upon their own knowledge, or where they lack personal knowledge, upon information and belief, including the investigation of their counsel.

## INTRODUCTION

1.      BellRing and Premier market and sell ready-to-drink protein shakes under the brand name "Premier Protein." Unfortunately for Plaintiffs and other purchasers, testing conducted by multiple independent, ISO-accredited laboratories in April, May, and June 2023 demonstrates that certain flavors of Defendants' Premier Protein Shakes[1] (together, the "Premier Shakes") contain high levels of lead resulting in foods that are not healthy, but rather detriment health, including contributing to increasing the risk of cancer and reproductive toxicity.

2.      Lead is toxic to humans and has been identified by government regulators as a health risk, including being listed among other substances on California's Proposition 65 list.[2]  Exposure to lead during pregnancy can affect brain development and cause learning and behavior problems for the child.[3] Exposure to lead can also harm the reproductive systems of men and women.[4] Exposure to lead can also cause cancer.[5]

3.      Despite these health risks, Defendants label the products with health and wellness claims and do not disclose the presence of lead in the Premier Shakes on the labels (or elsewhere).

4.      Defendants could have, but failed to take effective steps to limit or remove the lead in the Premier Shakes.

5.      Nor is this Defendants' first major problem with the Premier Protein brand. In August 2022, they initiated a major recall after several lots of Premier products were identified as spoiled and

---

[1] Including Chocolate, Vanilla, Caramel, and Café Latte flavors.

[2] https://www.p65warnings.ca.gov/fact-sheets/lead-and-lead-compounds.

[3] *Id.*

[4] *Id.*

[5] *Id.*

contaminated with microbial organisms that could cause severe food poisoning and botulism. Defendants thus well understand the risks of relying on outside suppliers and manufacturers beyond their control. Defendants could have made the Premier Protein brand safer by ensuring better manufacturing processes, bringing the products' manufacture in-house, and/or putting in place systems to ensure a high level of quality control that would drastically reduce the risk that the products become contaminated or adulterated, whether with microbes or heavy metals. But Defendants put profits over people, continuing to rely on suppliers and third-party manufacturers for the Premier Shakes, rather than spend the money needed to make the brand safe.

6.      In short, Defendants are at least partly responsible for the lead being present in the Premier Shakes, and are certainly responsible for the *levels* at which it is present in them.

7.      Because consumers who purchased the Premier Shakes were injured by Defendants' affirmative misrepresentations, acts, and deceptive omissions concerning the presence of lead in the Premier Shakes, Plaintiffs bring this action against Defendants on behalf of themselves, similarly-situated Class Members, and the general public to enjoin Defendants from deceptively marketing the Premier Shakes in this manner and to recover compensation for injured Class Members.

## JURISDICTION & VENUE

8.      This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from at least one Defendant. In addition, more than two-thirds of the members of the class reside in states other than the state in which Defendants are citizens and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

9.      The Court has personal jurisdiction over Defendants as a result of their substantial, continuous and systematic contacts with the State, and because Defendants have purposely availed themselves of the benefits and privileges of conducting business activities within the State, including by marketing, distributing, and selling the Premier Shakes in California. Moreover, Defendant Premier is headquartered and has its principal place of business in California.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10.    Venue is proper in this Northern District of California pursuant to 28 U.S.C. § 1391(b) and (c), because Defendants reside (*i.e.*, are subject to personal jurisdiction) in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district. Moreover, Defendant Premier resides in this district.

## INTRADISTIRICT ASSIGNMENT

11.    Pursuant to N.D. Cal. Civ. L.R. 3-2(c), (d) & 3-5(b), this action is properly assigned to either the San Francisco or Oakland division because a substantial part of the events and omissions which give rise to the claims occurred in Alameda County.

## PARTIES

12.    Plaintiff Patricia Krystofiak is a citizen of California and is domiciled in, and is a resident of, San Diego County, California.

13.    Plaintiff Luis Carreno is a citizen of California and is domiciled in, and is a resident of, San Diego County, California

14.    Plaintiff Jonathan Zimmerman is a citizen of New York and is domiciled in, and is a resident of, Nassau County, New York.

15.    Defendant BellRing Brands, Inc. is a Delaware corporation with its principal place of business in St. Louis, Missouri.

16.    Defendant Premier Nutrition Company, LLC is a Delaware limited liability corporation with its principal place of business in Emeryville, California.

## FACTS

I.    **LEAD CONSUMPTION IS HARMFUL TO HUMAN HEALTH**

17.    Lead is a heavy metal found in the Earth's crust. It has no positive physiological role in the human body, but its harmful effects are manifold. At the cellular level, "heavy metals, including lead, create reactive radicals which damage cell structures, including DNA and cell membrane."[6] For humans, lead is a

---

[6] "Lead" in Kosnett M.J. et al., Poisoning and Drug Overdose, McGraw Hill Professional (5th ed. 2006).

cumulative toxicant that negatively affects multiple body systems, including the neurological, hematological, gastrointestinal, cardiovascular, immune, and renal systems.[7]

18.    Even when lead exposure is not severe or obvious, its effects are pernicious. At lower levels of exposure, lead produces a spectrum of injuries across multiple body systems. For example, it can affect children's brain development, resulting in lower IQ, and can cause behavioral changes such as reduced attention span, increased antisocial behavior, and reduced educational attainment. Lead exposure can also cause anemia, hypertension, renal impairment, immunotoxicity, toxicity to the reproductive organs, type 2 diabetes, and cancer. The damaging neurological and behavioral effects of lead are believed to be irreversible. Particularly relevant here:

> Metal toxicants which affect the immune system may contribute to an increased incidence of autoimmune diseases, infectious diseases and cancer. In the recent past, there has been a growing concern among health and environmental scientists on the impact of environmental exposure to heavy metal lead on human health. In some instances *the immune system appears to be exquisitely sensitive to the toxic heavy metal lead as compared to other toxicological parameters*.[8]

19.    Lead in the body is distributed to the brain, liver, kidneys and bones, and stored in the teeth and bones, where it accumulates over time. In times of stress, however, "the body can mobilize lead stores, thereby increasing the level of lead in the blood."[9] For example, lead that has accumulated in the bones is released into blood during pregnancy, exposing the fetus to lead.

20.    Its ability to accumulate in the body and lie in wait to be released into the blood without control and at unexpected times, makes lead particularly dangerous. Moreover, because lead accumulates in the body with repeated exposure, even "extremely low" levels of consistent lead exposure can, for

---

[7] World Health Organization, "Exposure to Lead: A Major Public Health Concern" (2d ed. 2021), *available at* https://www.who.int/publications/i/item/9789240037656.

[8] Mishra, K.P., "Lead exposure and its impact on immune system: a review," TOXICOLOGY, Vol. 23, No. 6, at 969-72 (Sept. 2009) (emphasis added); *see also* Pukanha, K. et al., "The Immunotoxicity of Chronic Exposure to High Levels of Lead: An Ex Vivo Investigation," TOXICS, Vol. 8, No. 3, at 56 (July 2020) (Concluding that "chronic high Pb exposure may cause a shift toward humoral immune response, together with a suppression of cellular immunity, thereby suggesting an elevation in cancer risk of Pb-exposed workers.").

[9] Centers for Disease Control and Prevention, "What is the Biological Fate of Lead in the Body?" (June 12, 2019), https://www.atsdr.cdc.gov/csem/leadtoxicity/biologic_fate.html.

*Krystofiak v. BellRing Brands, Inc.*, Case No: 3:23-cv-02819-AGT
FIRST AMENDED COMPLAINT

example, "reduce the cognitive capacity of children."[10] Moreover, as lead exposure increases, the range and severity of symptoms and effects also increase.

21.   As a result, the World Health Organization has declared that "There is no level of exposure to lead that is known to be without harmful effects," and "There is no known safe blood lead concentration."[11]

22.   Moreover, pursuant to Proposition 65, and in the interest of helping consumers avoid reproductive system disorders and cancer, the state of California has promulgated thresholds for lead exposure, including a maximum allowable dose level (MADL) for lead of just 0.5 µg (micrograms, sometimes expressed mcg) per day.[12]

23.   With respect to cancer, according to the body of science relied upon by California Office of Environmental Health Hazard Assessment (OEHHA) "[p]otency estimates . . . derived from data on tumor incidence after oral exposure of rats to lead[,]  . . . the intake level associated with lifetime cancer risk . . . is 15 µg /day."

24.   That is, oral exposure to just 15 µg of lead per day, creates a "significant risk level" for lifetime cancer. One single Premier Shake contains up to 1.39 µg of lead, or about 9.3% of this limit.[13] Thus, even a single drink cannot reasonably be characterized as healthy. Instead, reasonable consumers would rightly be concerned given the significant contribution of these drinks to their daily safe limit.

25.   Moreover, Defendants encourage consumers to drink multiple Premier Shakes per day, *see infra* at III(d), compounding the risk created by the lead levels in the Premier Shakes.

---

[10] Needleman H.L., et al., "The longterm effects of exposure to low doses of lead in childhood—An 11-year follow-up report," N.E.J. MED., Vol. 322 at 83-88 (1990).

[11] World Health Organization, "Lead Poisoning" (Aug. 31, 2022), *available at* https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health.

[12] Although Plaintiffs note this to help demonstrate the high amount of lead in the Premier Protein Products, Plaintiffs do not bring any claims based on Defendants' violation of California's Proposition 65.

[13] *NO SIGNIFICANT RISK LEVELS (NSRLs) FOR THE PROPOSITION 65 CARCINOGENS LEAD AND LEAD COMPOUNDS (ORAL)*, Reproductive and Cancer Hazard Assessment Section Office of Environmental Health Hazard Assessment (OEHHA) California Environmental Protection Agency (June 2021) ("OEHHA Lead Report"), *available at* https://oehha.ca.gov/media/downloads/crnr/leadoralnsrl.pdf

## II.    REASONABLE CONSUMERS DO NOT EXPECT LEAD IN THE PRODUCTS

26.    Given the negative effects of toxic lead, including at the levels found in the Premier Shakes, consumption of the Premier Shakes poses a health risk to consumers. That lead is present is also material to reasonable consumers, including Plaintiffs and members of the Class.

27.    As a household name, Premier Protein has earned significant public trust and confidence from consumers that its foods are safe and fit for regular consumption.

28.    Premier Protein holds itself out as worthy of that trust and has specifically held itself out as making premium protein supplement products. For example, on the Premier Protein website, Defendants state "We Want To Change What It Means To Live A Healthy Lifestyle By Making Everyone's Road To Better, Better."[14]

29.    Defendants knew that if, instead of boasting to the public about how healthy consuming the Premier Shakes is, they revealed to the public the presence of lead in the Premier Shakes, Plaintiffs and the Class Members would be unwilling to purchase the Premier Shakes or would pay less for them.

30.    Understanding consumers would be unwilling to purchase the Premier Shakes or would pay less for the Premier Shakes if they knew that the Premier Shakes contained lead in the amounts they do, Defendants concealed this fact from Plaintiffs and the Class Members and did not disclose the presence of lead on the Premier Shakes' labels, including in the ingredient lists.

31.    Defendants knew or should have known that Plaintiffs and the Class members would rely upon the packages of the Premier Shakes and intended for them to do so but failed to disclose the presence of lead. That is, the consumer-facing messages on the Premier Shakes' packaging that Defendants chose failed to make any reference to lead. Indeed, nowhere on the Premier Shakes' packaging is there any disclosure of the inclusion (or even possible inclusion) of lead.

32.    Additionally, Defendants knew or should have been aware that a reasonable consumer would consume the Premier Shakes regularly, leading to repeated exposure to lead, which accumulates in the body and its systems over time, exacerbating the negative effects over time, even if each individual exposure is "low." This is especially true since Defendants suggest consumers consume *more* than one shake per day,

---

[14] *See* https://www.premierprotein.com/about-us.

for instance including a "Recommended Usage" of "1-2 Premier Protein High Protein Shakes **daily**," *see, infra,* at III(d). Thus, the cumulative effect of consuming the Premier Shakes multiple times renders the amount of lead unreasonably dangerous, and at the very least reasonably concerning to consumers.

33.    Defendants knew or should have known they could control the levels of lead in the Premier Shakes by properly monitoring for heavy metal presence, sourcing ingredients with less heavy metals, or none at all, adjusting the Shakes' formulation to reduce or eliminate heavy metals, or improving their manufacturing process to eliminate introduction of lead caused by Defendants themselves. According to experts who conducted extensive testing on many different consumer products, including protein foods, many of them contain heavy metals (including lead), "link[ed] to cancer and other health conditions."[15] These same experts determined that, because "[n]ot all of the protein powders that were tested contained elevated levels of toxins," the problem is not global to protein powders *per se*, but rather lies with the "manufacturing processes" and from sourcing ingredients grown in soil contaminated with lead.[16] According to those experts, heavy metals were found in only about "40 percent of protein powders tested."[17]

34.    Prior to purchasing the Premier Shakes, Plaintiffs and the Class members were exposed to, saw, read, and understood the labels of the Premier Shakes, and relied upon the same in purchasing the Premier Shakes, but Defendants failed to disclose the presence of lead.

35.    As a result of Defendants' concealment of the fact that the Premier Shakes contain lead, Plaintiffs and the Class members reasonably believed the Premier Shakes were free from substances, including lead, that would negatively affect their health and increase their risk for cancer and/or reproductive harm.

## III.    DEFENDANTS MANUFACTURE AND MARKET PREMIER SHAKES CONTAINING DANGEROUS AMOUNTS OF LEAD, WHICH THEY FAIL TO DISCLOSE

36.    BellRing is a consumer products holding company operating in the global convenient nutrition category, which it estimates to be worth $54 billion. According to BellRing, the market can be

---

[15] *See* https://www.health.harvard.edu/staying-healthy/the-hidden-dangers-of-protein-powders.

[16] *Id.*

[17] *See*    https://www.foodsafetynews.com/2018/02/heavy-metals-found-in-40-percent-of-protein-powders-tested.

1    broken down into four key consumer need states: everyday nutrition, adult nutrition, sports nutrition, and

2    weight management.

3        37.    BellRing is specifically focused on protein products and owns three brands, with

4    corresponding subsidiaries: Premier Protein, Dymatize, and PowerBar.

5        38.    Premier Protein, however, is BellRing's "flagship brand."[18] According to BellRing's 2022

6    Annual Report, "For years, we have largely attributed BellRing's success to Premier Protein and it remains

7    our largest brand."[19] In fact, ready-to-drink Premier Protein Shakes account for 79% of BellRing's

8    approximately $1.4 billion in annual sales (and the Premier Protein brand accounted for 81% of its sales).

9        39.    BellRing's 2022 10-K further says that while "most brands in the convenient nutrition

10   category are positioned to appeal to consumers primarily in one need state," it believes "*Premier Protein*

11   has developed brand equities and product value propositions to appeal to a broad range of consumer need

12   states."[20]

13       40.    While Premier is technically a subsidiary of BellRing's, the two effectively act as a single

14   unit. Thus, for example—although the subsidiaries for the Dymatize and PowerBar brands are technically

15   affiliates of Premier's—Premier's "Careers" website says that the company "makes great-tasting food

16   products under the brand names *Premier Protein, Dymatize*, and *PowerBar*, and is part of publicly-traded

17   BellRing Brands (NYSE:BRBR)."[21]

18       41.    Similarly, in its public filings, BellRing—which is a spin-off from Post Foods—includes

19   Premier and its other brand subsidiaries when referring to itself.[22]

20   _____

21   [18]  BRBR 2022 Annual Report, *available at* https://cdn.bellring.com/assets/pdf/BRBR-2022-Annual-
     Report.pdf, at p. 2.

22   [19] *Id.*

23   [20] BellRing Brands, Inc. 2022 Form 10-K, at 6 (Nov. 17, 2022) ["BRBR 2022 10-K"].

24   [21] *See* "Join Us!," *at* https://jobs.premiernutrition.com/premier-nutrition.

25   [22] *See* BRBR 2022 10-K at 5-6 ("Unless otherwise indicated or the context otherwise requires, all references
     in this report to 'BellRing,' 'we,' 'our,' 'us,' 'the Company' and 'our Company' refer to (1) Old BellRing
26   and its consolidated subsidiaries during the periods prior to the completion of the Spin-off, including
     BellRing LLC, Premier Nutrition Company, LLC ('Premier Nutrition'), Dymatize Enterprises, LLC
27   ('Dymatize'), Supreme Protein, LLC ('Supreme Protein'), the PowerBar brand and Active Nutrition
     International GmbH ('Active Nutrition International') and (2) us and our consolidated subsidiaries during
28   the periods subsequent to the Spin-off, including, BellRing LLC, Premier Nutrition, Dymatize, Supreme

8

42.     Likewise, BellRing's Privacy Policy "includes information collected through" Premier's website, shown in the excerpt below.[23]

> **Effective Date: August 16, 2021**
>
> At BellRing Brands, Inc. and our subsidiaries, Premier Nutrition Company, LLC, Dymatize Enterprises, LLC and Supreme Protein, LLC ("BellRing," "we" or "our"), we want you to be familiar with how and why we collect, use and disclose information about you. This includes information we collect through our website, www.bellring.com, www.premierprotein.com, www.dymatize.com, www.powerbar.com and https://www.supremeprotein.com (our "Site") and in connection with the operation of our business and the offering of our subsidiaries' products and services. Some of this information may individually identify you. This Privacy Policy explains our information practices with respect to the information collected and the choices you can make about the collection, access and use of your information.

43.     The link to a privacy policy on Premier's website, meanwhile, is to the same URL on the BellRing website (bellring.com/privacy-policy).

44.     Moreover, the "Leadership" page of BellRing's website[24] includes biographies of persons who work for both BellRing and Premier, as follows:

- Darcy Horn Davenport - President & Chief Executive Officer, BellRing Brands, Inc.

- Paul Rode - Chief Financial Officer, BellRing Brands, Inc.

- Doug Cornille - Chief Growth Officer, Premier Nutrition Company

- Marc Mollere - Senior Vice President and General Manager of International, Premier Nutrition Company

- Robin Singh - Senior Vice President of Operations, Premier Nutrition Company[25]

- Eric Hunn - Vice President of People, BellRing Brands, Inc.

- Craig Rosenthal - Senior Vice President & General Counsel, BellRing Brands, Inc.

- Michael Sparda - Vice President of Sales, Premier Nutrition Company

- Ching-Yee Hu - Senior Vice President, Research & Innovation, Premier Nutrition Company.

---

Protein and Active Nutrition International, in each case, unless otherwise stated or the context otherwise indicates.").

[23] *See* "Privacy Policy," https://bellring.com/privacy-policy.

[24] *See* "Leadership," https://bellring.com/leadership.

[25] Mr. Singh's biography says, "Prior to joining BellRing Brands and Premier Nutrition, Robin spent 24 years at Mondelez International serving in a variety of roles, including vice president of operations."

**A.    Defendants Manufacturer and Market the Premier Shakes as Healthy, Including for Children**

45.    During at least the four years preceding the filing of the original Complaint (the "Class Period") Defendants (or their corporate predecessors) have manufactured, marketed, distributed, and sold the Premier Shakes.

46.    The Premier Shakes are sold across a diverse network of channels including club, food, drug and mass, eCommerce, specialty, and convenience. Walmart (including Sam's Club) and Costco are particularly important sellers, accounting for 63.5% of Defendants' brand sales in 2022. Moreover, the Premier Shakes are available online at major retailers including Amazon, Walmart, and Target, as well as a variety of smaller online grocery retailers

47.    To this end, Defendants affirmatively market and promote the Premier Shakes as healthy and nutritious foods. At times, Defendants even market the products as healthy for children, and helpful in promoting weight loss.

**1.    Through the Products' Labels and Packaging**

48.    First, the Premier Shakes' labels suggest the products are both generally healthy, and specifically beneficial for the body's immune system, including through the following representations:

    (1)    "a healthy snack"; and

    (2)    "with nutrients for ENERGY & IMMUNE health support" *or* "with nutrients for IMMUNE HEALTH support" (during some of the Class Period).

49.    Exemplars of the Premier Shakes' label and packaging appear below.













50.    In addition, as depicted below, the outside of at least the 12-pack of 11 oz. Premier Shakes also contains an "IMMUNE HEALTH" claim and says, "Maintaining a healthy lifestyle can be hard.

Premier Protein is here to make things a little easier." It also quotes a consumer as saying "I started my health journey at 41 and the taste of Premier Protein helps me not feel deprived from sweets. I drink it every day and I cook with it."



2. **Through Defendants' Websites and Social Media**

51. Defendants' online marketing efforts reiterate its message that consumption of the Premier Shakes promotes general and immune health.

52. For example, BellRing's website prominently displays the brand while stating it is "A company built on a simple idea: deliver nutrition that people can't wait to have."



53.     Premier's website includes product-specific pages. Each Premier Shake page promotes the product as "part of your healthy routine," as shown below.



54.     Moreover, each product page has a list of "Benefits" the product purportedly provides, which are replete with health and wellness claims. The example shown below, for the Chocolate flavor Premier Shake, states, for example, "good for nourishment," "an essential nutrient," "healthy immune support," "important antioxidants your body needs to support a heathy immune system as part of a healthy diet and lifestyle," "your daily hookup of important nutrients that help support your immune system as part of a healthy diet and lifestyle," and "help give your body the nourishment it needs."

## Benefits

 **30g Of Protein**

Protein isn't just good for nourishment. It's an essential nutrient that helps your body build and maintain muscle. In fact, some studies suggest it may be beneficial to eat 25-30g of protein at each meal.

 **Award-Winning Taste**

With so many indulgent flavors and that smooth, creamy texture, it's no wonder Premier Protein shakes have won The American Masters of Taste Gold Medal for SUPERIOR TASTING ready-to-drink protein beverages every year since 2015.

 **Healthy Immune Support**

Our shakes contain Vitamins C and E, important antioxidants your body needs to help support a healthy immune system as part of a healthy diet and lifestyle.

 **1g Of Sugar**

Sacrifices? No, thank you. Our award-winning taste comes without all the sugar, helping to take on cravings.

**Keeps You Feeling Full**

Life throws a lot at you. There's not time to waste feeling hungry! A 30g protein shake helps keep you feeling full for whatever comes next.

 **24 Vitamins & Minerals**

Think of a shake as part of your daily hookup of important nutrients that help support your immune system as part of a healthy diet and lifestyle and help give your body the nourishment it needs.

55.     In an article on the Premier website titled "Protein Shakes for Everyone!,"[26] Defendants depict several different types of Premier Protein consumers, including a pre-teen and teenage children, and give advice, including from a "Dr. Applegate," as follows:

- "Whether you're too busy to eat breakfast, concerned that your kids aren't getting the nutrition they need, or trying to hit specific fitness goals like muscle gain or weight loss, additions of protein drinks to your lifestyle can help."

- "Find Your Teen; Any parent of a teenager knows—keeping your teen fed, particularly with the things you want them to eat—is a challenge. Gone are the days of them eating three meals a day at your table. Enter busy sports schedules and it's hard to say what they're putting in their bodies. Protein is a macro that can really start to lag, especially since teens actually have higher protein needs for their size than adults. Dr. Applegate says a protein shake can help bridge some of these gaps.

  o   Offer a protein shake at breakfast to add a dose of protein to cereal and fruit.

  o   Pack a chilled shake along with a banana for an easy snack after school

  o   When a meal is lacking in high-quality protein like fish or plant protein, add in a shake."

56.     In fact, ***Defendants market the Premier Shakes for children as young as four years old***, writing in the same article, "when you really just want your kids to get the nutrients they need to grow and stay healthy . . . kids as young as four can reap the benefits of protein shakes to supplement their normal diet . . . What kid can say no to a chocolatey shake?!"

---

[26] *See* https://www.premierprotein.com/whats-shaking/shakes-for-everyone.

57.    Defendants further reiterate their health and wellness marketing for the products through their social media accounts. Premier's Facebook page, for example, says that "The team at Premier Nutrition is dedicated to researching and developing a variety of products" with "exceptional nutritional values that are unsurpassed by any other products on the market." A Facebook campaign Premier ran also encouraged users to "Share how Premier Protein has helped you along your health and fitness journey . . . for a chance to be featured on our social media channels!" And in a post on Instagram, Premier wrote, "We know what an important role our shakes play in your wellness routines."

58.    Defendants also maintain a YouTube channel with dozens of videos marketing the Premier Shakes.[27] Some of these commercials—likely because they are integrated into third-party retailer websites for marketing purposes, or are being pushed as commercials to relevant YouTube viewers—have tens of millions of views.

59.    For example, a commercial titled "Breakfast with Benefits" has 23 million views, and reiterates the Premier Shakes' labeling claims.



60.    As depicted below, in YouTube copy for a recent commercial regarding Root Beer Float Premier Shakes, Defendants state that the product provides "modern nutrition you need to feel like the bee's knees."



---

[27] *See* https://www.youtube.com/@PremierNutritionNews/videos.

61.    Several Premier Protein commercials take the form of people telling stories about their experiences with the products. These frequently involve individuals who have existing health issues or are seeking to lose weight. In this manner, Defendants suggest the Premier Shakes are beneficial for individuals with diseases and those looking to lose weight.

62.    One commercial, titled "Lawreece and Karter's Story,"[28] concerns the mother of a 4-year-old son with cerebral palsy. In it, Lawreece says:

> Premier Protein has played a huge part in Karter's health journey. Children that have cerebral palsy are on the low end of the weight scale. Premier has kept him in the middle range. I will give him Premier Protein through his G-tube, which allows supplements to go in without him orally taking it and this is huge because he still needs those nutrients that he missed. It was a step of faith that I took on my own. Their protein stood out, just on the nutritional facts. We are faced with a lot of challenges and it has given me less worry. I would definitely advise all parents and families of special needs children to try this out because it has helped us.

63.    An extended version of the commercial features Karter's caregiver, Deja, titled "Deja Lawreece and Karter's story."[29] In it, Deja says that Premier Protein is "a big factor in keeping his health going." Lawreece then says, "My cousin Deja has come a long way. She's lost over 100 pounds and that's huge, supplementing food and exercising and using Premier Protein." Deja then says, "Nutrition is important to me because nutrition has changed my life." Later she says that by her and Karter "both just taking Premier Protein it plays a big part in our health and, you know, our look on life, that we're able to like be very positive forces in each other's lives."

64.    Deja is also featured alone in a commercial titled "Deja's Story 2."[30] In it, she discusses losing weight and says:

> So I restarted my journey again. Right now I'm at 80 pounds in 3 months. This time around with losing weight, I detoxed my body. By detoxing, I learned to replenish with the right fuel. So that right fuel included Premier Protein and it allowed me to tone my body, it allowed me to lose the weight, but also in a healthy way.
>
> [ . . . ]
>
> I noticed that with losing weight sometimes it can be very tiring. You're constantly in the gym every day. I'm in the gym twice a day. Yeah, I'm getting results from that, but I'm

---

[28] *See* https://www.youtube.com/watch?v=DV5SGeflZsk.

[29] *See* https://www.youtube.com/watch?v=iULEAPNY7rI.

[30] *See* https://www.youtube.com/watch?v=_zABpVrMKfM.

also getting tired. Premier Protein, that's helping me to keep going. So I'm back in the gym right after a whole five-hour workout. Premier is the start of my lifestyle. You would not see these guns had it not been for Premier.

[ . . . ]

That little self-care goes a long way. Just one shake is a whole lot of self-care and self-love.

65.    Another commercial, titled "Raymond's Story,"[31] features a 64-year-old grandfather with lupus. During the commercial, he says:

I try to work out and keep myself as physically fit as I possibly can. . . . I was diagnosed with lupus about 10 years ago. Lupus is an autoimmune disease. It's in the multiple sclerosis family and with me lupus can attack any part of my body. It's a lifelong disease, there's no cure for it.

My challenge is for me to try to get the muscle tone I could get when I was younger. I know I can. I will.

I was in the gym for about an hour and a half. Just at the end I was kind of dragging. I drank my protein shake and I was able to continue.

[ . . . ]

One of the things that happens when you get a little older is you get a little wiser. If something works for me, I try to pass it down to, like the people who are a little younger than me. I try to tell them, like, what works for me, and tell them to try it and to have a program of their own. I know that Premier works for me. It definitely makes me feel better, it gives me the power and the strength to keep moving.

[ . . . ]

I have to be healthy for myself first. You know, there are people that I love, I want to be healthy for them.

66.    A commercial titled "Marina's Story"[32] features a retail worker who says:

My health journey started with a doctor who did not have a good bedside manner. She basically bluntly told me, "you're just too fat." At that point I decided I needed to do something about that. I was having joint problems, I was prediabetic, I had high blood pressure. I had to make hard decisions.

I feel like the Premier Protein shakes are a tool. The doctor told me how important protein is. A girlfriend drinks Premier drinks and she gave me one, and it was good. It wasn't tolerable, it was good. I was very satisfied.

[ . . . ]

---

[31] *See* https://www.youtube.com/watch?v=WY_2_HjP-6M.

[32] *See* https://www.youtube.com/watch?v=KSOfDvtrVKU.

*Krystofiak v. BellRing Brands, Inc.*, Case No: 3:23-cv-02819-AGT
FIRST AMENDED COMPLAINT

My transition with this health journey has been interesting. I used to walk to work and walk home. Now I walk for enjoyment because there's no pain.

[ . . . ]

The advice I would have for other people who are trying to live healthier, don't get discouraged if you're trying something new and it's not for you. I tried a lot of things that didn't taste good and I could have just said, "well this is not for me," but I kept looking and I found something that I can incorporate into my lifestyle that works.

I'm being healthy for myself. I just want to have a better quality of life. I have to want to change for myself.

67.    A commercial titled "Leigh Ann's Story" features a doctoral student who explains:

Nutrition has become increasingly, I guess important in my lifestyle. About four years ago I embarked on a decision to have weight loss surgery. I had to begin changing how I ate, pretty much pay attention to everything I put in my body.

[ . . . ]

I feel like I'm the same person, I just carry less with me. I found that one of the things that was really important was to start the day with shakes. Because that way I knew I was starting the day with a head start on the amount of protein I need to get in a day.

It's really important for me to get a particular amount of protein a day. I don't eat a lot and what I eat has to be pretty nutritionally dense.

68.    A commercial titled "CHARMAINE Story,"[33] featuring a mother of six children, says:

I have a very active family. We're constantly busy, constantly on the go. I'm a mom 24/7. You get tired and burnt out from that. I couldn't keep up anymore. Premier Protein has been an amazing part of my journey. Just because things change in your life, it doesn't mean that you can't stay on top of your health. I want to stick with it and I want something that is convenient enough for my schedule. . . . It's a life-changer for me. If I can do it with six kids, other moms can do it too. I want to make sure I'm a good role model for my kids, I want to practice what I preach, you know?

69.    The "CHARMAINE Story" commercial has been edited into a 30-second version, and two different 15-second versions. These shortened commercials have been integrated into product pages for the Premier Shakes on third-party retailer websites, such as Target.com. As a result, these shortened versions have collectively been viewed more than 26 million times.

70.    A commercial titled "ANDY Story" features the father of two daughters who says:

I want to be an active dad and to be around for a long time. And I also want to be a dad who's a great example. Eating nutritiously and exercising are hard to come by. Premier

---

[33] *See* https://www.youtube.com/watch?v=T7Gbtj_y7mQ.

*Krystofiak v. BellRing Brands, Inc.*, Case No: 3:23-cv-02819-AGT
FIRST AMENDED COMPLAINT

Protein gives me the change to be flexible. I've got to be intentional about what I grab in the middle of the afternoon. No matter how busy, no matter how hectic the schedule is, Premier Protein allows me to eat nutritiously throughout the day.

[ . . . ]

At the end of the day, I want to have a lifestyle that is healthy. And this is something that I can trust and something I know is going to make a difference.

71.     The "ANDY Story" commercial also features Andy and his daughters making pancake batter with a Premier Protein shake as Andy says they "love experimenting with pancakes, different recipes."



72.     A 15-second version of the "ANDY Story" commercial has 2 million views.

**3.     Through Information Provided to Online Retailers**

73.      The Premier Shakes are available to purchase from a wide variety of online retailers including Amazon.com, Walmart.com, Target.com, SamsClub.com, Kroger.com, Ralphs.com, and many others. Defendants provide these online retailers with product images, product information, and marketing pieces. These items regularly repeat Defendants' claims that the Premier Shakes are both generally healthy, and specifically promote immune health.

74.     In many instances, the product images and marketing materials displayed on Amazon, Walmart, Target, and other online retailers highlight and repeat Defendants' health and wellness claims that appear on the Premier Shakes' labels. Moreover, in several cases Defendants go further, for example claiming the Premier Shakes provide "Guilt-free indulgence."

75.     Exemplars of these materials, relating to the Chocolate flavor 11.5 oz. Premier Shake, appear below.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19






20      76.     In addition, most Premier Protein Product pages on Amazon include a section of the listing

21 titled "From the Manufacturer," with additional product details. As shown below, Defendants' product

22 information includes statements like, "Our mission is to inspire optimism on the way to better health" and

23 "you're on a journey to becoming a healthier, happier you. We're here to help you stay on course. Every

24 shake, bar, and powder nourishes your body with sustainable, feel-good energy and gives you just what you

25 need to achieve your health goals." Defendants further tell consumers the Premier Shakes are "complete

26 with all essential amino acids" and "help fuel muscles quickly and for several hours to support your goals."

27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

Amazon.com : Premier Protein 30g Protein Shake, Café Latte, 11.5 fl oz : Health & Household



## About Us

Our mission is to inspire optimism on the way to better health. Every day, you're on a journey to becoming a happier, healthier you. We're here to help you stay on course. Our protein-rich products satisfy your cravings for both nutrition and amazing taste. Every shake, bar and powder nourishes your body with sustainable, feel-good energy and gives you just what you need you to achieve your health goals.



**Product Description**

Packaged in a 11.5oz bottle, each Premier Protein Shake contains 30 grams of protein, complete with all the essential amino acids, 1g of sugar, 3-5g carbs (depending on flavor), 160 calories, 24 vitamins & minerals, and is also low in fat. We use a blend of milk protein and casein in our shakes to help fuel muscles quickly and for several hours to help support your goals. Enjoy a shake as a healthy snack, a breakfast on-the-go, an afternoon snack, or as pre- or post-workout fuel. They are delicious as is but are also highly customizable. Try blending with your favorite fruits and vegetables for a delicious smoothie or adding to cereal or oatmeal. Available in 11 delicious flavors: Chocolate, Vanilla, Cafe Latte, Caramel, Cookies & Cream, Strawberries & Cream, Bananas & Cream, Peaches & Cream, Cinnamon Roll, Chocolate Peanut Butter and Cake Batter Delight.

**Product details**

Package Dimensions : 6.89 x 2.28 x 2.24 inches; 13.76 Ounces
UPC : 643843717898
Manufacturer : Premier Nutrition
ASIN : B09DLG6TXB
Country of Origin : USA

https://www.amazon.com/Premier-Protein-Shake-Café-Latte/dp/B09DLG6TXB/ref=sr_1_50_f3_0o_fs?crid=2DWE71FSJ6NAP&keywords=premier+protein&qid=1685650951&sr=8-50

21    77.    The "Product details" provided by Premier for Sam's Club online, depicted below, likewise

22  reiterates Defendants' health and wellness claims for the products. This includes statements like, "it's part

23  of your healthy routine," "contains a variety of healthy ingredients," "can provide many benefits," "Healthy

24  Immune Support," "help support a healthy immune system as part of a healthy diet and lifestyle,"

25  "committed to promoting a healthy and active lifestyle," and "think of this shake as part of your daily hookup

26  of important nutrients that can help support your immune health as part of a healthy diet and lifestyle and

27  help give your body the nourishment it needs."

28

*Krystofiak v. BellRing Brands, Inc.*, Case No: 3:23-cv-02819-AGT
FIRST AMENDED COMPLAINT



78.    Some products' "Specifications" page suggests a "Recommended Usage" of "1-2 Premier Protein High Protein Shakes **daily**," as depicted below.

79.    While much of the imagery used for the Premier Shakes on Target.com is similar to that used for Amazon, Walmart and Sam's Club, Target's product pages also frequently include short video commercials, typically clips from the YouTube videos discussed above.

80.    In the product details information Defendants provided to Target, they reiterate their health and wellness claims for the product, for example stating that the Premier Shakes are "a healthy snack," and suggesting people drink them "for the breakfast on-the-go and [as an] afternoon snack, or as a pre-or-post workout fuel."

**B.    The Premier Shakes Contain Unhealthy Levels of Lead**

81.    Independent laboratory testing completed in April, May, and June 2023 by two separate, ISO-accredited laboratories demonstrates that the Premier Shakes contain high levels of lead—with each serving of each product well in excess of the 0.5 µg MADL (*i.e.*, daily limit) under California's Proposition 65. The amounts of lead in the Premier Shakes are also a significant portion of the 15 µg/day limit that

23

represents a "significant risk level" for lifelong cancer, contributing up to 9.3% of that limit for a single shake.

| Product | Flavor | Laboratory | Testing Date | Lead (μg per serving) |
|---|---|---|---|---|
| Protein Shakes | Chocolate | ISO-Accredited Lab 1<br>ISO-Accredited Lab 2 | 5.22.2023<br>5.31.2023 | 1.39<br>1.346 |
| | Vanilla | ISO-Accredited Lab 1<br>ISO-Accredited Lab 2 | 5.22.2023<br>6.02.2023 | 0.498<br>0.833 |
| | Caramel | ISO-Accredited Lab 1<br>ISO-Accredited Lab 2 | 5.01.2023<br>6.02.2023 | 1.08<br>0.717 |
| | Café Latte | ISO-Accredited Lab 1<br>ISO-Accredited Lab 2 | 5.22.2023<br>6.02.2023 | 1.33<br>0.969 |

82.    As discussed, *supra*, the California OEHHA determined a basis for the estimation of cancer risk from exposure to lead.[34] Carcinogenic potencies were estimated from oral studies of the carcinogenicity of lead compounds and estimated potencies were based upon the administered doses of lead.[35] "Based on the findings from the administration of different lead compounds by different routes . . . it is clear that [ ] lead . . . is responsible for renal carcinogenicity."[36] Based on assessment of available data sets and cancer potency values, OEHHA determined that "the intake level associated with lifetime cancer risk . . . for lead is 15 μg /day."[37] Thus, OEHHA established that level, 15 μg /day, as the cutoff for "No Significant Risk Level" meaning, at or above exposure to 15 μg /day, humans are at "significant risk" of developing lifelong cancer.

**C.    Defendants Have a History of Quality Control Problems**

83.    Defendants have a history of quality control issues that should have made them particularly vigilant about dangerous or unsafe levels of contaminants in the Premier Shakes, and particularly their lead levels.

---

[34] OEHHA Lead Report, *supra*, n.13
[35] *Id*.
[36] *Id*.
[37] *Id*.

84.     In 2013, Premier was sent a 60-day Proposition 65 notice by the Environmental Research Center for excessive lead found in two of its protein bars. Premier settled that case, agreeing to pay fines, penalties, and attorneys' fees for its Proposition 65 violations.[38]

85.     In 2019, Premier also settled a class action lawsuit alleging it falsely overstated the amount of protein in in the Premier Shakes.[39]

86.     In 2022, Premier recalled many of its 11 ounce Premier Shakes due to potential microbial contamination from the organisms *Cronobacter sakazakii*, and *Clostridium botulinum*, which can cause serious illness including botulism.[40]

87.     In August 2023, a federal jury found Premier's marketing of its "Joint Juice" product was false, misleading, and fraudulent, and that the product was worthless.[41]

88.     In short, Defendants have a history of quality control issues, including specifically as to lead contamination. Defendants knew or should have known that they owed consumers a duty of care to adequately test for lead. Had they done so, they would have known that the Premier Shakes contained significant levels of lead.

89.     Alternatively, Defendants did know that the Premier Shakes contained significant levels of lead and purposely hid that fact from consumers.

**D.     Defendants Encourage Consumers' Repeated Use of the Premier Shakes Throughout the Day**

90.     Through a variety of statements and other marketing methods, Defendants encourage Premier Shake purchasers to consume multiple servings each day. By doing so, Defendants increase consumers' exposure to the lead in the Premier Shakes.

---

[38] *See* https://oag.ca.gov/system/files/prop65/settlements/2013-00696S3624.pdf.

[39] *See* https://topclassactions.com/lawsuit-settlements/consumer-products/food/judge-gives-final-ok-9m-premier-nutrition-protein-shake-settlement.

[40] *See* https://www.premierprotein.com/recall-information.

[41] *See* https://www.natlawreview.com/article/pulp-fiction-food-court-squeezes-statutory-damages-request-class-defrauded-joint.

91.     In an article on the Premier Protein website titled "The Ultimate Guide to Protein Shakes," in a section titled "How Many Protein Shakes Should You Drink a Day?," Defendants say, "How protein shakes fit into your healthy lifestyle will vary from person to person and even day to day. On a particularly busy day, maybe you'll have a shake on your way into the office and another after you hit the gym."[42]

92.     In the "From the Manufacturer" information they provided to Amazon, Defendants tell consumers to "Enjoy a shake as a healthy snack, a breakfast on-the-go, an afternoon snack, or as pre- or post-workout fuel." Defendants go on to say Premier Shakes are "highly customizable. Try blending with your favorite fruits and vegetables for a delicious smoothie or adding to cereal or oatmeal."

93.     These serving suggestions are reinforced through marketing imagery Defendants provide to online retailers like Wal-Mart and Target, which show the Premier Shakes being used to supplement a variety of other foods and beverages, as shown below.



---

[42] *See* https://www.premierprotein.com/whats-shaking/the-ultimate-guide-to-protein-shakes.







*Krystofiak v. BellRing Brands, Inc.*, Case No: 3:23-cv-02819-AGT
First Amended Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
















*Krystofiak v. BellRing Brands, Inc.*, Case No: 3:23-cv-02819-AGT
FIRST AMENDED COMPLAINT

94.     Defendants also encourage the repeated consumption of the Premier Shakes in online commercials. For example, one commercial, titled "Araceli_2021 30," which is integrated into third-party retailer websites, involves a woman—the same one featured on the Premier Shake 12-pack container—who says she uses Premier Shakes to quell her sweet tooth and cooks with it:

> I'm Araceli and I am a real Premier Protein fan. I started my health journey at 41. I didn't realize that 40 was so life-changing. For me it was like a new beginning. The taste of Premier Protein helps me not feel deprived from sweets. I drink it every day. I cook with it. Premier Protein is my thing. I love it.



95.     Premier's website also has a section titled "Recipes," which contains **220** recipes using Premier products, arranged in "Breakfast," "Dessert," "Drinks," "Seasonal," and "Snacks" types. There are 24 recipes for the Chocolate Premier Shake alone, some of which are depicted below.



30

96.     Premier's website also links to a cookbook available for download, the cover page of which is depicted below.[43]



97.     As an example of the recipes provided, the one depicted below uses the Vanilla Premier Shake to create Egg White & Spinach Breakfast Biscuits.



---

[43] *See* https://cdn.premierprotein.com/p/a/downloads/premier-protein-cookbook.pdf.

1    **IV.    THE PREMIER PROTEIN PRODUCTS' LABELING VIOLATES CALIFORNIA AND**

2    **FEDERAL FOOD LABELING LAW**

3    98.    California and New York broadly prohibit the misbranding of food in language largely

4    identical to that found in the Federal Food, Drug, and Cosmetic Act ("FDCA").

5    99.    The Premier Shakes' labeling violates California Health and Safety Code §§ 109875, *et. seq.*

6    (the "Sherman Law"), which has expressly adopted the federal food labeling requirements as its own. *See*,

7    *e.g.*, *id.* § 110100; *id.* § 110670 ("Any food is misbranded if its labeling does not conform with the

8    requirements for nutrition labeling as set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act

9    and the regulation adopted pursuant thereto."). The Premier Shakes' labeling also violates New York's

10    Agriculture and Marketing Law, which incorporates the FDCA's labeling provisions found in 21 C.F.R.

11    part 101. *See* N.Y. Comp. Codes R. & Regs. tit. 1, § 259.1.

12    100.    Specifically, the labeling and website claims are false and misleading for the reasons

13    described herein, in violation of 21 U.S.C. § 343(a), which deems misbranded any food whose "label is false

14    or misleading in any particular." Defendants accordingly also violated California's parallel provision of the

15    Sherman Law, *see* Cal. Health & Safety Code § 110670, and New York Agriculture and Marketing Law.

16    101.    Second, Defendants "fail[ed] to reveal facts that are material in light of other representations

17    made or suggested by the statement[s], word[s], design[s], device[s], or any combination thereof," in

18    violation of 21 C.F.R. § 1.21(a)(1). Such facts include the detrimental health consequences of consuming

19    the Premier Shakes given that they contain lead, which is unsafe in any amount.

20    102.    Third, Defendants failed to reveal facts that were "[m]aterial with respect to the

21    consequences which may result from use of the article under" both "[t]he conditions prescribed in such

22    labeling," and "such conditions of use as are customary or usual," in violation of § 1.21(a)(2). Namely,

23    Defendants failed to disclose the detrimental health consequences likely to result from the usual

24    consumption of the Premier Shakes in the customary and prescribed manners, including regular

25    consumption of the standard serving size. This is especially true because Defendants, through a variety of

26    means, encourage consumers to consume the Premier Shakes multiple times per day.

27    103.    Finally, Defendants have also misbranded Premier Shakes in violation of California's

28    Sherman Law by, *inter alia*, failing to disclose the presence of lead on the Premier Shakes' labels as required

32

by 21 U.S.C. § 343, which states that food is misbranded "unless its label bears . . . the common or usual name of each . . . ingredient." That is, food manufacturers, like Defendants, are required to list all ingredients in the food, unless those ingredients are subject to an exemption from this requirement. Because the lead is not subject to any exemption under applicable law, Defendants misbranded the Premier Shakes.

## V. PLAINTIFFS' PURCHASE, RELIANCE, AND INJURY

104.    Plaintiff Patricia Krystofiak regularly purchased the Premier Shakes, in various flavors, including at least the Café Latte flavor, online through Walmart.com. She began purchasing the Premier Shakes in approximately 2022 and regularly consumed them, often times drinking one Premier Shake daily as a meal replacement. In purchasing the Premier Shakes, Ms. Krystofiak relied on claims that suggested the shakes were healthy, including "Immune Health Support," which was particularly important to her. Ms. Krystofiak would not have purchased the Premier Shakes if she knew they contained, or even potentially contained lead.

105.    Plaintiff Luis Carreno regularly purchased Premier Shakes, in the Chocolate flavor, through online e-tailers including Amazon, and from Costco and Food 4 Less stores in San Diego County. He began purchasing the Premier Shakes in 2020, and would occasionally buy them, most often in a 16-pack, sometimes as frequently as once per month. In purchasing the Premier Shakes, Mr. Carreno relied on label claims that suggested they were healthy, including "IMMUNE HEALTH and "healthy snack," which were particularly important to him. Mr. Carreno would not have purchased the Premier Shakes if he knew they contained, or even potentially contained lead.

106.    Plaintiff Jonathan Zimmerman regularly purchased Premier Shakes, in various flavors, including at least the Café Latte flavor, from BJ's wholesale in Westbury, New York, where he regularly shops. He began purchasing the Shakes in approximately 2018 and has regularly consumed them since then, typically as a meal replacement. In purchasing the Premier Shakes, Mr. Zimmerman was looking for a meal replacement or food that provided him with a high amount of protein, and he purchased the Premier Shakes believing based on the totality of the products' labeling, including the "IMMUNE HEALTH and "healthy snack" statements, that they were healthy, and did not contain any heavy metals. Mr. Zimmerman would not have purchased the Premier Shakes if he knew they contained, or even potentially contained, lead.

107.    When purchasing the Premier Shakes, Plaintiffs were looking for healthy, nutritious options, and believed that was what they were receiving. Plaintiffs would have avoided any Premier Shake they knew contained toxic heavy metals, like lead. Plaintiffs likewise would have avoided any Premier Shake they knew could increase their risk of reproductive toxicity or cancer, or inhibited neurological function, anemia, kidney damage, a compromised immune system, seizures, coma, and death.

108.    Plaintiffs acted reasonably in purchasing the Premier Shakes, whose labels did not disclose the presence of lead, and in fact conveyed to reasonable consumers that the Premier Shakes are healthy and nutritious, and specifically are "healthy snacks" and promote immune health.

109.    By omitting that the Premier Shakes contained lead, Defendants were able to gain a greater share of the market than they would have otherwise, and increased the size of the market.

110.    Plaintiffs paid more for the Premier Shakes, and would only have been willing to pay less, or unwilling to purchase them at all, absent Defendants' affirmative health and wellness statements, as well as their omissions regarding the lead content described herein.

111.    Plaintiffs would not have purchased the Premier Shakes if they had known that they were misbranded pursuant to California and New York law, as well as  FDA regulations, or that they contained unsafe levels of toxic lead in the amounts found in the Premier Shakes.

112.    For these reasons, the Premier Shakes were worth less than what Plaintiffs and other Class Members paid for them.

113.    Plaintiffs and other Class Members lost money as a result of Defendants' omissions and unfair practices in that they did not receive what they paid for when purchasing the Premier Shakes.

114.    Plaintiffs still wish to purchase protein shakes, and continue to see the Premier Shakes at the stores in which they regularly shop. They would purchase the Premier Shakes in the future if—because of an injunction requiring Defendants to disclose lead or other heavy metals when present—they could be assured that, by the absence of a disclosure, the Premier Shakes no longer contained unsafe levels of toxic metals, including lead. But unless Defendants are enjoined in the manner Plaintiffs request, Plaintiffs may not be able to reasonably determine whether the lead in the Products has been addressed, or whether Defendants are just continuing to omit its presence.

115. Plaintiffs' substantive right to a marketplace free of fraud, where they are entitled to rely with confidence on representations such as those made by Defendants, continues to be violated every time Plaintiffs are exposed to the Premier Shakes' labels.

116. Plaintiffs' legal remedies are inadequate to prevent these future injuries.

## CLASS ACTION ALLEGATIONS

117. While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek to represent a class of all persons in the United States (the "Nationwide Class"), and Plaintiffs Krystofiak and Carreno separately seek to represent a subclass of all persons in California (the "California Subclass"), who, at any time from four years preceding the date of the filing of this Complaint to the time a class is notified, purchased one or more Premier Shakes (as defined herein) for individual household use, and not for resale. Plaintiff Zimmerman further seeks to represent a subclass of all persons in New York (the "New York Subclass") who, at any time from three years preceding the date of the filing of this Complaint to the time a class is notified, purchased one or more Premier Shakes for individual household use, and not for resale.

118. The members in the proposed Nationwide Class and Subclasses (together, "Classes") are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class Members in a single action will provide substantial benefits to the parties and Court.

119. Questions of law and fact common to Plaintiffs and the Classes include:

a. Whether, through labeling and advertising the Premier Shakes, Defendants communicated a message that the products are generally healthy;

b. Whether, through labeling and advertising the Premier Shakes, Defendants communicated a message that the products promote immune health;

c. Whether those messages were material, or likely to be material, to a reasonable consumer, or whether Defendants had reason to believe that they were;

d. Whether the Premier Shakes contain lead;

e. Whether the Premier Shakes contain lead at levels the state of California has deemed to create a risk of reproductive harm, and/or cancer;

f. Whether the challenged claims are false, misleading, or reasonably likely to deceive a

35

reasonable consumer;

g.   Whether Defendants were under a duty to disclose information about the Premier Shakes' lead content;

h.   Whether Defendants omitted material information about the Premier Shakes' lead content;

i.   Whether that omission was material, or likely to be material to a reasonable consumer;

j.   Whether that omission was likely to deceive a reasonable consumer;

k.   Whether Defendants' conduct was consumer-oriented.

l.   Whether Defendants made and breached any warranties;

m.   Whether the Premier Shakes are misbranded;

n.   Whether Plaintiffs and the Classes are entitled to monetary damages and the measure of those damages;

o.   Whether Plaintiffs and Classes are entitled to restitution, disgorgement and/or other equitable and injunctive relief;

p.   Whether Plaintiffs and the Classes are entitled to injunctive or other equitable relief, and its proper scope; and

q.   Whether Plaintiffs and the Classes are entitled to attorneys' fees, and the proper amount.

120.   These common questions of law and fact predominate over questions that affect only individual Class Members.

121.   Plaintiffs' claims are typical of other Class Members' claims because they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct.

122.   Plaintiffs will fairly and adequately represent and protect the interests of the Classes, have no interests incompatible with the interests of the Classes, and have retained counsel competent and experienced in class action litigation.

123.   Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

124.   Defendants have acted on grounds applicable to the Classes, thereby making appropriate final injunctive and declaratory relief concerning each of the Classes as a whole.

125.   As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.***

**(On Behalf of the Nationwide Class and California Subclass)**

126.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

127.   The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

128.   The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants alleged herein constitute business acts and practices.

### Fraudulent

129.   A statement or practice is fraudulent under the UCL if it is likely to deceive a significant portion of the public, applying an objective reasonable consumer test.

130.   The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants were fraudulent because they induced Plaintiffs and other Class Members to purchase the Premier Shakes under false pretenses, and were likely to deceive reasonable consumers and the public.

### Unlawful

131.   The acts of Defendants alleged herein are "unlawful" under the UCL in that, as alleged herein, they violate at least the following laws:[44]

      a.   The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

      b.   The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*;

---

[44] Plaintiffs reserve the right to allege other violations of law that constitute other unlawful business acts or practices.

c.    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq*. and its implementing regulations, including 21 C.F.R. § 1.21;

d.    The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety; and

e.    The New York Agriculture and Marketing Law, N.Y. Comp. Codes R. & Regs. tit. 1, § 259.1.

132.    By violating these laws, Defendants have engaged in unlawful business acts and practices.

133.    Because Plaintiffs' claims under the UCL's "unlawful" prong include only one element—the violation of some predicate law or regulation—and do not require the public be likely to be deceived so that the reasonable consumer test is not an element of those claims, Plaintiffs' legal remedies, which have additional elements including likelihood of deception under the reasonable consumer standard, are inadequate to fully compensate Plaintiffs for all of Defendants' unlawful acts. Because Plaintiffs' losses may not be fully compensated by their legal damages, their legal remedies are inadequate.

**Unfair**

134.    Defendants' conduct with respect to the labeling, advertising, and sale of the Premier Shakes was unfair because their conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers, and the utility of their conduct, if any, did and does not outweigh the gravity of the harm to their victims.

135.    Defendants' conduct was also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not necessarily limited to the False Advertising Law, portions of the Federal Food, Drug, and Cosmetic Act, and portions of the California Sherman Food, Drug, and Cosmetic Law.

136.    Defendants' conduct was also unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves could reasonably have avoided.

137.    There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

\*                    \*                    \*

38

138.    Defendants profited from, and Plaintiffs and other Class Members suffered injury in fact and lost money because of Defendants' fraudulent, unlawful, and unfair conduct. Therefore Plaintiffs, individually and on behalf of the Nationwide Class and California Subclass seek: (1) an order enjoining Defendants from continuing to conduct business through unlawful, unfair, or fraudulent acts or practices; (2) compensatory restitution; and (3) reasonable attorney's fees.

139.    Because Plaintiffs' claims under the "unfair" prong of the UCL sweep more broadly than their claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiffs' legal remedies are inadequate to fully compensate Plaintiffs for all of Defendants' challenged behavior.

### SECOND CAUSE OF ACTION

### Violation of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*

### (On behalf of the Nationwide Class and California Subclass)

140.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

141.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500. It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.*

142.    As alleged herein, the advertisements, labeling, policies, acts, and practices of Defendants relating to the Premier Shakes were likely to mislead consumers acting reasonably, as to the healthfulness of the products.

143.    Plaintiffs suffered injury in fact as a result of Defendants' actions as set forth herein because Plaintiffs purchased the Premier Shakes in reliance on Defendants' false and misleading statements and omissions concerning the healthfulness and lead content of the products.

144.    Defendants' business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to the FAL because Defendants have advertised the Premier Shakes in a

39

manner that is untrue and misleading, which Defendants knew or reasonably should have known, and omitted material information from the products' labeling and advertising.

145.    Defendants profited from the sale of the falsely and deceptively advertised Premier Shakes to unwary consumers.

146.    As a result, Plaintiffs and other Class Members are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendants were unjustly enriched.

147.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiffs, on behalf of themselves and other Class Members seek an order enjoining Defendants from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

148.    Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA or commercial code (for Plaintiffs' breach of warranty claims), and restitution is not limited to returning to Plaintiffs and other Class Members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

### THIRD CAUSE OF ACTION

### Violation of the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*

### (On behalf of the Nationwide Class and California Subclass)

149.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

150.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

151.    Defendants' false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase of the Premier Shakes by Plaintiffs and other Class Members for personal, family, or household purposes, and violated and continue to violate the following sections of the CLRA:

1        a.     § 1770(a)(5): representing that goods have characteristics, uses, or benefits which

2    they do not have;

3        b.     § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if

4    they are of another;

5        c.     § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

6        d.     § 1770(a)(16): representing the subject of a transaction has been supplied in

7    accordance with a previous representation when it has not.

8    152.    Defendants profited from the sale of the deceptively advertised Premier Shakes to unwary

9    consumers.

10    153.    Defendants' wrongful business practices constituted, and constitute, a continuing course of

11    conduct in violation of the CLRA.

12    154.    Plaintiffs seek injunctive relief under Civil Code § 1782(d).

13    155.    Although Plaintiffs do not currently seek damages for their claims under the CLRA, in

14    compliance with Cal. Civ. Code § 1782, Plaintiffs have sent written notice of their claims to Defendants and

15    may thereafter amend this Complaint to seek damages under the CLRA if Defendants refuse to remedy the

16    violation within 30 days thereafter.

17    156.    In compliance with Cal. Civ. Code § 1780(d), an affidavit of venue is filed concurrently

18    herewith.

19    <strong>FOURTH CAUSE OF ACTION</strong>

20    <strong>Breaches of Express Warranties, Cal. Com. Code § 2313(1)</strong>

21    <strong>(On behalf of the Nationwide Class and California Subclass)</strong>

22    157.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth

23    fully herein.

24    158.    Through the Premier Shakes' labeling, Defendants made affirmations of fact or promises, or

25    description of goods, that, *inter alia*, the products are nutritious, are healthy and provide nutritional and

26    health benefits, including to the immune system. These affirmations and descriptions include:

27    • "healthy snack"

28    • "IMMUNE health support" or "IMMUNE HEALTH support"

41

159.    These representations were part of the basis of the bargain, in that Plaintiffs and other Class Members purchased the Premier Shakes in reasonable reliance on those statements. Cal. Com. Code § 2313(1).

160.    Defendants breached these express warranties by selling Premier Shakes that, for the reasons described herein, do not meet the above affirmations, promises, and product descriptions.

161.    That breach actually and proximately caused injury in the form of the lost purchase price that Plaintiffs and other Class Members paid for the Premier Shakes.

162.    As a result, Plaintiffs seek, on behalf of themselves and other Class Members, their actual damages arising as a result of Defendants' breaches of express warranty, including, without limitation, expectation damages.

**FIFTH CAUSE OF ACTION**

**Breach of Implied Warranty of Merchantability, Cal. Com. Code § 2314**

**(On Behalf of the Nationwide and California Subclass)**

163.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

164.    Defendants, through their acts set forth herein, in the sale, marketing, and promotion of the Premier Shakes bearing statements "healthy snack" or "immune health support" or made representations, that, *inter alia*, the Premier Shakes are healthy, including for the immune system.

165.    Defendants are merchants with respect to the goods of this kind, which were sold to Plaintiffs and other Class Members, and there were, in the sale to Plaintiffs and other Class Members, implied warranties that those goods were merchantable.

166.    However, Defendants breached that implied warranty because, for the reasons discussed herein, the Premier Shakes were and are not healthy, including for the immune system.

167.    As an actual and proximate result of Defendants' conduct, Plaintiffs and other Class Members did not receive goods as impliedly warranted by Defendants to be merchantable in that they did not conform to promises and affirmations made on the container or label of the goods.

168.    Defendants further breached their implied warranty because the Premier Shakes were unsafe in that they contained unsafe levels of toxic lead. Therefore, the products would not pass without objection

42

in the trade or industry and were accordingly not fit for the ordinary purpose for which they are used, which is consumption by consumers, including children and pregnant women.

169.    Since the presence of lead in the Premier Shakes renders them unsafe for human consumption, the products that Plaintiffs and other Class Members purchased are worthless, or at a minimum are worth less than Plaintiffs and other Class Members paid for them.

170.    As a result, Plaintiffs seek, on behalf of themselves and other Class Members, their actual damages arising as a result of Defendants' breaches of implied warranty, including, without limitation, expectation damages.

### SIXTH CAUSE OF ACTION

### Unfair and Deceptive Business Practices, N.Y. Gen. Bus. L. § 349

### (On behalf of the New York Subclass)

171.    Plaintiff Zimmerman realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

172.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was consumer oriented.

173.    Defendants' conduct constitutes deceptive acts or practices or false advertising in the conduct of business, trade, or commerce or in the furnishing of services in New York which affects the public interest under N.Y. Gen. Bus. L. § 349.

174.    As alleged herein, Defendants engaged in, and continue to engage in, deceptive acts and practices by advertising, marketing, distributing, and selling the Premier Shakes with false or misleading claims and representations, and deceptive omissions.

175.    As alleged herein, by misbranding the Premier Shakes, Defendants engaged in, and continue to engage in, unlawful and deceptive acts and practices.

176.    Defendants' conduct was materially misleading to Plaintiff Zimmerman and the New York Subclass.

177.    As a direct and proximate result of Defendants' violation of N.Y. Gen. Bus. L. § 349, Plaintiff Zimmerman and the New York Class were injured and suffered damages.

178.    The injuries to Plaintiff Zimmerman and the New York Subclass were foreseeable to Defendants and, thus Defendants' actions were unconscionable and unreasonable.

179.    Defendant is liable for damages sustained by Plaintiff Zimmerman and the New York Subclass to the maximum extent allowable under N.Y. Gen. Bus. L. § 349, actual damages or $50 per unit, whichever is greater.

180.    Pursuant to N.Y. Gen. Bus. L. § 349(h), Plaintiff Zimmerman and the New York Subclass seek an Order enjoining Defendants from continuing to engage in unlawful acts or practices, false advertising, and any other acts prohibited by law, including those set forth in this Complaint.

**SEVENTH CAUSE OF ACTION**

**False Advertising, N.Y. Gen. Bus. L. § 350**

**(On behalf of the New York Subclass)**

181.    Plaintiff Zimmerman realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

182.    Defendants have engaged and are engaging in consumer-oriented conduct which is deceptive or misleading in a material way (both by affirmative misrepresentations and by material omissions), constituting false advertising in the conduct of any business, trade, or commerce, in violation of N.Y. Gen. Bus. L. § 350.

183.    As a result of Defendants' false advertising, Plaintiff Zimmerman and the New York Subclass Members have suffered and continue to suffer substantial injury, including damages, which would not have occurred but for the false and deceptive advertising, and which will continue to occur unless Defendants are permanently enjoined by this Court.

184.    Plaintiff Zimmerman and the New York Subclass seek to enjoin the unlawful acts and practices described herein, and to recover their actual damages or $500 per unit, whichever is greater, along with reasonable attorney fees.

1

2

3

**EIGHTH CAUSE OF ACTION**

**Negligent Misrepresentation**

**(On behalf of the Nationwide Class)**

4       185.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set

5   forth herein.

6       186.    Defendants marketed the Premier Shakes in a manner conveying to reasonable consumers

7   that the products promote general health and wellness, and provide specific health benefits to the immune

8   system.

9       187.    Defendants' misrepresentations regarding the Premier Shakes are material to a reasonable

10  consumer because they relate to human health generally and immune health specifically. Reasonable

11  consumers would attach importance to such representations and would be induced to act thereon in making

12  purchase decisions. Defendants intend that Plaintiffs and other consumers rely on these representations, as

13  evidenced by the intentional and conspicuous placement of the representations on the Premier Shakes'

14  packaging by Defendants

15      188.    In selling the Premier Shakes, Defendants acted in the ordinary course of their business and

16  had a pecuniary interest in Plaintiffs and other Class Members purchasing the products.

17      189.    Defendants owed a duty of care to Plaintiffs, not to provide them false or incomplete

18  information when they were making their purchase decisions regarding the Premier Shakes.

19      190.    Defendants knew or had been negligent in not knowing that the Premier Shakes did not

20  promote health, but instead, contained high levels of toxic lead. Defendants had no reasonable grounds for

21  believing their misrepresentations were not false and misleading.

22      191.    Plaintiffs and other Class Members have reasonably and justifiably relied on Defendants'

23  misrepresentations when purchasing the Premier Shakes and, had the correct facts been known, would not

24  have purchased the products at the prices at which they were offered (or at all).

25      192.    Therefore, as a direct and proximate result of Defendants' negligent misrepresentations,

26  Plaintiffs and other Class Members have suffered economic losses and other general and specific damages,

27  in the amount of the products' purchase prices, or some portion thereof, and any interest that would have

28  accrued on those monies, all in an amount to be proven at trial.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NINTH CAUSE OF ACTION**

**Intentional Misrepresentation**

**(On behalf of the Nationwide Class)**

193.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

194.    Defendants marketed the Premier Shakes in a manner conveying to reasonable consumers that the products promote general health and wellness and immune system function. However, exposure to lead in the products harms the overall health of the average consumer and harms the immune system. Therefore, Defendants have made misrepresentations about the Premier Shakes.

195.    Defendants' misrepresentations regarding the Premier Shakes are material to a reasonable consumer because they relate to human health generally and the immune system specifically. A reasonable consumer would attach importance to such representations and would be induced to act thereon in making purchase decisions.

196.    At all relevant times, Defendants knew that the misrepresentations were misleading, or acted recklessly in making the misrepresentations, without regard to their truth.

197.    Defendants intend that Plaintiffs and other consumers rely on these misrepresentations, as evidenced by the intentional and conspicuous placement of the misleading representations on the Premier Shakes' packaging by Defendants.

198.    Plaintiffs and other Class Members have reasonably and justifiably relied on Defendants' intentional misrepresentations when purchasing the Premier Shakes; had the correct facts been known, they would not have purchased the Premier Shakes at the prices at which the products were offered (or at all).

199.    Therefore, as a direct and proximate result of Defendants' intentional misrepresentations, Plaintiffs and other Class Members have suffered economic losses and other general and specific damages, in the amount of the products' purchase prices, or some portion thereof, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

**TENTH CAUSE OF ACTION**

**Unjust Enrichment**

**(On behalf of the Nationwide Class)**

200. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

201. Plaintiffs and other Class Members conferred economic benefits on Defendants by purchasing the Premier Shakes.

202. Defendants' financial benefits resulting from their unlawful and inequitable conduct are economically traceable to Plaintiffs' and other Class Members' purchases of the Premier Shakes and the economic benefits conferred on Defendants are a direct and proximate result of their unlawful and inequitable conduct.

203. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these economic benefits because the benefits were procured as a direct and proximate result of their wrongful conduct.

204. As a result, Plaintiffs and other Class Members are entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business practices.

**<u>PRAYER FOR RELIEF</u>**

205. Wherefore, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for judgment against Defendants as to each and every cause of action, and the following remedies:

a.    An Order declaring this action to be a proper class action, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' undersigned counsel as Class Counsel;

b.    An Order requiring Defendants to bear the cost of Class Notice;

c.    A judgment awarding Plaintiffs other Class Members appropriate relief, including actual, compensatory, and punitive damages (as permitted by law), in an amount to be determined at trial;

*Krystofiak v. BellRing Brands, Inc.*, Case No: 3:23-cv-02819-AGT
FIRST AMENDED COMPLAINT

1            d.      A judgment awarding any and all equitable, injunctive, and declaratory relief as may

2    be appropriate;

3            e.      Pre-judgment and post-judgment interest, as permitted by law;

4            f.      Attorneys' fees and costs; and

5            g.      Any other and further relief that Court deems necessary, just, or proper.

6    **<u>JURY DEMAND</u>**

7    206.    Plaintiffs hereby demand a trial by jury on all issues so triable.

8

9

10    Dated:  July 3, 2024                /s/   Jack Fitzgerald

11                             **FITZGERALD MONROE FLYNN PC**
                         JACK FITZGERALD

12                             *jfitzgerald@fmfpc.com*
                         MELANIE R. MONROE

13                             *mmonroe@fmfpc.com*
                         TREVOR FLYNN

14                             *tflynn@fmfpc.com*
                         PETER GRAZUL

15                             *pgrazul@fmfpc.com*

16                             2341 Jefferson Street, Suite 200
                         San Diego, California 92110

17                             Phone: (619) 215-1741

18                             ***Counsel for Plaintiffs***

19

20

21

22

23

24

25

26

27

28

*Krystofiak v. BellRing Brands, Inc.*, Case No: 3:23-cv-02819-AGT
FIRST AMENDED COMPLAINT