**KING & SPALDING LLP**
Michael L. Resch (SBN 202909)
mresch@kslaw.com
Anne M. Voigts (SBN 220783)
avoigts@kslaw.com
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1200
Facsimile: (415) 318-1300

**KING & SPALDING LLP**
Dale J. Giali (SBN 150382)
dgiali@kslaw.com
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants
BELLRING BRANDS, INC. and
PREMIER NUTRITION COMPANY, LLC

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA KRYSTOFIAK, et al., | Case No. 3:23-cv-2819-AGT |
| Plaintiffs, | Hon. Alex G. Tse, Presiding |
| v. | **NOTICE OF MOTION TO DISMISS FIRST AMENDED COMPLAINT: MEMORANDUM AND AUTHORITIES IN SUPPORT** |
| BELLRING BRANDS, INC., et al., | |
| Defendants. | Date:        November 22, 2024 |
| | Time:        10:00 a.m. |
| | Dept:        Ctrm A, 15th Floor |

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2    PLEASE TAKE NOTICE that on November 22, 2024, at 10:00 a.m., in Courtroom A,

3    15th Floor, of this Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, before

4    the Honorable Alex G. Tse, defendants BellRing Brands, Inc. and Premier Nutrition Company,

5    LLC ("defendants") will and hereby do move the Court for an order dismissing the first amended

6    class action complaint, and each claim contained therein, with prejudice.

7    This motion is made pursuant to Fed. R. Civ. P. 8, 9(b), 12(b)(1), and 12(b)(6), and is

8    based on the following grounds:

9    1.    Plaintiffs have not addressed the deficiencies in their allegations that were

10    identified by the Court in its June 14, 2024 order on defendants' motion to dismiss the initial

11    complaint in this case, including the need to make plausible allegations connecting the alleged

12    harms from lead exposure to the alleged lead levels in defendants' products;

13    2.    Plaintiffs lack standing to pursue their claims;

14    3.    Plaintiffs' claims are barred under the doctrine of express preemption;

15    4.    Plaintiffs do not plausibly allege that defendants' statements and alleged omissions

16    were false or deceptive or that they would be material to plaintiffs or the reasonable consumer;

17    5.    Plaintiffs' claims for breach of implied or express warranty fail for the additional

18    reasons that plaintiffs fail to make plausible allegations that the products were not fit for their

19    ordinary purpose, and defendants did not make warranties as alleged; and

20    6.    Plaintiffs' claim for unjust enrichment fails for the additional reason that the claim

21    is entirely duplicative and derivative of the other causes of action.

22    This motion is supported by this notice, the attached memorandum of points and

23    authorities, pleadings and documents on file in this case, and on such other written and oral

24    argument as may be presented to the Court on this motion.

25

26

27

28

MOTION TO DISMISS FAC                                    Case No. 3:23-cv-2819-AGT

1  Dated: August 19, 2024                    **KING & SPALDING LLP**
                                             Michael L. Resch
2                                            Dale J. Giali
                                             Anne M. Voigts
3

4

5                                            By:  _/s/ Michael L. Resch_____
                                                  Michael L. Resch
6                                                 Attorneys for Defendants
                                                  BELLRING BRANDS, INC. and
7                                                 PREMIER NUTRITION COMPANY, LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**STATEMENT OF ISSUES TO BE DECIDED**

1.    Does the first amended complaint address the deficiencies in plaintiffs' allegations that were previously highlighted by the Court, including the need to make plausible allegations connecting the alleged harms from lead exposure to the alleged lead levels in defendants' products?

2.    Do plaintiffs have standing to pursue their claims?

3.    Are plaintiffs' claims barred under the doctrine of express preemption?

4.    Have plaintiffs plausibly alleged that defendants' representations and alleged omissions were false or deceptive and material to plaintiffs and the reasonable consumer?

5.    Have plaintiffs otherwise adequately alleged claims for breach of warranty, fraud, negligent and intentional misrepresentation, and unjust enrichment?

1

## **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................. 3

  A.    The Court's June 14, 2024 Order ............................................................ 3

  B.    First Amended Complaint ....................................................................... 6

  C.    Prop 65's NSRL ...................................................................................... 7

III.  THE FAC SHOULD BE DISMISSED WITH PREJUDICE ............................ 8

  A.    Plaintiffs Lack Standing to Pursue Their Claims ................................... 8

    1.    Plaintiffs Do Not Sufficiently Allege Their Purchases (For Standing or Fed. R. Civ. P. 9(b)) ............................................................................................. 8

    2.    Plaintiffs May Not Expand the Challenged Products Via the Substantially Similar Doctrine ................................................................................................. 10

    3.    Plaintiffs Lack Standing to Pursue Claims on Advertisements They Did Not See or Rely Upon .................................................................................................. 12

  B.    Plaintiffs' Challenges to "Immune Health Support" and "Healthy Snack" Are Preempted ................................................................................................. 13

    1.    21 C.F.R. § 101.65(d) Defines Two Separate Healthy-Related Implied Nutrient Content Claims: One Relating to The Entire Food Product and The Other Relating to Specified Nutrients In The Product ..................................................... 14

    2.    The Healthy Snack Statement Is Adjacent to The Shake's Nutrients and Is an Implied Nutrient Content Claim Under § 101.65(d)(1)(ii) ...................... 15

    3.    The Healthy Snack Labeling Statement Relates to The Entire Food (i.e., The Entire Shake) And Is an Implied Nutrient Content Claim Under § 101.65(d)(1)(i) .............. 16

    4.    The "Immune Health" Statements Expressly Reference "Nutrients" And Are Implied Nutrient Content Claims ................................................................. 17

    5.    Challenges To the Healthy Snack and Immune Health Statements Are Expressly Preempted .................................................................................................. 17

  C.    The FAC Does Not Address the Fundamental Deficiency in Plaintiffs' Claims Highlighted by the Court's Order ...................................................... 18

    1.    Plaintiffs' California Consumer Protection Claims Fail ............................... 18

    2.    Plaintiffs' Express Warranty Claim Fails ................................................... 22

    3.    Plaintiffs' Implied Warranty of Merchantability Claim Fails ...................... 23

    4.    Plaintiffs' Claims Under New York Law Fail ............................................. 23

    5.    Plaintiffs' Negligent Misrepresentation Claim Fails .................................. 23

    6.    Plaintiffs' Intentional Misrepresentation Claim Fails................................. 23

    7.    Plaintiffs' Unjust Enrichment Claim Fails ................................................. 24

IV.   CONCLUSION ................................................................................................ 24

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

3    **Cases**

4    *Allen v. City of Beverly Hills,*
        911 F.2d 367 (9th Cir. 1990)...................................................................................... 8

5
6    *Ascon Props., Inc. v. Mobil Oil Co.,*
        866 F.2d 1149 (9th Cir. 1989).................................................................................... 8

7    *Ashcroft v. Iqbal,*
        556 U.S. 662 (2009) ....................................................................................... 18, 19

8
9    *Astiana v. Dreyer's Grand Ice Cream, Inc.,*
        2012 WL 2990766 (N.D. Cal. July 20, 2012) ........................................................ 11

10   *Azadpour v. Sun Microsystems, Inc.,*
        2007 WL 2141079 (N.D. Cal. July 23, 2007) ........................................................ 10

11
12   *Balistreri v. McCormick & Co.,*
        2023 WL 5988600 (N.D. Cal. Sept. 13, 2023) ...................................................... 23

13   *Bank of the W. v. Super. Ct.,*
        2 Cal. 4th 1254 (1992) ............................................................................................ 19

14
15   *Becerra v. Dr Pepper/Seven Up, Inc.,*
        945 F.3d 1225 (9th Cir. 2019)................................................................................. 19

16   *Cannara v. Nemeth,*
        467 F. Supp. 3d 877 (N.D. Cal. 2020) .................................................................... 19

17
18   *Cheslow v. Ghirardelli Chocolate Co.,*
        445 F. Supp. 3d 8 (N.D. Cal. 2020) ........................................................................ 12

19   *Cheslow v. Ghirardelli Chocolate Co.,*
        472 F. Supp. 3d 686 (N.D. Cal. 2020) .................................................................... 12

20
21   *DiGiacinto v. RB Health (US) LLC,*
        668 F. Supp. 3d 950 (N.D. Cal. 2023) .................................................................... 22

22   *Dumas v. Kipp,*
        90 F.3d 386 (9th Cir. 1996)....................................................................................... 8

23
24   *Durnford v. Musclepharm Corp.,*
        907 F.3d 595 (9th Cir. 2018)................................................................................... 18

25   *Ebner v. Fresh, Inc.,*
        838 F.3d 958 (9th Cir. 2016)................................................................................... 19

26
27   *Envtl. L. Found. v. Abbott Labs, et al.,*
        No. CGC-10-503002 (San Francisco Superior Court)............................................. 8

28   *Felice v. Guardian Techs., LLC,*
        2024 WL 1486140 (N.D. Cal. Apr. 4, 2024) .......................................................... 12

MOTION TO DISMISS FAC                                    Case No. 3:23-cv-2819-AGT

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982) ................................................................................... 14

*Freeman v. Time, Inc.*,
    68 F.3d 285 (9th Cir. 1995) ....................................................................... 19

*Gilchrist v. Joshua*,
    2017 WL 2123640 (S.D. Cal. May 16, 2017) ....................................... 18, 19

*Gorenstein v. Ocean Spray Cranberries, Inc.*,
    2010 WL 10838229 (C.D. Cal. Jan. 29, 2010) ........................................... 18

*Grausz v. Hershey Co.*,
    691 F. Supp. 3d 1178 (S.D. Cal. 2023) .................................................. 5, 23

*Gustavson v. Wrigley Sales Co.*,
    2014 WL 60197 (N.D. Cal. Jan. 7, 2014) .................................................. 18

*Gutierrez v. Bausch Health US, LLC*,
    2024 WL 1854288 (9th Cir. Apr. 29, 2024) ................................. 10, 13, 22

*Hadley v. Kellogg Sales Co.*,
    273 F. Supp. 3d 1052 (N.D. Cal. 2017) .................................................... 13

*Ham v. Hain Celestial Grp., Inc.*,
    70 F. Supp. 3d 1188 (N.D. Cal. 2014) ...................................................... 12

*Hammerling v. Google LLC*,
    615 F. Supp. 3d 1069 (N.D. Cal. 2022) .................................................... 19

*Hayden v. Bob's Red Mill Nat. Foods, Inc.*,
    2024 WL 1643696 (N.D. Cal. Apr. 16, 2024) ........................................... 21

*Hodsdon v. Mars. Inc.*,
    891 F.3d 857 (9th Cir. 2018) ..................................................................... 22

*In re Ferrero Litig.*,
    794 F. Supp. 2d 1107 (S.D. Cal. 2011) .................................................... 12

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (Cal. 2009) ....................................................................... 13

*In re Trader Joe's Co. Dark Chocolate Litig.*,
    2024 WL 1319725 (S.D. Cal. Mar. 27, 2024) ........................................... 21

*Kaanaana v. Barrett Bus. Servs.*, Inc.,
    11 Cal. 5th 158 (2021) ............................................................................... 18

*Kane v. Chobani, Inc.*,
    2013 WL 5289253 (N.D. Cal. Sept. 19, 2013) ......................................... 12

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ..................................................................... 19

vii

*Kimmell v. Schaefer*,
  89 N.Y.2d 257 (1996) ............................................................................ 23

*Krause-Pettai v. Unilever U.S., Inc.*,
  2021 WL 1597931 (S.D. Cal. Apr. 23, 2021) ........................................ 11

*Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*,
  821 F. Supp. 2d 616 (S.D.N.Y. 2011) ................................................... 23

*Lavie v. Procter & Gamble Co.*,
  105 Cal. App. 4th 496 (2003) ............................................................... 19

*LeGrand v. Abbott Lab'ys*,
  655 F. Supp. 3d 871 (N.D. Cal. 2023) .................................................. 15

*McGinity v. Procter & Gamble Co.*,
  69 F.4th 1093 (9th Cir. 2023) .............................................................. 19

*Moore v. Trader Joe's Co.*
  4 F.4th 874 (9th Cir. 2021) .................................................................. 19

*Peviani v. Hostess Brands, Inc.*,
  750 F. Supp. 2d 1111 (C.D. Cal. 2010) ................................................ 18

*Red v. The Kroger Co.*,
  2010 WL 4262037 (C.D. Cal. Sept. 2, 2010) ........................................ 18

*Songstad v. Sup. Ct.*,
  93 Cal. App. 4th 1202 (2001) ............................................................... 18

*United States v. Atl. Res. Corp.*,
  551 U.S. 128 (2007) ............................................................................. 18

*Weaver v. Champion Petfoods USA Inc.*,
  2019 WL 2774139 (E.D. Wis. July 1, 2019) .................................. 2, 4, 22

*Weinstat v. Dentsply Int'l., Inc.*,
  180 Cal. App. 4th 1213 (2010) ............................................................. 22

*Wilson v. Frito-Lay N. Am., Inc.*,
  961 F. Supp. 2d 1134 (N.D. Cal. 2013) ................................................ 11

*Yumul v. Smart Balance, Inc.*,
  2011 WL 1045555 (C.D. Cal. Mar. 14, 2011) ....................................... 18

**Statutes**

21 U.S.C. § 343 ................................................................... 13, 16, 17, 18

21 U.S.C. § 343-1 ............................................................................. passim

Cal. Health & Saf. Code § 25249.10 ............................................................ 7

N.Y. Gen. Bus. L. § 350 ........................................................................................................ 23

N.Y. Gen. Bus. Law § 349 .................................................................................................... 23

**Regulations**

21 C.F.R. § 1.21 .................................................................................................................... 18

21 C.F.R. § 101.65 ........................................................................................................ passim

27 Cal. Code Regs. § 25705 ................................................................................................... 7

**Other Authorities**

58 Fed. Reg. 2302 (Jan. 6, 1993) ................................................................................... 14, 16

Fed. R. Civ. P. 8 ..................................................................................................................... ii

Fed. R. Civ. P. 9(b) ............................................................................................................ ii, 9

Fed. R. Civ. P. 12 ........................................................................................................... ii, 18

1    **I.    INTRODUCTION**

2         In ruling on defendants' motion to dismiss the initial complaint, the Court identified a

3    fundamental pleading requirement: "Plaintiffs must plausibly connect the representations of

4    immune health or health(y) to the alleged lead levels they rely on in the complaint." Dkt. 38 (June

5    14, 2024 Order) ("Order") at 15. The Court explained that the complaint's allegations fell short

6    because plaintiffs failed "to show that the measured lead values exceed some relevant threshold

7    or range that is 'independent of Prop 65.'" *Id*. at 16. With full benefit of the Court's detailed

8    analysis, plaintiffs filed an amended complaint with the *same* glaring deficiency. Plaintiffs' claims

9    should be dismissed with prejudice on this ground alone.

10        Though their amended complaint contains some significant changes—*e.g.*, dropping all

11   claims challenging defendants' powder products—large parts of plaintiffs' amended complaint are

12   strikingly similar to their initial complaint. Plaintiffs continue to assert the same health-based

13   claims against defendants' protein shakes based on the same test results they alleged in the initial

14   complaint. *Compare* Dkt. 40 (July 3, 2024 First Amended Complaint) ("FAC") at ¶ 81 *with* Dkt. 1

15   (Complaint) at ¶ 73. Based on the same prior tests of the same products, the FAC continues to

16   allege trace lead levels in defendants' shakes ranging from 0.498 to 1.39 micrograms (μg). FAC at

17   ¶¶ 1, 81.

18        The Order required plaintiffs to make plausible allegations that such miniscule levels of

19   lead "**exceed** some relevant threshold or range that is '***independent of Prop 65***.'" Order at 16

20   (emphasis added). Like the initial complaint, however, the FAC alleges **only** a Prop 65-based

21   threshold for lead. Plaintiffs then re-allege that lead exposure can "cause anemia, hypertension,

22   renal impairment, immunotoxicity, toxicity to the reproductive organs, type 2 diabetes, and

23   cancer." FAC at ¶ 18. In so doing, plaintiffs fail entirely to address, let alone reconcile, the Court's

24   flat rejection of plaintiffs' recitation of these harms because they are disconnected from the

25   alleged lead levels in defendants' products. *See* Order at 16.

26        To be sure, the FAC reflects a new allegation regarding a threshold for lead: a reference to

27   Prop 65's "No Significant Risk Level" ("NSRL") for lead of 15 μg per day. *See* FAC at ¶¶ 23-24,

28

1

81-82. Plaintiffs' reliance on this threshold—*i.e.*, the Prop 65 safe harbor level for cancer warnings regarding lead—fails for reasons that are familiar to the Court.

**First**, and most fundamentally, all of the alleged lead levels in defendants' products are **significantly below** the 15 µg threshold now alleged by plaintiffs, as even plaintiffs admit. FAC at ¶ 24; *see also* chart at p. 21, *infra*. This means that defendants' shakes are below Prop 65's safe harbor level, and thus Prop 65 expressly does **not** require a warning for the shakes. It also means that plaintiffs failed to comply with the Court's directive that the alleged levels must **exceed** a threshold (that is independent of Prop 65). Order at 16.

**Second**, plaintiffs' use of the NSRL to challenge defendants' healthy claims based on such low lead levels (*i.e.*, levels that are 3.3% to 9.3% of the NSRL) is tantamount to alleging that lead content at **any** level supports a claim. If 3.3% of the conservative NSRL threshold could state a claim, what about 2.9%, 1.5% or 0.1%? This explains why the Court already rejected this standardless theory of liability and required the alleged lead levels to "exceed" any alleged threshold. Otherwise, as the Court held, this would "produce a 'preposterous' result." *See* Order at 16 (quoting *Weaver v. Champion Petfoods USA Inc.*, 2019 WL 2774139, at *3 (E.D. Wis. July 1, 2019)).

**Third**, the NSRL relates to Prop 65's warning requirement for cancer only (it applies to none of the other health issues plaintiffs allege) and is a daily intake level calculated to result in, at most, one excess case of cancer in an exposed population of 100,000 **assuming lifetime (i.e., 70 years) exposure**.[1] Plaintiffs do not (and cannot) allege daily consumption of defendants' shakes for 70 years (*i.e.*, the equivalent of more than 25,500 shakes). That, of course, is largely beside the point given that the lead levels in defendants' products—as tested by plaintiffs—are a small fraction of the NSRL. But even if the shakes contained 15 µg of lead, plaintiffs' cumulative exposure (well below a shake per day for 70 years) *still* would not trigger the intentionally conservative cancer risk associated with the NSRL.

---

[1] *See* Cal. Office of Environmental Health Hazard Assessment, Proposition 65 Safe Harbor Levels: No Significant Risk Levels for Carcinogens and Maximum Allowable Dose Levels for Chemicals Causing Reproductive Toxicity (Jan. 2008), https://oehha.ca.gov/media/downloads/crnr/feb2008statusreport.pdf.

2

1    In short, plaintiffs have done nothing to cure the fatal deficiency identified by the Court. If

2    anything, plaintiffs' continued reliance on Prop 65, and now a Prop 65 threshold that is 15 times

3    higher than the average alleged lead level in defendants' shakes, tells the Court all it needs to

4    know.

5    As described in detail below, the FAC failed to address other deficiencies as well. For

6    example, once again, plaintiffs devote countless pages to defendants' website and other non-label

7    marketing materials without any allegation that they ever saw, let alone relied on, representations

8    beyond the product packaging. *See*, *e.g.*, FAC at ¶¶ 34, 51-80 & ¶¶ 104-106. Plaintiffs also

9    improperly continue to allege claims against products they did not purchase and that are not

10    substantially similar to those they did. Moreover, plaintiffs' claims are expressly preempted

11    because they impermissibly seek to impose lead-based requirements for health-related nutrient

12    content claims when such requirements are not contained in the governing FDA regulations.

13    While each of these alternative arguments is dispositive, the Court need not consider them given

14    the FAC's threshold failure to connect any harm to the alleged lead levels in defendants' shakes.

15    **II.    FACTUAL BACKGROUND**

16        **A.    The Court's June 14, 2024 Order**

17    On June 14, 2024—after considering the parties' briefing on defendants' motion to

18    dismiss, extensive argument at the hearing on December 1, 2023, and supplemental briefing on

19    preemption issues—the Court issued a 28-page detailed Order granting in part and denying in part

20    defendants' motion. The Court carefully analyzed plaintiffs' allegations and concluded, among

21    other things, that plaintiffs had failed to connect the alleged harms from lead exposure to the

22    alleged lead levels in defendants' products. Order at 15-16. Without plausible allegations that the

23    alleged lead levels exceeded some relevant threshold (without reliance on any Prop 65 thresholds,

24    which plaintiffs had fully disavowed), the Court concluded that plaintiffs' claims could not

25    survive. The Court provided plaintiffs leave to amend to address this and other deficiencies

26    identified in the Order, including:

27    **Standing.** The Court ruled that plaintiffs Krystofiak and Zimmerman lacked Article III

28    standing and failed to satisfy Rule 9(b)'s heightened pleading standard due to their failure to

3

1    specify a "single flavor, container size, or pack size they purchased." *Id*. at 4, 7. The Court also

2    stated that it would not consider plaintiffs' standing to assert claims for unpurchased shakes until

3    they sufficiently alleged what they purchased. *Id*. at 5.

4          **Preemption.** The Court determined that claims based on defendants' "High Protein"

5    labeling are expressly preempted by federal law. *Id.* at 8-9. The Court also determined that claims

6    based on "healthy" would be preempted if defendants' use of "healthy" were an implied nutrient

7    content claim. *Id*. at 9-10. The Court concluded that defendants had not argued the term "healthy

8    snack" is connected to a nutrient and, therefore, claims based on "healthy snack" in the initial

9    complaint would not be preempted. *Id*.

10         **Prop 65.** In concluding that plaintiffs' claims do not constitute a Prop 65 action subject to

11   Prop 65's notice requirements, the Order states: "While Plaintiffs reference Prop 65 MADL

12   values in the complaint, their claims are based on harms that are different than, or in addition to,

13   Prop 65's focus of carcinogens and reproductive toxins." *Id.* at 12-13.

14         **California Consumer Protection Claims.** The Court explained that plaintiffs "must

15   plausibly connect the representations of immune health or health(y) to the alleged levels they rely

16   on in the complaint" and "must allege what constitutes a high level of lead." *Id.* at 15-16. The

17   Court ruled that, while plaintiffs allege that the "healthy" and "immune health" claims are

18   misleading because the shakes/powders contain levels of lead that allegedly cause anemia,

19   hypertension, renal impairment, immunotoxicity, toxicity to reproductive organs, type 2 diabetes,

20   and cancer, the "complaint does not actually allege the level associated with these harms, but

21   rather includes citations to reference material in a footnote." *Id.* at 16. Without clearly identifying

22   why the level of lead found in the products is deceptive, "a conclusory allegation that lead

23   content, measured at *any* level (e.g., even well below the MADL), is 'low' or 'high' could support

24   a claim, which could produce a 'preposterous' result." *Id.* (quoting *Weaver*, 2019 WL 2774139 at

25   *3).

26         For these reasons, the Court held that plaintiffs had not stated a plausible claim for

27   misrepresentation based on the labeling of the protein shakes. Additionally, because the same

28   alleged conduct underpins the unlawful and unfair prongs of a California Unfair Competition Law

1   ("UCL") claim, the Court dismissed those theories as well. *Id.* at 17.

2            Regarding defendants' alleged failure to disclose lead/omissions, the Court ruled that

3   plaintiffs "must allege more to establish an omission contrary to actual representations made in

4   connection with the Products." *Id.* at 19. Additionally, the Court determined that plaintiffs did not

5   sufficiently allege any basis for a duty to disclose or warn "based on the measured lead levels and

6   alleged misrepresentations regarding health." *Id.* To establish such a duty, plaintiffs "must allege

7   the connection between the alleged amount of lead in the Products and the representations on the

8   Products." *Id.*

9            **Express Warranty, New York Law, and Intentional Misrepresentation Claims.** The

10  Court held that plaintiffs' allegations cannot support their breach of express warranty claim,

11  claims under New York law, and intentional misrepresentation claim for the same reasons they

12  cannot support a claim under California consumer protection laws. *Id.* at 20, 22, 24.

13           **Implied Warranty of Merchantability Claim.** The Court explained that "Plaintiffs'

14  conclusory allegations the Products are 'unsafe' and 'would not pass without objection in the

15  trade or industry' do not state a plausible implied warranty claim." *Id.* at 21 (citing *Grausz v.

16  Hershey Co.*, 691 F. Supp. 3d 1178, 1196 (S.D. Cal. 2023)). Specifically, the Court was "not

17  persuaded that the Products are any different from other products in the market or would

18  otherwise be objected to in the trade or industry." Order at 21. Additionally, as with the California

19  consumer protection and express warranty claims, plaintiffs did not sufficiently allege facts to

20  support an implied warranty claim based on the "healthy snack" and "immune health" labeling.

21  *Id.* at 22.

22           **Negligent Misrepresentation Claim.** The Court held that plaintiffs did not state a

23  plausible claim for negligent misrepresentation. *Id.* Plaintiffs refer to statements on Premier's

24  website and social media page to allege that defendants conveyed scientific knowledge of health

25  and nutrition to consumers. *Id.* at 23-24. The Court held that plaintiffs did not sufficiently allege

26  that these statements were connected to lead or that plaintiffs relied on the statements in making

27  their purchases. *Id.* at 24.

28           **Unjust Enrichment Claim.** The Court dismissed the unjust enrichment claim, because

1  the inequitable prong of plaintiffs' claim is based on the same conduct as the California consumer

2  protection claims and fails for the same reasons. *Id.* at 24-26.

3          The Court granted plaintiffs leave to amend and ordered plaintiffs to file their amended

4  complaint by July 5, 2024. *Id*. at 28.

5          **B.      First Amended Complaint**

6          On July 3, 2024, plaintiffs filed the FAC, but the FAC fails to cure the dispositive

7  deficiencies identified in the Order.

8          **Scope of the FAC.** In the FAC, plaintiffs drop all challenges to defendants' protein

9  *powder* products. Plaintiffs' challenges are now limited to defendants' protein *shakes*. Although

10  plaintiffs only allege purchases of the chocolate and café latte flavors, the FAC also references

11  two non-purchased products (*i.e.*, vanilla and caramel flavors) (collectively, the "Products"). *See*

12  FAC at ¶ 1 n.1. Accordingly, the number of challenged Products has gone from twenty (Order at

13  1) to four. Additionally, plaintiffs removed allegations based on defendants' "High Protein"

14  labeling, given that the Court ruled that claims based on that statement are expressly preempted.

15          **The FAC's Allegations.** The FAC continues to assert the same claims based on the same

16  "healthy snack" and "immune health" label statements and the same test results that were

17  included in the initial complaint. FAC at ¶ 81. Plaintiffs allege no additional testing or new lead

18  levels. More specifically, the FAC challenges the following labeling statements: "Enjoy a shake

19  in the morning or as a healthy snack" (*see* product images at FAC at ¶ 49) (sometimes referred to

20  herein as the "healthy snack" statement); "with nutrients for ENERGY & IMMUNE health

21  support" and "with nutrients for IMMUNE HEALTH support" (*id.*) (sometimes referred to herein

22  as the "immune health" statements) (sometimes collectively referred to as "health-based"

23  statements). The "healthy snack" statement appears next to the Products' nutrition facts panels,

24  immediately adjacent to the Products' nutrition information. *Id*. In addition to using the word

25  "nutrients," the immune health statements appear with an asterisk and associated statement that

26  says: "antioxidants Vitamins C & E, as part of a healthy diet and lifestyle." *See, e.g*., FAC at ¶ 75

27  (product images).

28          The FAC also continues to allege that defendants' health-based statements are actionable

6

based on trace amounts of lead ranging from 0.498 to 1.39 µg. The FAC continues to allege

generally that lead exposure can cause "anemia, hypertension, renal impairment, immunotoxicity,

toxicity to the reproductive organs, type 2 diabetes, and cancer." *Id.* at ¶ 18.

Like the initial complaint, the FAC does not connect the alleged harms to the alleged lead

levels. Indeed, despite the Court's clear directive, the FAC does not allege that the lead levels in

the Products exceed a threshold that is independent of Prop 65. And as for the only new threshold

alleged in the FAC—*i.e.*, Prop 65's safe harbor level for lead relating to cancer warnings—the

lead levels in the Products as tested by plaintiffs are a very small fraction of that threshold.

*Compare* FAC at ¶¶ 23-24 (alleging NSRL of 15 µg/day) *with* FAC at ¶ 81 (0.498 to 1.39 µg).

### C.    Prop 65's NSRL

The 15 µg/day level alleged by plaintiffs is the NSRL established by the California Office

of Environmental Health Hazard Assessment ("OEHHA") as the "safe harbor level" for Prop 65

warnings related to cancer risk.[2] The 15 µg/day safe harbor NSRL for lead is codified in the Prop

65 regulations.[3] Plaintiffs cite, as the source for this 15 µg/day limit, the report prepared by

OEHHA in June 2001 when setting the NSRL for lead and lead compounds. FAC at n.13.[4]

A Prop 65 warning is required unless the amount of the substance included on the Prop 65

list falls below an applicable safe harbor level.[5] The safe harbor levels for Prop 65 warnings

related to cancer risk are identified by OEHHA in the Prop 65 regulations as NSRLs.[6] The NSRL

is defined as the "daily intake level calculated to result in one excess case of cancer in an exposed

---

[2] *See* OEHHA, Proposition 65 No Significant Risk Levels (NSRLs) and Maximum Allowable Dose Levels (MADLs) (Oct. 27, 2023), https://oehha.ca.gov/proposition-65/general-info/current-proposition-65-no-significant-risk-levels-nsrls-maximum (setting a 15 µg/day NSRL for oral exposure to "lead and lead compounds").

[3] 27 Cal. Code Regs. § 25705(b)(1).

[4] OEHHA, Reproductive and Cancer Hazard Assessment Section, *No Significant Risk Levels (NSRLs) for the Proposition 65 Carcinogens Lead and Lead Compounds (Oral)* (June 2001), https://oehha.ca.gov/media/downloads/proposition-65/chemicals/leadoralnsrl.pdf.

[5] Cal. Health & Saf. Code § 25249.10(c).

[6] *See* 27 Cal. Code Regs. § 25705(b)(1).

1  population of 100,000, assuming lifetime (70-year) exposure at the level in question."[7] The

2  NSRLs are safe harbor levels for Prop 65 cancer warnings *only*; they are not applicable to

3  reproductive toxicity or other harms.[8]

4  **III.    THE FAC SHOULD BE DISMISSED WITH PREJUDICE**

5         A complaint should be dismissed without leave to amend when further amendments

6  would be futile. *See Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996) (affirming district court's

7  dismissal without leave to amend where plaintiff continued to allege insufficient facts); *Allen v.*

8  *City of Beverly Hills*, 911 F.2d 367, 373-74 (9th Cir. 1990) (affirming district court's dismissal

9  and denying plaintiff leave to amend amended complaint where further amendment would be

10  futile). A district court's "discretion to deny leave to amend is particularly broad where plaintiff

11  has previously amended the complaint." *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160

12  (9th Cir. 1989).

13        Here, the Court clearly identified fatal deficiencies in plaintiffs' claims that plaintiffs

14  failed to correct in the FAC. As such, plaintiffs' claims should be dismissed with prejudice.

15        **A.    Plaintiffs Lack Standing to Pursue Their Claims**

16             **1.    Plaintiffs Do Not Sufficiently Allege Their Purchases (For Standing or**

17                  **Fed. R. Civ. P. 9(b))**

18        In their first motion to dismiss, defendants pointed out that plaintiffs did not allege

19  purchasing each of the twenty challenged products, that two of the plaintiffs did not allege

20  purchasing any particular product, that a given plaintiff doesn't have standing without purchasing

21  a specific product, and that plaintiffs don't have standing for products not purchased. Dkt. 16 at

22  III.A.2; Order at 4. In response, the Court ruled that plaintiffs Krystofiak and Zimmerman lacked

---

[7] OEHHA, Proposition 65 Safe Harbor Levels: No Significant Risk Levels for Carcinogens and Maximum Allowable Dose Levels for Chemicals Causing Reproductive Toxicity, at 1 (Jan. 2008), https://oehha.ca.gov/media/downloads/crnr/feb2008statusreport.pdf.

[8] *See* OEHHA, Proposition 65 No Significant Risk Levels (NSRLs) and Maximum Allowable Dose Levels (MADLs) (Oct. 27, 2023), https://oehha.ca.gov/proposition-65/general-info/current-proposition-65-no-significant-risk-levels-nsrls-maximum (stating NSRLs are for "cancer-causing chemicals" and MADLs are for "chemicals causing reproductive toxicity"); *see also* Dkt. 16 at 5-7 (describing the relationship of the consent judgment in *Entl. L. Found. v. Abbott Labs, et al.*, No. CGC-10-503002 (San Francisco Superior Court) to the MADL).

1   standing because they did not allege any specific products purchased. Order at 2, 4-6. The Court

2   also recognized the limitations involved in a plaintiff attempting to challenge products not

3   purchased under a theory that the products are substantially similar to purchased products (*id*. at

4   4) and deferred addressing that issue until after Krystofiak and Zimmerman allege what product

5   they purchased (*id*. at 5).[9]

6       In their amended complaint, Krystofiak and Zimmerman have identified the same single

7   product that each purchased—a café latte shake. FAC at ¶¶ 104, 106. Though the Court

8   specifically called-out Krystofiak and Zimmerman for failing to identify the "container size, or

9   pack size they purchased" (Order at 4) and ordered that the allegations of purchase are deficient

10  without that information, in their amended complaint they again fail to identify the container or

11  pack size.[10] Because challenged advertising appears differently (if at all) on different container

12  and pack sizes (*see, e.g*., FAC at ¶¶ 50, 75), Krystofiak and Zimmerman still have not sufficiently

13  alleged a purchase that can support their standing to assert their claims.

14      In the initial complaint, plaintiff Carreno alleged purchasing chocolate *powder* (Complaint

15  at ¶ 108), and the Court credited that allegation as sufficient to confer standing as to Carreno for

16  claims against *powder* products (Order at 2, 6). Carreno allegedly began purchasing the chocolate

17  powder in mid-2022 because of the "particularly important" attributes that the powder contained

18  "High Protein" and "Plant Protein." Complaint at ¶ 108.

19      Following the Order, Carreno conveniently pivoted. Specifically, after the Court rejected

20  plaintiffs' challenges to defendants' protein labeling and pointed out that the powder products do

21  not make the same health-based label statements that survived the first motion to dismiss (Order

22

23  [9] The Court also pointed out that plaintiffs must identify the specific products they "actually
    purchased" to satisfy Fed. R. Civ. P. 9(b)'s particularity "pleading requirement." Order at 7-8.
24  Plaintiffs' failures detailed in this section also demonstrate a continued failure to comply with
    Rule 9.
25  [10] The Court made clear plaintiffs needed to identify "which products they actually purchased,"
26  because it is "unclear whether the purchased shakes are among any combination of flavor,
    container size, and pack size listed in paragraph 33 of the complaint." Order at 4-5. Nevertheless,
27  plaintiffs have again failed to allege whether they purchased the 11 ounce (FAC at ¶ 50) or 11.5
    ounce (*id*. at ¶ 75) shakes, and Krystofiak and Zimmerman have not identified the pack size,
28  whether 4-pack (*id*. at ¶ 49), 12-pack (*id*. at ¶¶ 49, 94), 16-pack (*id*. at ¶ 105), or 18-pack (*id*. at ¶
    49), or the 15-pack referenced in the initial complaint (Complaint at ¶ 33).

9

at 7-8, 17), Carreno jettisoned his challenges to powder. He also abandoned the "particularly important" reasons he purchased the powder, *i.e.*, "High Protein" and "Plant Protein." Instead, he now alleges purchasing *shakes* and it turns out that the "particularly important" attributes to Carreno are now "Immune Health Support" and "healthy snack" (FAC at ¶ 105), the only two label claims that survived the initial motion to dismiss. Order at 15. Unlike Krystofiak and Zimmerman, Carreno *does* identify a pack size, alleging that he "most often" buys a 16-pack (FAC at ¶ 105), but he does not identify a container size and, significantly, the FAC provides no details or pictures of a 16-pack.

As such, contrary to this Court's clear directive, plaintiffs again fail to identify with particularity the products they purchased (*Gutierrez v. Bausch Health US, LLC*, 2024 WL 1854288, at *1 (9th Cir. Apr. 29, 2024))—and Carreno has changed his allegations about his purchases in ways that are inconsistent with the initial complaint and clearly designed to exploit the Order, all without explanation. *See Azadpour v. Sun Microsystems, Inc.*, 2007 WL 2141079, at *2 n.2 (N.D. Cal. July 23, 2007) ("Where allegations in an amended complaint contradict those in a prior complaint, a district court need not accept the new alleged facts as true, and may, in fact, strike the changed allegations as 'false and sham.'"). In summary, plaintiffs have failed (again) to allege standing to bring their claims or satisfy Fed. R. Civ. P. 9(b).[11]

### 2.    Plaintiffs May Not Expand the Challenged Products Via the Substantially Similar Doctrine

The Court already has recognized that in certain circumstances a plaintiff may have standing over products not purchased if those products are substantially similar to a product the

---

[11] As the FAC demonstrates, failing to identify the specific products purchased is not a legal technicality or a matter of semantics. For example, at the lower half of page 12 of the FAC, plaintiffs include an image of a 12-pack of 11.5-ounce vanilla shakes. As is clear from the image on the lower left of that page, the "healthy snack" statement is on the lower third of the back panel of the bottle, well below the indented "waistline" of the bottle. As is also clear from the 12-pack box, that portion of the bottle with the "healthy snack" statement would be completely screened from view from a consumer at the time of purchase by the box itself. Indeed, regardless of what pack is purchased, the "healthy snack" line—which is only shown as being on the bottle and never on the box packaging—will always be out of view to the consumer at the time a box of shakes is purchased, regardless of the pack size. FAC at 11, 12.

1  plaintiff has purchased and is suing on. Order at 4. For example, where the same food product

2  (ice cream) has the exact same challenged label statement (natural flavors) for each variety, a

3  consumer that purchased only chocolate ice cream may have standing to challenge vanilla ice

4  cream. *Id*.; *Astiana v. Dreyer's Grand Ice Cream, Inc.*, 2012 WL 2990766, at *11-13 (N.D. Cal.

5  July 20, 2012).

6          Here, however, there is no basis for plaintiffs to argue that non-purchased shakes are

7  substantially similar to purchased shakes. Because plaintiffs have failed to demonstrate

8  substantial similarity, plaintiffs have failed to allege standing to sue over shakes that they have

9  not specifically alleged to have purchased. *Wilson v. Frito-Lay N. Am., Inc*., 961 F. Supp. 2d

10  1134, 1140-41 (N.D. Cal. 2013); *Krause-Pettai v. Unilever U.S., Inc*., 2021 WL 1597931 at *7

11  (S.D. Cal. Apr. 23, 2021).

12          First, and as an initial matter, plaintiffs have dropped all challenges to powder products in

13  their complaint and those are no longer in the case. Plaintiffs also have conducted no additional

14  lead testing. The original testing on shakes was only as to chocolate, vanilla, caramel, and café

15  latte, and plaintiffs are using the same tests and results now. *Compare* Complaint at ¶ 73 *to* FAC

16  at ¶ 81. This Court already ruled that it will not carry over any lead tests to shake flavors not

17  tested. Order at 4 ("lead levels of untested products cannot confer standing"). Accordingly,

18  plaintiffs have correctly dropped all challenges to any products other than shakes, and have

19  dropped all shake flavors other than chocolate, vanilla, caramel, and café latte. *Compare*

20  Complaint at ¶ 33 with FAC at n.1.

21          Second, as plaintiffs readily acknowledge, the packaging, labeling, and website

22  advertising can and does differ as to given shake containers (11 oz. or 11.5 oz.) and packages (4-

23  pack, 12-pack, 18-pack, or 15-pack). *See, e.g*., FAC at ¶¶ 48-50, 75; Complaint at ¶ 33.

24          Third, the focus of plaintiffs' consumer deception theory is undisclosed alleged unsafe

25  levels of lead. But as detailed elsewhere in this motion (*see, e.g*., chart at p. 21, *infra*), all lead

26  levels alleged in the FAC are significantly below Prop 65's 15 µg safe harbor relied on by

27  plaintiffs. And more to the point of plaintiffs' lack of standing to sue for non-purchased products,

28  plaintiffs' own testing reflects material variance in the universally low lead levels between and

among the flavors, from .498 µg for vanilla to 1.39 µg for chocolate. FAC at ¶ 81. Indeed, the Court has already recognized this "sizable difference" when it questioned plaintiffs' ability to demonstrate substantial similarity. Order at 5.

There is no authority permitting a plaintiff to sue on non-purchased products on a record similar to this one.

### 3.    Plaintiffs Lack Standing to Pursue Claims on Advertisements They Did Not See or Rely Upon

Whether Krystofiak, Zimmerman, and Carreno can state a claim depends on the allegations specific *to them*, not allegations about unidentified non-party consumers or about advertisements they haven't seen. *Felice v. Guardian Techs., LLC*, 2024 WL 1486140, at *3-4 (N.D. Cal. Apr. 4, 2024) (plaintiff lacks standing to sue over advertising he/she did not review or rely upon); *Cheslow v. Ghirardelli Chocolate Co*., 472 F. Supp. 3d 686, 692 (N.D. Cal. 2020) ("because plaintiffs did not allege they relied on Ghirardelli's website when purchasing the product, they could not allege they were deceived by that website"); *Cheslow v. Ghirardelli Chocolate Co*., 445 F. Supp. 3d 8, 21 (N.D. Cal. 2020) ("assessing a website with regard to plaintiffs' claims is not appropriate when plaintiffs did not purchase the product or allege that they used the website"); *Ham v. Hain Celestial Grp., Inc.*, 70 F. Supp. 3d 1188, 1197 (N.D. Cal. 2014) ("A party does not have standing to challenge statements or advertisements that she never saw"); *Kane v. Chobani, Inc*., 2013 WL 5289253, at *8-9 (N.D. Cal. Sept. 19, 2013) (disregarding website allegations where plaintiff did not allege he saw and relied on website); *In re Ferrero Litig*., 794 F. Supp. 2d 1107, 1111-12 (S.D. Cal. 2011) (same).

Plaintiffs allege exposure to, and reliance on, solely the "labels" of the products they purchased. FAC at ¶¶ 34, 105, 106, 108. Despite devoting ten pages of their amended complaint (¶¶ 51-80) to allegations about *other* alleged advertising, at no time have any of the plaintiffs alleged seeing or relying on any of it, whether website, social media, or online. What's more, some of this alleged non-label advertising relates to products none of the plaintiffs purchased and some products plaintiffs never tested. *See, e.g*., FAC at ¶ 49 (caramel), ¶ 59 (apple cinnamon), ¶ 60 (root beer float).

Adding to this already chaotic record, neither the Court nor defendants know the actual café latte and chocolate shakes purchased—and, in turn, do not know the specific label statements plaintiffs saw—because none of the plaintiffs identify the container size (11 oz. or 11.5 oz), and Krystofiak and Zimmerman do not identify the pack-size (4-pack, 12-pack, 18-pack, or 15-pack). But we do know that plaintiffs may not support their claims with anything *other* than statements that are actually on the labels of café latte shakes (Krystofiak and Zimmerman) and chocolate shakes (Carreno) *and* that they allegedly saw and relied on as part of their purchasing decision. Accordingly, the non-label advertising alleged at ¶¶ 51-72 (websites and social media, including YouTube commercials) and ¶¶ 73-80 (online ad copy and product specifications)—for which plaintiffs fail to allege "actual reliance"—may not be used by plaintiffs to support their claims. *Gutierrez*, 2024 WL 1854288, at *1.[12]

### B. Plaintiffs' Challenges to "Immune Health Support" and "Healthy Snack" Are Preempted

Plaintiffs challenge two advertising statements, both appearing on the product labels: "Immune Health Support" and "healthy snack." FAC at ¶¶ 34, 104-106.[13] Both statements are healthy dietary practices statements, both statements are regulated by FDA as implied nutrient content claims, and both statements are covered by the express preemption provision found at 21 U.S.C. § 343-1. Because plaintiffs are attempting to impose requirements not identical to the federal food labeling laws governing healthy-related nutrient content claims, their challenges to these two statements are expressly preempted. 21 U.S.C. § 343-1(a)(5) (as it incorporates 21 U.S.C. § 343(r)(1)(A)); *Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1071-74 (N.D. Cal. 2017).

FDA's detailed regulation setting out the specific requirements to refer to products as

---

[12] The *Gutierrez* decision also forecloses an argument by plaintiffs that they may rely on *In re Tobacco II Cases* to support the notion that they may allege reliance without details. *See* 46 Cal. 4th 298, 328 (Cal. 2009). The rule in *In re Tobacco II Cases* is applicable **only** in situations where there is an **exposure to a long-term pervasive advertising campaign** (*e.g.*, cigarettes), a fact that is neither alleged nor present here.

[13] Notably, in their initial complaint, *none* of the plaintiffs alleged viewing or relying on the healthy snack label statement. Complaint at ¶¶ 107-109. With the benefit of the Court's Order specifically calling out that statement, both Carreno and Zimmerman have amended their allegations to add cites to that statement for the first time. FAC at ¶¶ 105, 106. Defendants now address the new allegations accordingly.

healthy (21 C.F.R. § 101.65(d) was promulgated under 21 U.S.C. § 343(r)(1) (also known as 403(r)(1)). *See* 58 Fed. Reg. 2302, 2374-75 (Jan. 6, 1993) (attached as Appendix A). Regulations promulgated under § 343(r)(1) are specifically covered by the express preemption provision of the Nutrition Labeling and Education Act, as plainly detailed at 21 U.S.C. § 343-1(a)(5). Federal regulations, of course, preempt state law to the same extent as federal statutes. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

### 1. 21 C.F.R. § 101.65(d) Defines Two Separate Healthy-Related Implied Nutrient Content Claims: One Relating to The Entire Food Product and The Other Relating to Specified Nutrients In The Product

As the Court recognized in its Order, section 101.65(d) provides:

(d) General nutrition claims.

(1) This paragraph covers labeling claims that are implied nutrient content claims because they:

(i) Suggest that a ***food*** because of its nutrient content may help consumers maintain healthy dietary practices; ***and***

(ii) Are made in connection with an explicit or implicit claim or statement ***about a nutrient*** (e.g., "healthy, contains 3 grams of fat").

Order at 9 (quoting § 101.65(d)) (emphasis added). Significantly, the context of these two definitions and the regulation makes clear that the word "and" joining the definitions distributes the introductory clause separately to *each*, such that the introductory clause "labeling claims that are implied nutrient content claims" includes a statement that suggests the entire food is healthy and, separately, a statement that refers to a specific nutrient as providing a healthy benefit. *See, e.g.*, 58 Fed. Reg. at 2374-75 (attached as Appendix A and recognizing that 21 C.F.R. § 101.65(d)(1)(i) describes a stand-alone definition). Put succinctly, a healthy related statement is covered by 21 C.F.R. § 101.65(d) if it suggests an entire food product can maintain healthy dietary practices *or* if the statement identifies particular nutrients as associated with a healthy diet.

When the healthy snack and immune health statements are analyzed under this framework,

14

as FDA does, they clearly fit within § 101.65(d). The healthy snack statement fits into both definitions and the immune health statement fits into § 101.65(d)(1)(ii).[14]

### 2. The Healthy Snack Statement Is Adjacent to The Shake's Nutrients and Is an Implied Nutrient Content Claim Under § 101.65(d)(1)(ii)

In the Order, the Court was unable to connect "healthy snack" to a particular nutrient and, therefore, ruled that healthy snack did not satisfy 21 C.F.R. § 101.65(d)(1)(ii). Order at 10. In doing so, the Court explained that there was a lack of support for the healthy snack statement being an implied nutrient claim. *Id*. Directly addressing this aspect of the Order in light of plaintiffs' new allegations (*see* n.13, *supra*), defendants respond as follows.

As an initial matter, the Court recognized in the Order that

> [t]he word "healthy" need not be "directly adjacent to the discussion of a nutrient to create an implied nutrient content claim," but "there must be connection given the words, their *placement*, and their *context*."

Order at 9-10 (quoting *LeGrand v. Abbott Lab'ys*, 655 F. Supp. 3d 871, 888 (N.D. Cal. 2023) (emphasis added). Here, the term "healthy snack" *is* directly adjacent to the nutrients and is clearly connected to the nutrients given the healthy snack statement's placement and context. Specifically, as shown here in images pulled from the FAC (at 11, 12), healthy snack always appears on the side of the label with the Nutrition Facts and immediately adjacent to that information:

  

---

[14] This underscores the wisdom of leaving interpretation and application of food labeling regulations to FDA (*see* 21 U.S.C. § 337(a)) and that these issues are particularly ill-suited to be litigated in consumer class actions on a product-by-product, case-by-case basis.

**3. The Healthy Snack Labeling Statement Relates to The Entire Food (i.e., The Entire Shake) And Is an Implied Nutrient Content Claim Under § 101.65(d)(1)(i)**

In every location on the label that "healthy snack" appears, it is used in the sentence "Enjoy a *shake* in the morning as a healthy snack." FAC at 11, 12 (emphasis added). This fits squarely within the definition provided at 21 C.F.R. § 101.65(d)(1)(i) of a healthy-related implied nutrient content claim, because it

> [s]uggest[s] that a *food* because of its nutrient content may help consumers maintain a healthy dietary practice.

21 C.F.R. § 101.65(d)(1)(i) (emphasis added). A label statement fitting that definition is "cover[ed]" by the regulation, as provided in the first line of 21 C.F.R. § 101.65(d)(1). FDA has left no doubt that a label statement that associates "healthy" with the nutrients in *an entire product* pursuant to § 101.65(d)(1)(i) is covered by 21 U.S.C. § 343(r)(1) and is covered by 21 C.F.R. § 101.65(d), and, therefore, subject to 21 U.S.C. § 343-1 preemption:

> A claim that a *food*, because of its nutrient content, may be useful in maintaining healthy dietary practices is clearly a claim that characterizes the level of nutrient in that food. The claim is essentially saying that the *level of nutrients in the food* is such that the food will contribute to good health.

58 Fed. Reg. at 2374-75 (attached as Appendix A) (emphasis added).

The Products' labels leave no doubt that the healthy snack statement relates to the entire shake. Accordingly, "Enjoy a shake in the morning as a healthy snack" is covered by 21 C.F.R. § 101.65(d)(1) and is within the express preemption at 21 U.S.C. § 343-1(a)(5).

### 4. The "Immune Health" Statements Expressly Reference "Nutrients" And Are Implied Nutrient Content Claims

In every place that Immune Health Support appears on a label, it expressly references nutrients and is specifically associated—via an asterisk—with the statement "antioxidant Vitamins C & E, as part of a healthy diet and lifestyle," as shown here. *See, e.g.*, FAC at 21 (upper right image).



As such, the Immune Health Support statement associates the word "health" with specific nutrients in the shakes (as well as the shake itself) and is clearly within 21 C.F.R. § 101.65(d)(1).

### 5. Challenges To the Healthy Snack and Immune Health Statements Are Expressly Preempted

Express preemption bars a plaintiff from imposing label requirements that are *different from or not identical to* federal requirements. *See* 21 U.S.C. § 343-1(a)(5) (as it incorporates 21 U.S.C. § 343(r)(1)(A)). Here, plaintiffs seek to impose a requirement on the use of the words "health" and "healthy" (both words are expressly covered in 21 C.F.R. § 101.65(d)(2)) that is different from or not identical to the federal requirements regarding health/healthy labeling found at 21 C.F.R. § 101.65(d)(2)(i) & (ii). Namely, plaintiffs are imposing a requirement that health/healthy may not be used if the food contains lead or does not disclose the presence of lead. But 21 C.F.R. § 101.65(d)(2) contains no such requirement.

21 C.F.R. § 101.65(d)(2) provides detailed requirements for use of the words "health" and

"healthy," including disqualifying levels of fat, saturated fat, cholesterol and sodium, and qualifying amounts of vitamins, calcium, iron, protein, or fiber. Because the regulation nowhere addresses a lead-related content or disclosure requirement, plaintiffs' claims in that regard are preempted. 21 U.S.C. § 343-1(a)(5).[15]

## C.     The FAC Does Not Address the Fundamental Deficiency in Plaintiffs' Claims Highlighted by the Court's Order

Having failed to add allegations that the lead levels in defendants' shakes exceed a safety threshold (from Prop 65 or otherwise), the FAC should be dismissed for the same reasons that the Court dismissed the initial complaint.

### 1.     Plaintiffs' California Consumer Protection Claims Fail

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Gilchrist v. Joshua*, 2017 WL 2123640, at *1 (S.D. Cal. May 16, 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The plausibility analysis is 'context-specific' and not only invites, but 'requires the reviewing court to draw on its judicial experience and common sense.'" *Cannara v.*

---

[15] Plaintiffs' suggestion (FAC at ¶¶ 100, 101) that the generalized "reveal facts that are material" provision of 21 C.F.R. § 1.21(a)(1) or the generalized "false or misleading in any particular" provision of 21 U.S.C. § 343(a), somehow negates 21 U.S.C. § 343-1 preemption quickly collapses. Neither of those laws has anything to do with healthy label statements (the specific topic of 21 C.F.R. § 101.65(d)(2)) or lead. Plaintiffs may not use those generalized laws to require disclosure of the presence or possible presence of lead in a product that is labeled pursuant to a specific regulation covering healthy-related nutrient content claims. *Durnford v. Musclepharm Corp.*, 907 F.3d 595, 602 (9th Cir. 2018); *Kaanaana v. Barrett Bus. Servs., Inc.*, 11 Cal. 5th 158, 172 (2021); *Songstad v. Sup. Ct.*, 93 Cal. App. 4th 1202, 1209 (2001). Indeed, plaintiffs' view would impermissibly render the preemption provision at § 343-1(a)(5) meaningless. *United States v. Atl. Res. Corp.*, 551 U.S. 128, 137 (2007) (warning against effectively defeating a statutory objective via interpreting one statute in a manner that negates other statutory provisions); *Red v. The Kroger Co.*, 2010 WL 4262037, at *5 (C.D. Cal. Sept. 2, 2010) ("nutrient content claims that are permitted under federal law . . . by definition" are not somehow deficient due to a lack of disclosure of an entirely unrelated constituent); *Gustavson v. Wrigley Sales Co.*, 2014 WL 60197, at * 8 (N.D. Cal. Jan. 7, 2014); *Yumul v. Smart Balance*, *Inc.*, 2011 WL 1045555, at *9 (C.D. Cal. Mar. 14, 2011); *Peviani v. Hostess Brands, Inc.*, 750 F. Supp. 2d 1111, 1119 (C.D. Cal. 2010). Plaintiffs have not advanced any authority to the contrary or any authority disputing the sound conclusion that to construe 21 C.F.R. § 1.21(a)(1) or 21 U.S.C. § 343(a) otherwise "would eviscerate the strict preemption requirements of § 343-1" (*Gorenstein v. Ocean Spray Cranberries, Inc.*, 2010 WL 10838229, at *1 (C.D. Cal. Jan. 29, 2010)) and destroy the predictability and uniformity sought by Congress and FDA—*i.e.*, it would make it impossible for a manufacturer to have any certainty that its labeling statements accurately declaring a food or nutrient as "healthy" are permissible.

18

1    *Nemeth*, 467 F. Supp. 3d 877, 882 (N.D. Cal. 2020) (quoting *Iqbal*, 556 U.S. at 679). A court

2    need not credit "conclusory" allegations, "unwarranted deductions of fact," or "unreasonable

3    inferences." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). Further,

4    facts indicating the "'mere possibility of misconduct' . . . fall short of meeting this plausibility

5    standard." *Gilchrist*, 2017 WL 2123640, at \*2 (quoting *Iqbal*, 556 U.S. at 679).

6        A claim for fraudulent misrepresentation or omission under California's UCL, False

7    Advertising Law ("FAL"), or Consumers Legal Remedies Act ("CLRA") requires "(1)

8    misrepresentation or omission, (2) reliance, and (3) damages." *Hammerling v. Google LLC*, 615

9    F. Supp. 3d 1069, 1081 (N.D. Cal. 2022); *see also Moore v. Trader Joe's Co.* 4 F.4th 874, 881-82

10   (9th Cir. 2021). Under that standard, a plaintiff must allege "that members of the public are likely

11   to be deceived." *Ebner v. Fresh, Inc*., 838 F.3d 958, 965 (9th Cir. 2016) (quotations omitted).

12   This "requires more than a mere possibility that [a] label 'might conceivably be misunderstood by

13   some few consumers viewing it in an unreasonable manner.'" *Id.* (*quoting Lavie v. Procter &*

14   *Gamble Co*., 105 Cal. App. 4th 496, 508 (2003)). "Rather, the reasonable consumer standard

15   requires a probability 'that a significant portion of the general consuming public or of targeted

16   consumers, acting reasonably in the circumstances, could be misled.'" *McGinity v. Procter &*

17   *Gamble Co*., 69 F.4th 1093, 1097 (9th Cir. 2023).

18       Applying the reasonable consumer standard requires consideration of the challenged

19   statements in context, which can include other information on the label, common sense, and

20   common knowledge about the product. *See Moore*, 4 F.4th at 883; *Ebner*, 838 F.3d at 965;

21   *Becerra v. Dr Pepper/Seven Up, Inc*., 945 F.3d 1225, 1229 (9th Cir. 2019). When, due to

22   ambiguity of the challenged statement or otherwise, a reasonable consumer would "necessarily

23   require more information," the reasonable consumer would not jump to unreasonable conclusions.

24   *McGinity*, 69 F.4th at 1097-1098. Plaintiffs have not plausibly alleged, as required by the

25   reasonable consumer test, that "members of the public are likely to be deceived" by the product

26   labeling. *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995) (quoting *Bank of the W. v.*

27   *Super. Ct.*, 2 Cal. 4th 1254, 1267 (1992)).

28       The Court's Order tasked plaintiffs with identifying a lead level that "constitutes a high

19

level of lead," and "plausibly connect" such level to the representations of health and immune health identified by plaintiffs' in the product labeling. Order at 15-16. In response, plaintiffs identified 15 µg of lead per day, based on the Prop 65 safe harbor for cancer warnings, as the relevant unsafe limit applicable to the Products. FAC at ¶¶ 23-24. In describing the 15 µg/day NSRL, plaintiffs allege that 15 µg/day is "the intake level associated with lifetime cancer risk," but conveniently omit that this level is conservatively set to be a level at which there would be a single excess case of cancer in a population of 100,000 following *70 years* of daily exposure.[16] FAC at ¶ 82.

Despite alleging Prop 65's NSRL (which is over 10 times higher than the alleged lead levels in the shakes), plaintiffs have failed to connect this level to the health harms identified in the FAC. *See* FAC at ¶ 18. In fact, NSRLs are only identified by OEHHA for cancer risk, and are entirely inapplicable to the other harms identified by plaintiffs. Plaintiffs have not alleged a relevant lead level applicable to any other harms.[17]

**Alleged Misrepresentations in Protein Shake Labeling.** Plaintiffs allege that the representations in labeling and advertising regarding "immune health" and "healthy snack" were deceptive given the lead content of the shakes. However, plaintiffs have still failed to "clearly allege why the level of lead is deceptive." Order at 16. Plaintiffs have identified the 15 µg/day safe harbor level for cancer warnings as their chosen unsafe lead level, but plaintiffs' own testing demonstrates that the shakes fall well below this allegedly unsafe limit. Because defendants' shakes are well beneath the safe harbor level, the shakes do ***not*** pose a cancer risk under Prop 65—and a contrary allegation is implausible.

---

[16] OEHHA, Proposition 65 Safe Harbor Levels: No Significant Risk Levels for Carcinogens and Maximum Allowable Dose Levels for Chemicals Causing Reproductive Toxicity (Jan. 2008), https://oehha.ca.gov/media/downloads/crnr/feb2008statusreport.pdf.

[17] The FAC also continues to reference Prop 65's MADL of 0.5 µg (FAC at ¶¶ 22, 81) but the allegations are no different than those contained in the initial complaint that plaintiffs disavowed, and the Court properly found to be insufficient.

As the FAC confirms, plaintiffs' highest test result is only 9.3% of the 15 µg/day NSRL (FAC at ¶¶ 23-24); the other tests results are even lower:[18]

| Flavor of Protein Shake | Laboratory | Testing Date | Lead (µg per serving) | Percentage of 15 µg (per serving) |
|---|---|---|---|---|
| Chocolate | ISO-Accredited Lab 1 | 5-22-2023 | 1.39 | 9.26% |
| | ISO-Accredited Lab 2 | 5-31-2023 | 1.346 | 8.97% |
| Vanilla (*Not purchased by any plaintiff*) | ISO-Accredited Lab 1 | 5-22-2023 | 0.498 | 3.32% |
| | ISO-Accredited Lab 2 | 6-2-2023 | 0.833 | 5.55% |
| Caramel (*Not purchased by any plaintiff*) | ISO-Accredited Lab 1 | 5-1-2023 | 1.08 | 7.20% |
| | ISO-Accredited Lab 2 | 6-2-2023 | 0.717 | 4.78% |
| Café Latte | ISO-Accredited Lab 1 | 5-22-2023 | 1.33 | 8.87% |
| | ISO-Accredited Lab 2 | 6-2-2023 | 0.969 | 6.46% |

Plaintiffs have not alleged harms associated with these alleged levels of lead in the product. *See Hayden v. Bob's Red Mill Nat. Foods, Inc.*, 2024 WL 1643696, at *8 (N.D. Cal. Apr. 16, 2024) (holding that a Prop 65 threshold for labeling purposes is not necessarily equivalent to a threshold for health purposes). As the Court concluded in its Order, such a disconnect between the alleged harms and lead levels requires dismissal. *See In re Trader Joe's Co. Dark Chocolate Litig.*, 2024 WL 1319725, at *11 (S.D. Cal. Mar. 27, 2024) (plaintiffs must connect the health risks alleged to the levels of metals identified in the products). Otherwise, plaintiffs could claim

---

[18] Plaintiffs try to nudge closer to the 15 µg NSRL by noting that defendants encourage consumption of multiple drinks per day. FAC at ¶ 25. To reach the 15 µg NSRL, however, a consumer would need to consume at least 11 chocolate shakes or at least 12 café latte shakes in a single day. Of course, plaintiffs do not allege that they consumed so many shakes, let alone any labeling suggesting that consumers should consume 11 or 12 shakes per day. Moreover, because Prop 65's NSRL is based on daily exposure for 70 years, plaintiffs would need to allege consumers drank 11-12 shakes per day for 70 years to fall within the NSRL's health risk. In stark contrast to this required level of consumption, plaintiffs defined the class to include individuals with only "one" shake purchase. FAC at ¶ 117.

1    (indeed, they effectively try to do so here) that lead at *any* level is unsafe. Put another way, if less

2    than 10% of the alleged threshold can support a claim, any amount above zero fits plaintiffs'

3    deception theory.

4    But the Court already rejected this precise theory: "Plaintiffs must clearly allege why the

5    level of lead is deceptive. Otherwise, a conclusory allegation that lead content, measured at *any*

6    level (e.g., even well below the MADL), is 'low' or 'high' could support a claim, which could

7    produce a 'preposterous' result." Order at 16 (citing *Weaver*, 2019 WL 2774139, at *3).

8    **Alleged Omissions in Protein Shake Labeling.** An omission claim requires that the

9    omission be (i) contrary to an actual representation or (ii) of a fact for which the defendant had a

10   duty to disclose. *Hodsdon v. Mars. Inc.*, 891 F.3d 857, 861 (9th Cir. 2018). On the first prong, as

11   with the initial complaint, "Plaintiffs must allege more to establish an omission contrary to actual

12   representations made in connection with the products." Order at 19. Plaintiffs have not stated a

13   plausible claim for why the alleged lead levels are contrary to the health-related labeling claims.

14   Additionally, plaintiffs have still failed to allege any basis for a duty to disclose the presence of

15   lead, "based on the measured lead levels and alleged misrepresentations regarding health." Order

16   at 19. Furthermore, to the extent plaintiffs are alleging that defendants must disclose cancer and

17   reproductive health-related risks (*see, e.g.*, FAC at ¶ 107), such allegations are "impermissible

18   attempts to plead around" Prop 65's pre-suit notice requirements. *Gutierrez*, 2024 WL 1854288,

19   at *2.

20                      **2.    Plaintiffs' Express Warranty Claim Fails**

21   As explained in the Order, plaintiffs' allegations cannot support a breach of express

22   warranty claim for the same reasons they cannot support a claim under California consumer

23   protection laws. A breach of express warranty claim requires: "(1) the seller's statements

24   constitute an affirmation of fact or promise or a description of the goods; (2) the statement was

25   part of the basis of the bargain; and (3) the warranty was breached." *DiGiacinto v. RB Health*

26   *(US) LLC*, 668 F. Supp. 3d 950, 966 (N.D. Cal. 2023) (citing *Weinstat v. Dentsply Int'l., Inc.*, 180

27   Cal. App. 4th 1213, 1227 (2010)). Plaintiffs allege that the statements "healthy snack" and

28   "immune health support" were affirmations that the Products are nutritious and healthy. FAC at ¶

158. But plaintiffs failed to allege the required connection between the amount of lead in the Products and the representations on the Product labels. *See* Order at 19-20.

### 3.      Plaintiffs' Implied Warranty of Merchantability Claim Fails

Like the initial complaint, the FAC still includes conclusory allegations that the Products are "unsafe" and "would not pass without objection in the trade or industry." FAC at ¶ 168. *See Grausz*, 691 F. Supp. 3d at 1196 (finding a conclusory allegation that chocolates were unsafe not to be plausible unless plaintiff can plead facts "showing that the chocolates purchased by Plaintiff were somehow distinct from those that are safe"). Plaintiffs cannot demonstrate that the Products failed to meet the minimum level of quality for protein shakes. *See Balistreri v. McCormick & Co.*, 2023 WL 5988600, at *11 (N.D. Cal. Sept. 13, 2023) (stating that "[m]erchantability is a very low standard").

### 4.      Plaintiffs' Claims Under New York Law Fail

Plaintiffs' New York law claims relate to the prohibitions against "[d]eceptive acts or practices in the conduct of any business, trade or commerce" and "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law §§ 349(a), 350. Plaintiffs' New York law claims fail for the same reasons that their California consumer protection claims fail; plaintiffs have not plausibly alleged deception.

### 5.      Plaintiffs' Negligent Misrepresentation Claim Fails

As described above, plaintiffs have not stated a plausible claim with respect to their allegations of deception. Additionally, for a negligent misrepresentation claim in a commercial transaction in New York, plaintiffs must plead "justifiable reliance." *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 623-24 (S.D.N.Y. 2011), *aff'd*, 478 F. App'x 679, 682-83 (2d Cir. 2012). A finding of justifiable reliance turns in part on "whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (1996). As with the initial complaint, plaintiffs' "allegations are insufficient as to the representations being related to lead." Order at 24.

### 6.      Plaintiffs' Intentional Misrepresentation Claim Fails

Plaintiffs' allegations cannot support an intentional misrepresentation claim for the same

1  reasons they cannot support a claim under California consumer protection laws. *See also*, nn. 9 &

2  10, *supra*.

### 7.    Plaintiffs' Unjust Enrichment Claim Fails

4      In support of their unjust enrichment claim, plaintiffs allege that "[i]t would be

5  inequitable, unconscionable, and unjust for Defendants to be permitted to retain . . . economic

6  benefits because the benefits were procured as a direct and proximate result of their wrongful

7  conduct." FAC at ¶ 203. Plaintiffs, however, received a benefit from the purchase of the Products

8  and the inequitable prong of plaintiffs' unjust enrichment claim fails for the same reasons their

9  California consumer protection claims fail. As a result, plaintiffs' claims for equitable relief also

10  fail.

## IV.    CONCLUSION

12      For the foregoing reasons, defendants respectfully request that the FAC be dismissed with

13  prejudice.

14  Dated: August 19, 2024

**KING & SPALDING LLP**
Dale J. Giali
Michael L. Resch
Anne M. Voigts

By:  */s/ Michael L. Resch*
Michael L. Resch
Attorneys for Defendants
BELLRING BRANDS, INC. and
PREMIER NUTRITION COMPANY, LLC