**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD (SBN 257370)
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE (SBN 275423)
*mmonroe@fmfpc.com*
TREVOR M. FLYNN (SBN 253362)
*tflynn@fmfpc.com*
PETER GRAZUL (SBN 342735)
*pgrazul@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, CA 92110
Phone: (619) 215-1741
***Counsel for Plaintiffs***

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA KRYSTOFIAK, LUIS CARRENO, and JONATHAN ZIMMERMAN, on behalf of themselves, all others similarly situated, and the general public,<br><br>                    Plaintiffs,<br><br>          v.<br><br>BELLRING BRANDS, INC. and PREMIER NUTRITION COMPANY, LLC,<br><br>                    Defendants. | Case No.: 3:23-cv-02819-AGT<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT [DKT. NO. 43]**<br><br>Judge:      Honorable Alex G. Tse<br>Date:       November 22, 2024<br>Time:       10:00 a.m.<br>Location:   Courtroom A, 15th Floor |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ............................................................................................................... 1

FACTS ............................................................................................................................. 1

LEGAL STANDARD ........................................................................................................... 7

ARGUMENT ..................................................................................................................... 8

    I.     PLAINTIFFS HAVE ADEQUATELY ALLEGED THEIR STANDING ............................ 8

          A.    Plaintiffs Adequately Allege their Own Standing ...................................... 8

          B.    Plaintiffs Adequately Allege their Standing to Challenge Substantially
               Similar Flavors .......................................................................................... 9

          C.    There is no Inconsistency in Mr. Carreno's Allegations ......................... 10

          D.    Non-Labeling Advertising is Relevant to Plaintiffs' and the Class's Claims............ 11

    II.    PLAINTIFFS' CHALLENGES ARE NOT PREEMPTED ............................................ 12

          A.    The Regulatory Scheme ........................................................................ 12

          B.    Defendants are Wrong that the Court Erred in Applying § 101.65(d) ..................... 13

          C.    Defendants Fail to "Address" the Court's No-Preemption Holding......................... 17

               1.    The "Healthy Snack" Claim is Not an Implied Nutrient Content
                     Claim......................................................................................... 17

               2.    "Immune Health Support" is a Non-Preempted Structure/Function
                     Claim, Not an Implied Nutrient Content Claim............................. 18

               3.    Defendants Have Not Shown Premier Shakes Comply with the
                     Requirements for Making Healthy Dietary Practices Implied
                     Nutrient Content Claims ............................................................. 19

    III.    PLAINTIFFS' CONSUMER FRAUD CLAIMS ARE PLAUSIBLE ................................. 20

    IV.    DEFENDANTS CONCEDE PLAINTIFFS STATE A UCL "UNLAWFUL"
           PRONG CLAIM .................................................................................................... 24

CONCLUSION.................................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Cases**

*Ackerman v. Coca-Cola Co.*,
  2010 WL 2925955 (E.D.N.Y. July 21, 2010) ........................................................................ 16, 18, 20

*Aguilera v. Molina*,
  2020 WL 4050873 (N.D. Cal. July 20, 2020) ........................................................................ 8

*Anderson v. Jamba Juice Co.*,
  888 F. Supp. 2d 1000 (N.D. Cal. 2012) ........................................................................ 10

*Andrade-Heymsfield v. Danone US, Inc.*,
  2019 WL 3817948 (S.D. Cal. Aug. 14, 2019) ........................................................................ 15, 19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................ 7

*Azadpour v. Sun Microsystems, Inc.*,
  2007 WL 2141079 (N.D. Cal. July 23, 2007) ........................................................................ 10

*Becerra v. Dr Pepper/Seven Up, Inc.*,
  2018 WL 3995832 (N.D. Cal. Aug. 21, 2018) ........................................................................ 11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................ 7

*Bland v. Sequel Natural Ltd.*,
  2019 WL 4658361 (N.D. Cal. Jan. 18, 2019) ........................................................................ 20

*Bronson v. Johnson & Johnson, Inc.*,
  2013 WL 1629191 (N.D. Cal. Apr. 16, 2013) ........................................................................ 19

*Cohen v. ConAgra Brands Inc.*,
  16 F.4th 1283 (9th Cir. 2021) ........................................................................ 18

*Freeman v. Time, Inc.*,
  68 F.3d 285 (9th Cir. 1995) ........................................................................ 21

*Grausz v. Hershey Co.*,
  2024 WL 312688 (S.D. Cal. Jan. 25, 2024) ........................................................................ 1, 24, 25

*Grausz v. Hershey Co.*,
  691 F. Supp. 3d 1178 (S.D. Cal. 2023) ........................................................................ 20, 21

*Grausz v. Kroger Co.*,
  2020 WL 12688138 (S.D. Cal. Mar. 3, 2020) ........................................................................ 14

ii

*Krystofiak et al. v. BellRing Brands, Inc. et al.*, Case No: 3:23-cv-02819-ATG
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

*Gutierrez v. Bausch Health US, LLC*,
   2024 WL 1854288 (9th Cir. Apr. 29, 2024) ........................................................... 12

*Hadley v. Kellogg Sales Co.*,
   273 F. Supp. 3d 1052 (N.D. Cal. 2017) ..........................................................passim

*Hayden v. Bob's Red Mill Natural Foods, Inc.*,
   2024 WL 1643696 (N.D. Cal. Apr. 16, 2024) ......................................................... 10

*Hishon v. King & Spalding*,
   467 U.S. 69 (1984) ...................................................................................................... 8

*Holt v. Foodstate, Inc.*,
   2015 WL 9592534 (S.D. Cal. Dec. 31, 2015) ........................................................ 25

*Horti v. Nestle HealthCare Nutrition, Inc.*,
   2022 WL 2441560 (N.D. Cal. July 5, 2022) ........................................................... 19

*Hughes v. Ester C Co.*,
   99 F. Supp. 3d 278 (E.D.N.Y. 2015) ...................................................................... 19

*Hunter v. Nature's Way Prods., LLC*,
   2016 WL 4262188 (S.D. Cal. Aug. 12, 2016) ......................................................... 14

*In re Lindt & Sprüngli (USA), Inc. Dark Chocolate Litig.*,
   2024 WL 4107244 (E.D.N.Y. Sept. 6, 2024) ................................................... 22, 25

*In re Quaker Oats Labeling Litig.*,
   2012 WL 1034532 (N.D. Cal. Mar. 28, 2012) ........................................................ 21

*In re Tobacco II Cases*,
   46 Cal. 4th 298 (2009) .............................................................................................. 11

*Johnson-Jack v. Health-Ade LLC*,
   587 F. Supp. 3d 957 (N.D. Cal. 2022) .................................................................... 14

*Krommenhock v. Post Foods, LLC*,
   2018 WL 1335867 (N.D. Cal. Mar. 15, 2018) ........................................................ 14

*Krommenhock v. Post Foods, LLC*,
   255 F. Supp. 3d 938 (N.D. Cal. 2017) ............................................................... 11, 13

*Krommenhock v. Post Foods, LLC*,
   334 F.R.D. 552 (N.D. Cal. Mar. 9, 2020) ............................................................... 10

*Krystofiak v. BellRing Brands, Inc.*,
   2024 WL 3012801 (N.D. Cal. June 14, 2024) ...................................................passim

*Kumar v. Salov N. Am. Corp.*,
  2016 WL 3844334 (N.D. Cal. July 15, 2016) ............................................................ 10

*Levy v. Hu Prods. LLC*,
  2024 WL 897495 (S.D.N.Y. Mar. 1, 2024) ......................................................... 22, 25

*Manzarek v. St. Paul Fire & Marine ns. Co.*,
  519 F.3d 1025 (9th Cir. 2008) ................................................................................... 7

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
  521 F.3d 1097 (9th Cir. 2008) ................................................................................... 7

*Milan v. Clif Bar. Co.*,
  2019 WL 3934918 (N.D. Cal. Aug. 20, 2019) ........................................................ 23

*Organic Consumers Ass'n v. Gen. Mills, Inc.*,
  235 F. Supp. 3d 226 (D.D.C. 2017) ......................................................................... 13

*Palmer v. Roosevelt Lake Log Owners Ass'n*,
  651 F.2d 1289 (9th Cir. 1981) ................................................................................... 8

*Red v. Kraft Foods, Inc.*,
  2011 WL 938297 (C.D. Cal. Jan. 13, 2011) ............................................................ 14

*Red v. Kraft Foods, Inc.*,
  754 F. Supp. 2d 1137 (C.D. Cal. 2010) ................................................................... 13

*Reid v. Johnson & Johnson*,
  780 F.3d 952 (9th Cir. 2015) ............................................................................. 17, 20

*Renn v. Otay Lakes Brewery, LLC*,
  2024 WL 4093188 (S.D. Cal. Sept. 5, 2024) ........................................................... 11

*Rodriguez v. Mondelez Global LLC*,
  703 F. Supp. 3d 1191 (S.D. Cal. 2023) .............................................................. 20, 21

*Sanchez v. Nurture, Inc.*,
  626 F. Supp. 3d 1107 (N.D. Cal. 2022) ................................................................... 19

*Sciortino v. Pepsico, Inc.*,
  108 F. Supp. 3d 780 (N.D. Cal. 2015) ..................................................................... 21

*Stewart v. Kodiak Cakes, LLC*,
  537 F. Supp. 3d 1103 (S.D. Cal. 2021) .................................................................... 14

*Stuve v. Kraft Heinz Co.*,
  2023 WL 184235 (N.D. Ill. Jan. 12, 2023) .............................................................. 25

iv

*Krystofiak et al. v. BellRing Brands, Inc. et al.*, Case No: 3:23-cv-02819-ATG
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

*Trazo v. Nestle USA, Inc.*,
   2013 WL 4083218 (N.D. Cal. Aug. 9, 2013) ................................................................. 18

*Vitiosus v. Alani Nutrition, LLC*,
   2022 WL 2441303(S.D. Cal. July 5, 2022) ................................................................. 16

*Williams-Sonoma, Inc. v. Amazon.com, Inc.*,
   627 F. Supp. 3d 1072 (N.D. Cal. 2020) ................................................................. 7


**Statutes**

21 U.S.C. § 343 ................................................................. 1, 24

21 U.S.C. § 343(r)(6) ................................................................. 19


**Other Authorities**

58 Fed. Reg. 2302-01 (Jan. 6, 1993) ................................................................. 16

59 Fed. Reg. 24232-01 (May 10, 1994) ................................................................. 15, 18

65 Fed. Reg. 1000-01(Jan. 6, 2000) ................................................................. 19


**Regulations**

21 C.F.R. § 101.100 ................................................................. 31

21 C.F.R. § 101.100(a)(1)(iii) ................................................................. 31

21 C.F.R. § 101.100(a)(3)(i) ................................................................. 30

21 C.F.R. § 101.13(b) ................................................................. 15

21 C.F.R. § 101.13(b)(2) ................................................................. 15

21 C.F.R. § 101.13(b)(2)(i) ................................................................. 15

21 C.F.R. § 101.13(b)(2)(ii) ................................................................. 15, 16, 22

21 C.F.R. § 101.13(c) ................................................................. 22

21 C.F.R. § 101.65 ................................................................. 15

v

*Krystofiak et al. v. BellRing Brands, Inc. et al.*, Case No: 3:23-cv-02819-ATG
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

21 C.F.R. § 101.65(d) ....................................................................................................passim

21 C.F.R. § 101.65(d)(1) ...............................................................................................passim

21 C.F.R. § 101.65(d)(1)(i) ..........................................................................................21, 22

21 C.F.R. § 101.65(d)(1)(ii) ...........................................................................16, 18, 21, 22

21 C.F.R. § 101.65(d)(2) ..................................................................................15, 16, 22, 25

21 C.F.R. § 101.65(d)(2)(i) ..................................................................................................25

21 C.F.R. § 101.65(d)(2)(iv) ...............................................................................................25

21 C.F.R. § 101.93 ...............................................................................................................24

21 C.F.R. § 101.93(f) ...........................................................................................................24

21 C.F.R. § 101.93(g)(2) ......................................................................................................24

vi

*Krystofiak et al. v. BellRing Brands, Inc. et al.*, Case No: 3:23-cv-02819-ATG
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

## INTRODUCTION

With the operative pleading now appropriately amended and tailored to the Court's previous Order, Defendants provide no salient reason for the dismissal of Plaintiffs' claims. Plaintiffs adequately allege their standing to challenge all Premier Protein flavors containing lead, and their allegations relating to Defendants' non-label advertising is highly relevant to their and the Class's claims. Plaintiffs' challenges are not preempted, as neither "healthy snack" nor "immune health support" is permitted or even governed by the regulation Defendants creatively misread, 21 C.F.R. § 101.65(d). Plaintiffs' consumer fraud claims present complex questions ill-suited for resolution now, but are plausible given the totality of their allegations. Finally, Defendants do not contest the plausibility of Plaintiffs' allegation that Defendants misbrand the Premier Shakes by failing to disclose lead in the ingredients lists in violation of 21 U.S.C. § 343, *see* Dkt. No. 40, First Am. Compl. ("FAC") ¶ 103, which is actionable under the Unfair Competition Law's "unlawful" prong, *see Grausz v. Hershey Co.*, --- F. Supp. 3d ----, ---- 2024 WL 312688, at *5 (S.D. Cal. Jan. 25, 2024). As a result, the Court should deny Defendants' motion.

## FACTS

Defendants "market and sell ready-to-drink protein shakes under the brand name 'Premier Protein.'" FAC ¶ 1. "[T]esting conducted by multiple independent, ISO-accredited laboratories . . . demonstrates that certain flavors"—Chocolate, Vanilla, Caramel, and Café Latte—"contain high levels of lead . . . ." *Id.*; *see also id.* ¶ 81 (testing results). "Despite the[] health risks" associated with lead exposure, "Defendants label the products with health and wellness claims and do not disclose the presence of lead in the Premier Shakes on the labels (or elsewhere)." *Id.* ¶ 3.

"[T]he Premier Shakes' labels suggest the products are both generally healthy, and specifically beneficial for the body's immune system," through the following labeling statements: (1) "a healthy snack"; (2) "with nutrients for ENERGY & IMMUNE health support" *or* "with nutrients for IMMUNE HEALTH support"; (3) "Maintaining a healthy lifestyle can be hard. Premier Protein is here to make things a little easier"; and (4) "I started my health journey at 41 and the taste of Premier Protein helps me not feel deprived from sweets. I drink it every day and I cook with it." *Id.* ¶¶ 48, 50. "Defendants' online marketing efforts reiterate [the] message that the consumption of Premier Shakes promotes general and immune health." *Id.* ¶ 51. This includes statements like, "A company built on a simple idea: deliver nutrition that people can't

1

*Krystofiak et al. v. BellRing Brands, Inc. et al.*, Case No: 3:23-cv-02819-ATG
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

wait to have," "part of your healthy routine," "good for nourishment," "an essential nutrient," "healthy immune support," "important antioxidants your body needs," "your daily hookup of important nutrients," and "help give your body the nourishment it needs." *Id.* ¶¶ 52-54.

"Defendants further reiterate their health and wellness marketing for the products through their social media accounts," saying "[t]he team at Premier Nutrition is dedicated to researching and developing a variety of products" with "exceptional nutritional values that are unsurpassed by any other products on the market," and "[w]e know what an important role our shakes play in your wellness routines." *Id.* ¶ 57. This includes "a YouTube channel with dozens" of commercials, some with "tens of millions of views." *Id.* ¶ 58. These videos "reiterate[] the Premier Shakes' labeling claims," *see id.* ¶ 59, and expand on them, with one "commercial . . . stat[ing] that the product provides 'modern nutrition you need to feel like the bee's knees.'" *Id.* ¶ 60. Several commercials "take the form of people telling stories about their experiences with the products" and "frequently involve individuals who have existing health issues or are seeking to lose weight," thereby "suggest[ing] the Premier Shakes are beneficial for individuals with diseases and those looking to lose weight." *Id.* ¶ 61; *see also id.* ¶¶ 62-72 (detailing content of commercials).

Moreover, "[t]he Premier Shakes are available to purchase from a wide variety of online retailers," and "Defendants provide the[m] . . . with product images, product information, and marketing pieces" that "repeat Defendants' claims that the Premier Shakes are both generally healthy, and specifically promote immune health." *Id.* ¶ 73. "[I]n several cases, Defendants go further, for example claiming the Premier Shakes provide 'Guilt-free indulgence.'" *Id.* ¶ 74; *see also id.* ¶ 75 (exemplars). "In addition, most Premier Protein Product pages on Amazon include a section of the listing titled 'From the Manufacturer,'" which "includes statements like, 'Our mission is to inspire optimism on the way to better health' and 'you're on a journey to becoming a healthier, happier you. . . . Every shake . . . nourishes your body with sustainable, feel-good energy and gives you just what you need to achieve your health goals.'" *Id.* ¶ 76. Similarly, "[t]he 'Product details' provided by [Defendants] for Sam's Club online . . . reiterates Defendants' health and wellness claims," including statements like "it's part of your healthy routine," "contains a variety of healthy ingredients," "can provide many benefits," "Healthy Immune Support," "committed to promoting a healthy and active lifestyle," and "think of this shake as part of your daily hookup of important nutrients that can help support your immune health . . . and help give your body the nourishment it needs." *Id.* ¶ 77.

Defendants market the Premier Shakes to "several different types of . . . consumers, including pre-teen and teenage children . . . ." *See id.* ¶ 55. "In fact, ***Defendants market the Premier Shakes for children as young as four years old***," telling consumers in an article on the Premier website that "kids as young as four can reap the benefits of protein shakes to supplement their normal diet . . . ." *Id.* ¶ 56 (quotation omitted).

Despite this health and wellness marketing, "[i]ndependent laboratory testing . . . by two separate, ISO-accredited laboratories demonstrates that the Premier Shakes contain high levels of lead," *id.* ¶ 81 a "heavy metal" that "has no positive physiological role in the human body, but [whose] harmful effects are manifold," *id.* ¶ 17. Lead is "a cumulative toxicant that negatively affects multiple body systems, including the neurological, hematological, gastrointestinal, cardiovascular, immune, and renal systems." *Id.* (citing World Health Organization, "Exposure to Lead: A Major Public Health Concern" (2d ed., 2021)). "Even when lead exposure is not severe or obvious, its effects are pernicious. At lower levels of exposure, lead produces a spectrum of injuries across multiple body systems." *Id.* ¶ 18. For example, lead can cause "irreversible" effects, "affect[ing] children's brain development, resulting in lower IQ"; "caus[ing] behavioral changes such as reduced attention span, increased antisocial behavior, and reduced educational attainment"; and "caus[ing] anemia, hypertension, renal impairment, immunotoxicity, toxicity to the reproductive organs, type 2 diabetes, and cancer." *Id.*

Lead is so damaging because it "create[s] reactive radicals which damage cell structures, including DNA and cell membrane." *Id.* ¶ 17 (quotation omitted). Moreover, "[l]ead in the body is distributed to the brain, liver, kidneys and bones, and stored in teeth and bones, where it accumulates over time." *Id.* ¶ 19. "In times of stress," however "'the body can mobilize lead stores, thereby increasing the level of lead in the blood,'" and this occurs, for example, "during pregnancy, exposing the fetus to lead." *Id.* (quoting Centers for Disease Control and Prevention, "What is the Biological Fate of Lead in the Body?" (June 12, 2019)). This "ability to accumulate in the body and lie in wait to be released into the blood without control and at unexpected times, makes lead particularly dangerous." *Id.* ¶ 20. Because of this, "even 'extremely low' levels of consistent lead exposure can, for example, 'reduce the cognitive capacity of children.'" *Id.*[1]

---

[1] The FAC attributes the quoted language to Needlemann, H.I., et al., "The longterm effects of exposure to low doses of lead in childhood—An 11-year follow-up report," N.E. J. Med., Vol. 322, at 83-88 (1990), *available at* https://www.nejm.org/doi/pdf/10.1056/NEJM199001113220203 ["Needleman (1990)"], but that is (inadvertently) mistaken. The language actually comes from Wani, A.L., et al., "Lead toxicity: a

3

1   "Moreover, as lead exposure increases, the range and severity of symptoms and effects also increase." *Id.*

2   Finally, "***the immune system appears to be exquisitely sensitive to the toxic heavy metal lead as compared***

3   ***to other toxicological parameters.***" *Id.* ¶ 18 (quoting Mishara, K.P., "Lead exposure and its impact on

4   immune system: a review," Toxicology, Vol. 23, No. 6, at 969 (Sept. 2009) (emphasis added)).

5         "As a result, the World Health Organization has declared that 'There is no level of exposure to lead

6   that is known to be without harmful effects,' and 'There is no known safe blood level concentration.'" *Id.* ¶

7   21 (quoting World Health Organization, "Lead Poisoning" (Aug. 31, 2022)). "Moreover, pursuant to

8   Proposition 65, and in the interest of helping consumers avoid reproductive system disorders and cancer,

9   _____

10  review," Interdiscip. Toxicol. Vol. 8, No. 2, at 57 (2015), *available at*
    https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4961898/pdf/ITX-8-055.pdf ["Wani 2015"], which itself

11  cites Needleman (1990) for the proposition. According to the article, "[t]here is no threshold value for the
    level of lead present in blood below which its concentration can be considered safe. Extremely low yet

12  permanent levels of lead exposure were found to reduce the cognitive capacity of children (Needlemann *et
    al.*, 1990)." Wani (2015) at 57. Needlemann "reexamined 132 . . . young adults who had initially been

13  studied as primary schoolchildren in 1975 through 1978." Needleman (1990) at 83. "[I]mpairment in
    neurobehavioral function was still found to be related to the lead content of teeth shed at the ages of six and

14  seven," with "young people with dentin lead levels >20 ppm ha[ving] a markedly higher risk of dropping
    out of high school . . . and of having a reading disability . . . as compared to those with dentin lead levels

15  <10 ppm," and "[h]igher lead levels . . . significantly associated with lower class standing in high school,
    increased absenteeism, lower vocabulary and grammatical-reasoning scores, poor hand-eye coordination,

16  longer reaction times, and slower finger tapping." *Id.* In classifying lead exposure, "the dentin lead levels
    measured from 1975 through 1977 were used to compute an arithmetic mean" and a scale was developed,

17  "i.e., high (>20 ppm), medium (10 to 19.9 ppm), and low (<10 ppm)[.]" *Id.* at 84. This was equivalent to,
    on average, 1.6 µmol per liter (34 µg per deciliter) for the high group, and 1.2 µmol per liter (24 µg per

18  deciliter) for the low group. *See id.* at 88. Needlemann notes that "rhesus monkeys, administered lead only
    in the first 100 days of life, had impairments in learning as adolescents," with their "mean blood lead level"

19  "[i]n adolescence" just "0.73 µmol per liter (15 ug per deciliter)." *Id.* at 87. Moreover, for the re-examination
    group, "[l]ead levels . . . were measured at the time of the reexamination to estimate current exposure," but

20  this "was discontinued after the first 48 subjects were tested, because none had a lead level exceeding 0.34
    µmol per liter (7 µg per deciliter), well below the Centers for Disease Control's definition of undue lead

21  exposure of 1.25 µmol per liter (25 µg per deciliter)." *Id.* at 84. Needlemann further notes that "[t]he
    consensus on what level of lead is toxic has changed in recent years, with "the Agency for Toxic Substances

22  and Disease Registry defin[ing] the threshold for neurobehavioral toxicity as 0.5 to 0.7 µmol per liter (10 to
    15 µg per deciliter)." *Id.* at 87-88; *see also* Canfield, R.L., et al., "Intellectual Impairment in Children with

23  Blood Lead Concentrations below 10 µg per Deciliter," N.E. J. Med. Vol. 348, No. 16, 1517-26, at 1517
    (Apr. 2003), *available at* https://www.nejm.org/doi/pdf/10.1056/NEJMoa022848 (Finding "blood lead

24  concentration inversely and significantly associated with IQ. In the linear model, each increase of 10 µg per

25  deciliter in the lifetime average blood lead concentration was associated with a 4.6-point decrease in IQ. . .

26  . When estimated in a nonlinear model . . . IQ declined by 7.4 points as lifetime average blood lead

27  concentrations increased from 1 to 10 µg per deciliter," and concluding that "more U.S. children may be

28  adversely affected by environmental lead than previously estimated.").

the state of California has promulgated thresholds for lead exposure, including a maximum allowable dose level (MADL) for lead of just 0.5 µg (micrograms, sometimes expressed mcg) per day." *Id.* ¶ 22. "With respect to cancer, according to the body of science relied upon by the California Office of Environmental Health Hazard Assessment (OEHHA) . . . 'the intake level associated with lifetime cancer risk . . . is 15 µg/day.'" *Id.* ¶ 23.

Independent laboratory testing of Defendants' Premier Shakes showed "each serving" of the Chocolate, Vanilla, Caramel, and Café Latte flavors contained "well in excess of the 0.5 µg MADL (i.e., daily limit) under California's Proposition 65" and "a significant portion"—as much as nearly 10%—"of the 15 µg/day limit that represents a 'significant risk level' for lifeline cancer . . . ." *Id.* ¶ 81. "Given the negative effects of toxic lead, including at the levels found in the Premier Shakes, consumption of the Premier Shakes" therefore "poses a health risk to consumers." *Id.* ¶ 26. "Thus, even a single drink cannot reasonably be characterized as healthy. Instead, reasonable consumers would rightly be concerned given the significant contribution of these drinks to their daily safe limit." *Id.* ¶ 24.

There are some particularly troubling aspects of this case. First, "[a]s a household name, Premier Protein has earned significant public trust and confidence from consumers that its foods are safe and fit for regular consumption." *Id.* ¶ 27. Defendants hold Premier Protein "out as worthy of that trust and . . . as making premium protein supplement products." *Id.* ¶ 28.

Second, "Defendants have a history of quality control issues," *id.* ¶ 83; *see generally id.* ¶¶ 84-88 (detailing issues), "that should have made them particularly vigilant about dangerous or unsafe levels of contaminants in the Premier Shakes, and particularly their lead levels." *Id.* ¶ 83. They could have "control[led] the levels of lead in the Premier Shakes by properly monitoring for heavy metal presence, sourcing ingredients with less heavy metals, or none at all, adjusting the Shakes' formulation to reduce or eliminate heavy metals, or improving their manufacturing process to eliminate introduction of lead caused by Defendants themselves." *Id.* ¶ 33; *see also id.* ¶ 88 ("Defendants knew or should have known they owed consumers a duty of care to adequately test for lead."). Indeed, because "'[n]ot all of the protein powders that were tested'" by a group of experts "'contained elevated levels of toxins,' the problem is not global to protein powers *per se*, but rather lies with the 'manufacturing processes' and from sourcing ingredients

grown in soil contaminated with lead." *Id.* ¶ 33 (quotation omitted) (further noting "heavy metals were found in only about '40 percent of protein powders tested.'" (quotation omitted)).

Third, "Defendants encourage consumers to drink multiple Premier Shakes per day, compounding the risk created by the lead levels in the Premier Shakes." *Id.* ¶ 25 (internal citation omitted); *see also id.* ¶¶ 78, 80, 90-97 (describing Defendants' efforts). Defendants thus "knew or should have been aware that a reasonable consumer would consume the Premier Shakes regularly, leading to repeated exposure to lead, which accumulates in the body and its systems over time . . . even if each individual exposure is 'low.'" *Id.* ¶ 32 ("[T]he cumulative effect of consuming the Premier Shakes multiple times renders the amount of lead unreasonably dangerous, and at the very least reasonably concerning to consumers.").

"Defendants knew that if, instead of boasting to the public about how healthy consuming Premier Shakes is, they revealed to the public the presence of lead in the Premier Shakes, Plaintiffs and the Class Members would be unwilling to purchase the Premier Shakes or would pay less for them." *Id.* ¶ 29. Understanding this, "Defendants concealed this fact . . . and did not disclose the presence of lead on the Premier Shakes' labels, including in the ingredient lists." *Id.* ¶ 30; *see also id.* ¶ 31 ("Defendants knew . . . Plaintiffs and the Class members would rely upon the packages of the Premier Shakes and intended for them to do so but failed to disclose the presence of lead."). "As a result of Defendants' concealment . . . Plaintiffs and the Class members reasonably believed the Premier Shakes were free from substances, including lead, that would negatively affect their health and increase their risk for cancer []or reproductive harm." *Id.* ¶ 35.

Plaintiffs Patricia Krystiofak, Luis Carreno, and Jonathan Zimmerman regularly purchased the Premier Shakes in reliance on the challenged labeling claims and unaware the products contained any lead. *See id.* ¶¶ 104-106. Ms. Krystiofak, a California consumer, *id.* ¶ 12, began purchasing the shakes, including the Café Latte flavor, online through Walmart.com in around 2022, "rel[ying] on claims that suggested the shakes were healthy," *id.* ¶ 104. She regularly consumed them, often drinking one shake daily as a meal replacement. *Id.* Mr. Carreno, another California consumer, *id.* ¶ 13, began purchasing the shakes in 2020, including in the Chocolate flavor, through online e-tailers including Amazon, and from Costco and Food 4 Less stores in San Diego County, "rely[ing] on label claims that suggested they were healthy," *id.* ¶ 105. Mr. Zimmerman, a New York consumer, *id.* ¶ 14, began purchasing the shakes, including in the Café Latte flavor, from BJ's Wholesale, in around 2018, "and has regularly consumed them since, typically as a meal

replacement." *Id.* ¶ 106. He "purchased the Premier Shakes believing based on the totality of the products' labeling . . . that they were healthy, and did not contain any heavy metals." *Id.*

None of the Plaintiffs would have purchased the shakes if they knew the shakes contained, or even potentially contained lead. *Id.* ¶¶ 104-106. Rather, because they "were looking for healthy, nutritious options," Plaintiffs "would have avoided any Premier Shake they knew contained toxic heavy metals, like lead" and "would have avoided any Premier Shake they knew could increase their risk of reproductive toxicity or cancer, or inhibited neurological function, anemia, kidney damage, a compromised immune system, seizures, coma, and death." *Id.* ¶ 107; *cf. id.* ¶ 26 ("That lead is present is . . . material to reasonable consumers, including Plaintiffs"). "Plaintiffs paid more for the Premier Shakes, and would have only been willing to pay less, or unwilling to purchase them at all, absent Defendants' affirmative health and wellness statements, as well as their omissions regarding the lead" of the shakes. *Id.* ¶ 110.

"Because consumers who purchased the Premier Shakes were injured by Defendants' affirmative misrepresentations, acts, and deceptive omissions concerning the presence of lead in the Premier Shakes, Plaintiffs bring this action" to "enjoin Defendants from deceptively marketing the Premier Shakes in this manner and to recover compensation for injured Class Members." *Id.* ¶ 7.

## LEGAL STANDARD

"Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). "To survive the motion, the complaint must contain 'enough facts to state a claim for relief that is plausible on its face.'" *Williams-Sonoma, Inc. v. Amazon.com, Inc.*, 627 F. Supp. 3d 1072, 1079 (N.D. Cal. 2020) (Tse, J.) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible when the plaintiff 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In determining whether the plaintiff's claims are plausible, court's 'accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party.'" *Krystofiak v. BellRing Brands, Inc.*, --- F. Supp. 3d ----, ----, 2024 WL 3012801, at *1 (N.D. Cal. June 14, 2024) (Tse, J.) (quoting *Manzarek v. St. Paul Fire & Marine ns. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008)). Motions to dismiss "should not be granted unless it appears beyond doubt that the

1  plaintiff[s] can prove no set of facts in support of [their] claim or claims that would entitle [them] to relief."

2  *Aguilera v. Molina*, 2020 WL 4050873, at *2 (N.D. Cal. July 20, 2020) (citing *Hishon v. King & Spalding*,

3  467 U.S. 69, 73 (1984); *Palmer v. Roosevelt Lake Log Owners Ass'n*, 651 F.2d 1289, 1294 (9th Cir. 1981)).

4  <u>ARGUMENT</u>

5  **I.     PLAINTIFFS HAVE ADEQUATELY ALLEGED THEIR STANDING**

6  **A.     Plaintiffs Adequately Allege their Own Standing**

7          Ms. Krystofiak alleges she "regularly purchased the Premier shakes . . . including at least the Café

8  Latte flavor," and "relied on claims that suggested the shakes were healthy, including 'Immune Health

9  Support,' which was particularly important to her." FAC ¶ 104. Mr. Carreno alleges he regularly "purchased

10  Premier shakes, in the Chocolate flavor," and "relied on label claims that suggested they were healthy,

11  including 'IMMUNE HEALTH['] and 'healthy snack,' which were particularly important to him." *Id.* ¶

12  105. Mr. Zimmerman alleges he "regularly purchased Premier Shakes . . . including at least the Café Latte

13  flavor," and "believing based on the totality of the products' labeling, including the 'IMMUNE HEALTH['']

14  and 'healthy snack' statements, that they were healthy, and did not contain any heavy metals." *Id.* ¶ 106.

15  Accordingly, Plaintiffs have now made it "clear which products they actually purchased," and that "the

16  purchased products overlap with the testing results presented at paragraph 73 of the complaint." *Krystofiak*,

17  2024 WL 3012801, at *2-3. That is, each Plaintiff has now "specified a single flavor" that is "among [the]

18  combination" of products "listed in paragraph 33 of the complaint." *See id.*, at *2.

19          Defendants overstate the Court's Order in arguing Plaintiffs' allegations are still insufficient. The

20  Court did not "order[] that the allegations of purchase are deficient without" the "container size, or pack

21  [plaintiffs] purchased," *see* Dkt. No 43, Mot. to Dismiss FAC ("Mot.") at 9 (record citation omitted). Rather,

22  it noted that "Plaintiffs have alleged the suite of Premier Protein Products includes . . . 'at least 18 flavors'

23  of the Premier Protein shakes and two flavors of Premier Protein Plant Powders," *Krystofiak*, 2024 WL

24  3012801, at *2 (citing Compl. ¶¶ 33-34), but it was "unclear whether the purchased shakes were among any

25  combination of flavor, containers size, and pack size listed in paragraph 33," since "Krystofiak and

26  Zimmerman[] ha[d] not specified a single flavor, container size, or pack size that they purchased," thereby

27  making it "unclear if the purchased products overlap with the testing results presented at paragraph 73 of

28  the complaint," *id.* at *3.

8

*Krystofiak et al. v. BellRing Brands, Inc. et al.*, Case No: 3:23-cv-02819-ATG
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

1

Paragraph 73 of the Complaint contained the following testing results.

| Product | Flavor | Laboratory | Testing Date | Lead (µg per serving) | % of Prop 65 Daily Limit |
|---|---|---|---|---|---|
| Protein Shakes | Chocolate | ISO-Accredited Lab 1<br>ISO-Accredited Lab 2 | 5.22.2023<br>5.31.2023 | 1.39<br>1.346 | 278%<br>268% |
| | Vanilla | ISO-Accredited Lab 1<br>ISO-Accredited Lab 2 | 5.22.2023<br>6.02.2023 | 0.498<br>0.833 | -<br>166% |
| | Caramel | ISO-Accredited Lab 1<br>ISO-Accredited Lab 2 | 5.01.2023<br>6.02.2023 | 1.08<br>0.717 | 216%<br>143% |
| | Café Latte | ISO-Accredited Lab 1<br>ISO-Accredited Lab 2 | 5.22.2023<br>6.02.2023 | 1.33<br>0.969 | 266%<br>194% |
| Protein Powder | Vanilla | ISO-Accredited Lab 1 | 4.27.2023 | 0.529 | 106% |
| | Chocolate | ISO-Accredited Lab 2 | 6.05.2023 | 0.667 | 133% |

Compl. ¶ 73; *cf. Krystofiak*, 2024 WL 3012801, at *2 ("Plaintiffs provide test results for four flavors of shakes and two flavors of powders."). Notably, the Court found Mr. Carreno's allegation that he purchased "Premier Plant Powder, in the chocolate flavor," sufficient for standing to challenge both flavors of the powder, even though, like the shakes, the powder comes in multiple sizes. *See* Compl. ¶ 42 (depicting 19.7 oz. and 18.6 oz. powder sizes); *Krystofiak*, 2024 WL 3012801, at *3. Just as Mr. Carreno's allegations were sufficient then, the Court should find Plaintiffs' allegations sufficient now, as they allege they purchased Chocolate and Café Latte flavors, which "overlap with the testing results presented," *see Krystofiak*, 2024 WL 3012801, at *3; FAC ¶ 81.

**B.    Plaintiffs Adequately Allege their Standing to Challenge Substantially Similar Flavors**

The Court should also find Plaintiffs have standing to challenge the Vanilla and Caramel shakes since they "are substantially similar because they are alleged to be sold using the same challenged representations, with the flavor not being material to Plaintiffs' claims." *See Krystofiak*, 2024 WL 3012801, at *3 (internal record citation omitted); *see also* FAC ¶ 48. Defendants claim "the packaging, labeling, and website advertising can and does differ as to given shake containers," Mot. at 11, but does not show any differences between the flavors, nor that any differences are material to the claims in the case. That "all lead levels alleged in the FAC are" supposedly "below Prop 65's . . . safe harbor," *see id.*, suggests, rather than undermines substantial similarity between the flavors. And while there is facially some "sizeable difference in the alleged lead content among flavors," *see Krystofiak*, 2024 WL 3012801, at *3, the extent to which that renders the products *not* substantially similar is an issue of fact inappropriate for resolution now.

9

Additional testing data could reveal, for example, that the average amounts of lead does not actually differ so much among the products. Or discovery could confirm Plaintiffs' allegations that any amount above a certain threshold is problematic. *See Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 564 (N.D. Cal. Mar. 9, 2020) ["*Krommenhock III*"] ("supporting commonality" was that "the added sugar, comprising 13.33% to 40% of calories, falls well above the 5% and 10% daily limits endorsed by authoritative sources and supported in the scientific literature" (record quotation omitted)). Thus, "any concerns regarding material differences in the products can be addressed at the class certification stage." *See Hayden v. Bob's Red Mill Natural Foods, Inc.*, 2024 WL 1643696, at *5 (N.D. Cal. Apr. 16, 2024) (quoting *Anderson v. Jamba Juice Co.*, 888 F. Supp. 2d 1000, 1006 (N.D. Cal. 2012)).

Defendants' arguments regarding the varying location and relative visibility of the challenged claims on different product sizes, *see* Mot. at 10 n.11, also raises issues of fact ill-suited for resolution on a motion to dismiss, particularly when Plaintiffs have each alleged specific labeling claims on which they relied, FAC ¶¶ 104-106. *See Kumar v. Salov N. Am. Corp.*, 2016 WL 3844334, at *9 (N.D. Cal. July 15, 2016) ("arguments about whether consumers were likely to notice the challenged phrase . . . go to the merits of the claim"); *cf. Krommenhock III*, 334 F.R.D. at 563-64 ("[U]nder California law prominence goes only to the inapposite question of whether significant numbers of prospective class members saw or interacted with the [challenged] statement," which "California law does not ask . . . .").

## C.    There is no Inconsistency in Mr. Carreno's Allegations

Defendants' attempt to discredit Mr. Carreno's allegations, *see* Mot. at 9-10, is misplaced and wrong. At this stage, the Court must "accept factual allegations in the complaint as true," *see Krystofiak*, 2024 WL 3012801, at *1 (quotation omitted). Defendants argue the Court may disregard this rule under the sham pleading doctrine, but do not demonstrate any "allegations in [the] amended complaint [that] contradict those in [the] prior complaint," Mot. at 10 (quoting *Azadpour v. Sun Microsystems, Inc.*, 2007 WL 2141079, at *2 n.2 (N.D. Cal. July 23, 2007)). They are simply wrong that "Carreno has changed his allegations about his purchases in ways that are inconsistent with the initial complaint," *id.*

First, Mr. Carreno's allegation in the FAC that he purchased Premier *shakes* is in no way inconsistent with his previous allegation that he purchased Premier *powder*. *See id.* at 9. All it suggests is Plaintiffs chose not to allege his shake purchases in the initial Complaint; but there is no authority they owe an "explanation"

1   for that in their Complaint. *See id.* at 10. Similarly, the importance to Mr. Carreno of health claims on protein

2   *shakes* is *consistent* with the importance to him of health claims on protein *powder*, even if the specific

3   labeling statements are different. *See id.* at 9-10. Defendants imply some nefariousness in Mr. Carreno

4   alleging reliance only on labeling claims that survived their previous Rule 12 motion, but because alleging

5   reliance on unchallenged labeling claims is superfluous and nonsensical, refraining from doing so is in no

6   way improper. *Cf. In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009) ("It is not necessary that the plaintiff's

7   reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive

8   factor influencing his conduct. It is enough that the representation has played a substantial part, and so had

9   been a substantial factor, in influencing his decision." (cleaned up) (citation omitted)).

10  **D.    Non-Labeling Advertising is Relevant to Plaintiffs' and the Class's Claims**

11      Defendants argue that "the non-label advertising alleged at [FAC] ¶¶ 51-72 (websites and social

12  media, including YouTube commercials) and ¶¶ 73-80 (online ad copy and product specifications)—for

13  which plaintiffs fail to allege 'actual reliance'—may not be used to support their claims," Mot. at 13. But

14  Ms. Krystofiak and Mr. Carreno allege they sometimes purchased the products online, and none of the

15  Plaintiffs' allegations preclude their reliance on such materials. *See* FAC ¶¶ 104-106. Moreover, "non-label

16  statements not personally viewed by plaintiffs could nonetheless be relevant to defendant's knowledge for

17  punitive damages or materiality at class certification." *See Becerra v. Dr Pepper/Seven Up, Inc.*, 2018 WL

18  3995832, at *5 (N.D. Cal. Aug. 21, 2018) (citations omitted); *see also Krommenhock v. Post Foods, LLC*,

19  255 F. Supp. 3d 938, 949 n.12 (N.D. Cal. 2017) ["*Krommenhock I*"] (Approving "plaintiffs includ[ing] these

20  statements in their FAC to demonstrate Post's longstanding policy, practice, and strategy to market its high-

21  sugar cereals as healthy." (internal record citation omitted)); *cf. Renn v. Otay Lakes Brewery, LLC*, 2024

22  WL 4093188 (S.D. Cal. Sept. 5, 2024) (compelling production of non-label advertising in action alleging

23  misleading health and wellness advertising of alcoholic kombucha).

24      Defendants cite *Gutierrez v. Bausch Health US, LLC*, but the case is distinguishable because the

25  plaintiffs did not challenge labeling claims, only "advertisements found in products and television, as well

26  as print magazines," many "unrelated to the Talcum Products at issue, or outside the class period" and even

27  where "the complaint identifie[d] an advertisement promoting the Talcum Products during the class period,"

28  the "plaintiffs fail[ed] to 'demonstrate actual reliance on the allegedly deceptive or misleading statements.'"

1    2024 WL 1854288, at *1 (9th Cir. Apr. 29, 2024) (Mem.) (citations omitted). Here, Plaintiffs allege actual

2    reliance on the challenged labeling claims. *See* FAC ¶¶ 104-106.

3    **II.    PLAINTIFFS' CHALLENGES ARE NOT PREEMPTED**

4    **A.    The Regulatory Scheme**

5        The regulation providing "general principles" for nutrient content claims defines an "implied

6    nutrient content claim" as "any claim" that:

7        (i)    Describes the food or an ingredient therein in a manner that suggests that a nutrient is
8               absent or present in a certain amount (e.g., 'high in oat bran'); *or*

9        (ii)   Suggests that the food, because of its nutrient content, may be useful in maintaining
10              healthy dietary practices and is made in association with an explicit claim or statement
              about a nutrient (e.g. 'healthy, contains 3 grams (g) of fat').

11   21 C.F.R. § 101.13(b)(2) (emphasis added). Thus, there are two genres of implied nutrient content claim: a

12   § 101.13(b)(2)(i) claim that implies a *level* of the nutrient, and a § 101.13(b)(2)(ii) claim that implies the

13   *usefulness* of a nutrient *in maintaining healthy dietary practices* (a "healthy dietary practices implied

14   nutrient content claim"). Statements of both genres "may not be made on the label or in labeling of foods

15   unless the claim is made in accordance with this regulation and the applicable regulations in subpart D . . .

16   ." 21 C.F.R. § 101.13(b) Subpart D includes 21 C.F.R. § 101.65, which provides requirements for making

17   "[i]mplied nutrient content claims and related label statements." Pursuant to § 101.65(d)(2), manufacturers

18   "may use the term 'healthy' . . . as an implied nutrient content claim on the label or in labeling of a food

19   that is useful in creating a diet that is consistent with dietary recommendations if" four conditions are met.

20   21 C.F.R. § 101.65(d)(2). Thus, § 101.65(d)(2) provides the requirements for making a healthy dietary

21   practices implied nutrient content claim, that is, the type of claim defined in § 101.13(b)(2)(ii). Section

22   101.65(d)(1) confirms that the "paragraph covers labeling claims that are implied nutrient content claims

23   because they" meet the definition in § 101.13(b)(2)(ii) of a healthy dietary practices nutrient content claim,

24   because they: "(i) Suggest that a food because of its nutrient content may help consumers maintain healthy

25   dietary practices; *and* (ii) Are made in connection with an explicit or implicit claim or statement about a

26   nutrient (e.g., 'healthy, contains 3 grams of fat')." 21 C.F.R. § 101.65(d)(1) (emphasis added).

27

28

*Krystofiak et al. v. BellRing Brands, Inc. et al.*, Case No: 3:23-cv-02819-ATG
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

**B.      Defendants are Wrong that the Court Erred in Applying § 101.65(d)**

Applying these regulations, the Court explained that "[t]he term 'healthy' may be considered an implied nutrient claim *when used in conjunction with a claim about a nutrient*." *Krystofiak*, 2024 WL 3012801, at *5 (emphasis added) (citing 21 C.F.R. § 101.65(d)) Because "[h]ere, the label states 'enjoy as a healthy snack' but this is not connected to any particular nutrient," the statement "does not satisfy 21 C.F.R. § 101.65(d)(1)(ii)" and therefore, "Defendants' use of 'healthy' is not an implied nutrient content claim and is not expressly preempted." *Id.* (citing *Red v. Kraft Foods, Inc.*, 754 F. Supp. 2d 1137, 1142 (C.D. Cal. 2010) (Recognizing that if claims "are not implied nutrient claims within the regulatory meaning . . . then there would be no obvious argument for express preemption.")).

Defendants claim the Court erred by not reading "the word 'and'" in § 101.65(d) to "distribute[] the introductory clause separately to *each*" of § 101.65(d)(1)(i) and (ii). *See* Mot. at 14. They assert "the context of . . . the regulation makes clear" that "and" between sections (d)(1)(i) and (ii) should really be read as "or," *id.*. That bold, self-serving assertion is without support or even explanation, and deserves short shrift, as it would put § 101.13(b)(2)(ii) (defining healthy dietary practices implied nutrient content claims) in direct conflict with § 101.65(d)(1) (defining which labeling statements are governed by the § 101.65(d)(2) requirements for healthy dietary practices implied nutrient content claims).

Defendants lack of authority for their position is unsurprising, as the regulation "is much narrower than [Defendants'] description implies. It does not generally define and regulate the meaning of the term 'healthy'; rather it sets conditions under which that term . . . can be used as part of an 'implied nutrient content claim' on a food label." *See Organic Consumers Ass'n v. Gen. Mills, Inc.*, 235 F. Supp. 3d 226, 233 (D.D.C. 2017); *see also Krommenhock I*, 255 F. Supp. 3d at 956 (Section 101.65(d)(2) "only governs labeling claims that 'suggest' that 'a food because of its nutrient content may help consumers maintain healthy dietary practices' when made 'in connection with an explicit or implicitly claim or statement about a nutrient (e.g., 'healthy, contains 3 grams of fat').'" (citing 21 C.F.R. § 101.65(d)(1))). Six years ago, the Honorable William H. Orrick rejected this exact argument, explaining:

> Post makes a very broad argument that its use of "healthy" anywhere on its packaging constitutes an "implied" nutrient claim even absent a direct or connected reference to a governed nutrient. But Post provides no authority to stretch the regulation to cover uses of the term "healthy" that are not combined with direct references to a governed nutrient. The

example provided in the regulation shows the required, direct connection; "healthy, contains 3 grams of fat."

*Krommenhock v. Post Foods, LLC*, 2018 WL 1335867, at *5 (N.D. Cal. Mar. 15, 2018).

Defendants' reading would also mean a long line of opinions permitting challenges to voluntary "healthy" claims on unhealthy or unsafe foods were all wrongly decided. *Compare* Mot. at 14 (claiming "a healthy related statement is covered by 21 C.F.R. § 101.65(d) if it suggests an entire food product can maintain healthy dietary practices" even if the statement does not "identif[y] particular nutrients as associated with a healthy diet"); *with Johnson-Jack v. Health-Ade LLC*, 587 F. Supp. 3d 957, 972 (N.D. Cal. 2022) ("Health-Ade" "is not linked to any nutrient or any specific disease or health-related condition and, therefore, is not a health claim or a nutrient-content claim. The term is unregulated, and plaintiffs' claims are not preempted."); *Stewart v. Kodiak Cakes, LLC*, 537 F. Supp. 3d 1103, 1151 (S.D. Cal. 2021) ("creates . . . a healthy muffin" actionable); *Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1084 (N.D. Cal. 2017) (Koh, J.) ("start with a healthy spoonful," and "invest in your health invest in yourself" actionable); *Red v. Kraft Foods, Inc.*, 2011 WL 938297, at *4 (C.D. Cal. Jan. 13, 2011) ("Steps to a Healthier You" actionable); *cf. Hunter v. Nature's Way Prods., LLC*, 2016 WL 4262188, at *7-8 (S.D. Cal. Aug. 12, 2016) (where "Variety of Healthy Uses" was "used in close proximity on the products' label" to the nutrient content claims "Non-hydrogenated [and] No trans fat," plaintiff stated a viable claim for Defendants' violation of § 101.65(d) because the product contained a disqualifying amount of total and saturated fat); *Grausz v. Kroger Co.*, 2020 WL 12688138, at *5 (S.D. Cal. Mar. 3, 2020) (similar).

The error in Defendants' reading is also evident because the result is nonsensical. According to Defendants, without anything more, the regulation would "cover[] labeling claims that are implied nutrient content claims because they: . . . (ii) Are made in connection with an explicit or implicit claim or statement about a nutrient . . . ." 21 C.F.R. § 101.65(d)(1)(ii) (exemplar claim removed). What is made in connection with a statement about a nutrient? Something is obviously missing, and Defendants are relying entirely on the exemplar claim to fill in the gap. *See* Mot. at 14 (asserting that "the introductory clause 'labeling claims that are implied nutrient content claims' includes" under section (ii) "a statement that refers to a specific nutrient as providing a healthy benefit"). In reality, Defendants are collapsing section (i) into section (ii) for a supposed "standalone" section (ii) claim.

14

*Krystofiak et al. v. BellRing Brands, Inc. et al.*, Case No: 3:23-cv-02819-ATG
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

So insignificant is the sub-sectioning Defendants try to leverage, that in *Hadley*, the Honorable Lucy H. Koh—now sitting on the Ninth Circuit Court of Appeals—even disregarded them when quoting the regulation, explaining that "implied nutrient content claims include statements that '[s]uggest[] that the food, because of its nutrient content, may be useful in maintaining healthy dietary practices and is [*sic*] made in association with an explicit or implicit claim or statement about a nutrient.'" 273 F. Supp. 3d at 1077 (quoting 21 C.F.R. § 101.65(d)(1) and stating, "[a] specific example of a nutrient content claim involving health is 'healthy, contains 3 grams of fat.'"). As Judge Koh further explained, "rulemaking discussing 'healthy' nutrient content claims clarifies the meaning of 'an explicit or implicit claim or statement about a nutrient,'" providing:

> "healthy" will be an implied nutrient content claim only where "the term 'healthy' is accompanied by additional language or graphic material or is otherwise presented in a context that explicitly or implicitly suggests that the food has a particular nutrient profile," and thus places the statement in a "nutritional context" by "impl[ying] that the product is useful in achieving dietary recommendations."

*Id.* (quoting 59 Fed. Reg. at 24235; *accord Andrade-Heymsfield v. Danone US, Inc.*, 2019 WL 3817948, at *7 (S.D. Cal. Aug. 14, 2019) ("The FDA has clarified that general references to 'healthy' do not suggest a nutritional profile of the food, and consumers possess the ability to discern when the word 'healthy' is being used to convey that a food has a particular nutrient profile." (citing 59 Fed. Reg. 24232, 24235 (May 10, 1994)[2] (The FDA:

> does not believe that the term 'healthy' inherently implies the absence or presence of a nutrient in a particular amount, or that the food that bears the term necessarily has a nutrient profile that would be helpful to consumers in structuring a diet that conforms to dietary guidelines. Rather, such inferences are likely to be drawn only if the term "healthy" is accompanied by additional language or graphic material or is otherwise presented in a context that explicitly or implicitly suggests that the food has a particular nutrient profile.)))

Defendants' reliance on the FDA's 1993 comments is misplaced, as they take the comments out of context. *See* Mot. at 16. The FDA was not explaining the application of § 101.65(d)(1)—which at the time was not yet even promulgated—but disputing comments suggesting it lacked the authority to regulate "healthy" as a nutrient content claim at all. In this context, the FDA was simply explaining that a claim that a food is "healthy" is a variation of a claim that certain healthful or harmful nutrients are present or absent

---

[2] *Available at* https://archives.federalregister.gov/issue_slice/1994/5/10/24216-24254.pdf#page=17.

in certain amounts. *See Vitiosus v. Alani Nutrition, LLC*, 2022 WL 2441303, at *4 (S.D. Cal. July 5, 2022) ("An implied nutrient content claim might also make 'a "general nutrition claim,' (a subcategory of an implied nutrition claim) consisting of an express or implied claim that the nutrient content of a food may help consumers maintain healthy dietary practices."" (quoting *Ackerman v. Coca-Cola Co.*, 2010 WL 2925955, at *3(E.D.N.Y. July 21, 2010))). The full context in which the limited language Defendants quote (indicated by underlining) is as follows:

> Many comments asserted that FDA's definition of implied nutrient content claims should not include claims that imply that a "food because of its nutrient content may be useful in achieving a total diet that conforms to current dietary recommendations (e.g., healthy)." Some of these comments stated that Congress showed no interest in regulating such claims but instead was concerned only with regulating those statements that characterize the level of a nutrient present in a food. One such comment noted that neither the act nor the legislative history contains any language addressing general nutrition claims.

> The agency does not agree with these comments. First, the reading of section 403(r)(1)(A) of the act suggested by these comments is clearly too narrow. <u>A claim that a food, because of its nutrient content, may by [*sic*] useful in maintaining healthy dietary practices is clearly a claim that characterizes the level of nutrient in that food. The claim is essentially saying that the level of nutrients in the food is such that the food will contribute to good health.</u>

> Moreover, Congress was clearly concerned with such claims. The October 24, 1990, proceedings in the Senate show that one purpose of the 1990 amendments was to regulate the use of nutrient content claims that appear on food labels and labeling in order to help consumers make appropriate dietary choices . . . . In addition, section 403(r) of the act itself, repeatedly uses the phrase "* * * will assist consumers in maintaining healthy dietary practices" to describe the information for which provision is being made (see e.g., section 403(r)(2)(A)(ii)(II) and (r)(2)(A)(iii)(I) of the act).

> The agency is therefore not persuaded that this aspect of the proposed definition of implied nutrient content claims is inconsistent with the language of the act, the intent of Congress, or the goals of the 1990 amendments.

58 Fed. Reg. 2302, 2374-75 (Jan. 6, 1993). Moreover, additional FDA comments flatly contradict Defendants' interpretation of the regulation:

> FDA advises that it will consider these [healthfulness] terms to be in a nutritional context when they appear in association with an explicit or implicit claim or statement about a nutrient. For example, in the statement, "nutritious, contains 3 g of fiber," "nutritious" is an implied nutrient content claim because it suggests that the food may be useful in maintaining healthy dietary practices. Accordingly, the agency is providing in new § 101.65(d)(1) that such statements are implied nutrient content claims and are subject to the requirements of section 403(r) of the act.

> However, the agency also believes that when a term such as "healthy," "wholesome," and "nutritious" appears on a food label in a context that does not render it an implied nutrient content claim, it is not subject to the requirements of section 403(r) of the act. Under such

16

conditions, the use of the term is subject to section 403(a) of the act, and FDA will determine whether it is misleading on a case-by-case basis.

*Id.* at 2375 (Jan. 6, 1993). If "healthy" can appear on a food "in a context that does not render it an implied nutrient content claim," then Defendants' assertion that anytime "healthy" appears on a food without reference to a specific nutrients, it refers to all food's nutrients, *see* Mot. at 16, must be wrong. Defendants also do not explain, how "the entire shake," *id.*, "may help consumers maintain a healthy dietary practice," *id.* (quoting 21 C.F.R. § 101.65(d)(1)(i)). The Court should be no more persuaded now than when Defendants previously cited the comments for the same mistaken point. Dkt. No. 32, Def. Suppl. Br. at 2.

**C.    Defendants Fail to "Address" the Court's No-Preemption Holding**

**1.    The "Healthy Snack" Claim is Not an Implied Nutrient Content Claim**

Reading the regulation correctly, the Court found "Defendants do not argue that the term 'healthy snack' is connected to a nutrient or otherwise provide any support for this product claim being an implied nutrient content claim." *Krystofiak*, 2024 WL 3012801, at *5 ("enjoy as a healthy snack" was "not connected to any particular nutrient and thus does not satisfy 21 C.F.R. § 101.65(d)(1)(ii)). Defendants attempt to "address[]" this now by claiming for the first time that because "'healthy snack' is directly adjacent to the" mandatory Nutrition Fact Box, it "is clearly connected to the nutrients," and thus an implied nutrient content claim. *See* Mot. at 15 (emphasis in original omitted).

But Defendants miss two key aspects of the Court's Order and regulatory scheme. First, to be an implied nutrient content claim and meet the requirements of § 101.65(d)(1)(ii), "healthy" must be "used in conjunction with a ***claim*** about a nutrient." *Krystofiak*, 2024 WL 3012801, at *5 (emphasis added) (citing 21 C.F.R. § 101.65(d)). "Information that is required or permitted by § 101.9," which prescribes the Nutrition Facts Box and governs its contents, "is not a nutrient content claim," though "[i]f such information is declared elsewhere on the label or in labeling, it is a nutrient content claim . . . ." 21 C.F.R. § 101.13(c). Thus, while "the nutrition label clearly contains information about nutrient content, the claims made in it are not considered 'nutrient content claims' for purposes of FDA regulations." *Reid v. Johnson & Johnson*, 780 F.3d 952, 960 (9th Cir. 2015) (citing 21 C.F.R. § 101.13(c)); *cf. Krystofiak*, 2024 WL 3012801, at *5 (there must be a "connection" between "[t]he word 'healthy'" and a "*discussion* of a nutrient" (emphasis

17

*Krystofiak et al. v. BellRing Brands, Inc. et al.*, Case No: 3:23-cv-02819-ATG
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

added)). In sum, nothing in the Nutrition Facts Box constitutes a "*claim or statement about* a nutrient," 21 C.F.R. § 101.65(d)(1)(ii) (emphasis added).

Second, to be a healthy dietary practices implied nutrient content claim, the claim must suggest the food is "useful in creating a diet that is consistent with dietary recommendations," *id.* § 101.65(d)(2); *see also id.* §§ 101.13(b)(2)(ii), 101.65(d)(1)(i). Defendants argue the labeling statements are "connect[ed]" to "particular nutrients," *see* Mot. at 15, but the regulation requires more than just a connection. Defendants wholly fail to explain how the placement of "healthy snack" next to the Nutrition Facts Box "explicitly or implicitly suggests that the food has a particular nutrient profile," that "is useful in achieving dietary recommendations." *See Hadley*, 273 F. Supp. 3d at 1077 (quoting 59 Fed. Reg. at 24235); *see also Ackerman*, 2010 WL 2925955, at *11 ("Not every use of the word 'healthy' on a food label conveys an implied nutrient content claim; a violation of 21 C.F.R. § 101.65(d)(2) occurs only where it is used in a context suggesting that a food will, because of its nutrient content, help consumers maintain healthy dietary practices."); *Trazo v. Nestle USA, Inc.*, 2013 WL 4083218, at *10 (N.D. Cal. Aug. 9, 2013) (

> Plaintiffs target "health claims" made on labels for Dark Chocolate Raisinets ("help to maintain good health") and Rich Milk Chocolate Cocoa ("antioxidants help to protect cells from damage and calcium to build strong bones"). Nestlé argues that these claims are not "healthy" nutrient content claims because they are not associated with dietary or nutritional principles and do not imply the levels of a particular nutrient.[3] Nestlé is correct regarding Plaintiffs' claims under 21 C.F.R. 101.65(d), which only applies if the statement is "made in connection with an explicit or implicit statement about a nutrient." (internal record citation omitted)).

Thus, while "Defendants carry the burden to establish preemption," *Krystofiak*, 2024 WL 3012801, at *4 (citing *Cohen v. ConAgra Brands Inc.*, 16 F.4th 1283, 1289 (9th Cir. 2021)), they have failed to do so here with respect to the "healthy snack" labeling claim.

**2.     "Immune Health Support" is a Non-Preempted Structure/Function Claim, Not an Implied Nutrient Content Claim**

Defendants argue their "immune health support" statements are implied nutrient content claims "clearly within 21 C.F.R. § 101.65(d)(1)" because they "associate[] the word 'health' with specific nutrients in the shakes," "via an asterisk" to "the statement 'antioxidant Vitamins C & E, as part of a healthy diet and

---

[3] Nestlé was represented in *Trazo* by Defendants' counsel here, Mr. Giali.

lifestyle[.]'" Mot. at 17. But Defendants' use of "the word 'healthy' in the context of ['with nutrients for IMMUNE HEALTH support'] is not necessarily describing the [Premier Shake] itself as 'healthy' on its own." *See Andrade-Heymsfield*, 2019 WL 3817948, at \*7. Rather, "'immune support[]'" is actually "an archetypal structure/function claim." *See Hughes v. Ester C Co.*, 99 F. Supp. 3d 278, 284 (E.D.N.Y. 2015) (citing 65 Fed. Reg. 1000-01 at 1028-29 (Jan. 6, 2000)). Structure/function claims "describe the role of [a] nutrient . . . intended to affect normal structure or function in humans" or "characterize the means by which a nutrient . . . acts to maintain such structure or function." *See* 21 C.F.R. § 101.93(f). Here, as in *Andrade-Heymsfield*, "'healthy' [i]s used in relating to function of [the immune system]," such that the immune health support statements "are not nutrient content claims because they describe the function of the nutrient, not the product itself." *See Sanchez v. Nurture, Inc.*, 626 F. Supp. 3d 1107, 1118 (N.D. Cal. 2022).

The Federal Food, Drug, and Cosmetic Act was amended by the Dietary Supplement Health and Education Act to address certain "statement[s] *for [ ] dietary supplement[s]*." 21 U.S.C. § 343(r)(6) (emphasis added). Section 343(r)(6) and its implementing regulations expressly apply *only* to "statements *for dietary supplements*," 21 C.F.R. § 101.93 (title) (emphasis added); 21 U.S.C. § 343(r)(6). Thus, "preemption for structure/function claims is limited to dietary supplements, *not food labels*." *Bronson v. Johnson & Johnson, Inc.*, 2013 WL 1629191, at \*6 (N.D. Cal. Apr. 16, 2013) (emphasis added); *cf. Horti v. Nestle HealthCare Nutrition, Inc.*, 2022 WL 2441560, at \*5-6 (N.D. Cal. July 5, 2022) ("To the extent plaintiffs argue that the Boost product labels make unsubstantiated 'disease claims' under 21 C.F.R. § 101.93(g)(2), their argument fails" since "that regulation does not apply [to foods] because it actually deals with 'dietary supplements[.]'").

### 3. Defendants Have Not Shown Premier Shakes Comply with the Requirements for Making Healthy Dietary Practices Implied Nutrient Content Claims

Even if Defendants had shown that, pursuant to § 101.65(d)(1), the challenged claims are *covered* by § 101.65(d)(2), they do even attempt to show the Premier shakes *comply* with its requirements, and particularly § 101.65(d)(2)(iv), which provides:

> (2)     You may use the term "healthy" or related terms . . . as an implied nutrient content claim on the label or in labeling of a food that is useful in creating a diet that is consistent with dietary recommendations if: [ . . . ]

19

      (iv)    If you add a nutrient to the food . . . to meet the 10 percent requirement,[4] that addition must be in accordance with the fortification policy for foods in § 104.20 of this chapter.

21 C.F.R. § 101.65(d)(2)(iv). This means:

FDA regulations do not permit . . . any nutrient content claim involving the word "healthy," (or any derivative) to be made about a food unless it contains . . . at least 10 percent of the recommended daily reference quantity of vitamin A, vitamin C, calcium, iron, protein or fiber ("minimum nutrient levels"). In the case of a claim that a product is "healthy," a manufacturer may fortify the product with nutrients in order to reach the required 10 percent nutrient threshold only if the addition of nutrients would be consistent with the FDA's fortification policy for foods set forth in 21 C.F.R. § 104.20, which bars the "indiscriminate addition of nutrients to foods."

*Ackerman*, 2010 WL 2925955, at *9 (internal citation and footnotes omitted).

As is evident from the exemplar ingredient list below, Premier shakes are just fortified water.

INGREDIENTS: WATER, MILK PROTEIN CONCENTRATE, CALCIUM CASEINATE, COCOA POWDER (PROCESSED WITH ALKALI), CONTAINS LESS THAN 1% OF HIGH OLEIC SUNFLOWER OIL OR SOYBEAN OIL, NATURAL AND ARTIFICIAL FLAVORS, INULIN, CELLULOSE GEL AND CELLULOSE GUM, SALT, SUCRALOSE, ACESULFAME POTASSIUM, CARRAGEENAN, TRIPOTASSIUM PHOSPHATE, DIPOTASSIUM PHOSPHATE, SODIUM HEXAMETAPHOSPHATE, **VITAMIN AND MINERAL BLEND** (DL-ALPHA-TOCOPHERYL ACETATE [VITAMIN E], ZINC GLYCINATE CHELATE, FERRIC ORTHOPHOSPHATE, VITAMIN A PALMITATE, NIACINAMIDE, PHYTONADIONE [VITAMIN K1], POTASSIUM IODIDE, CHOLECALCIFEROL [VITAMIN D3], COPPER GLUCONATE, CALCIUM D-PANTOTHENATE, MANGANESE SULFATE, SODIUM SELENITE, BIOTIN, SODIUM MOLYBDATE, FOLIC ACID, THIAMINE MONONITRATE [VITAMIN B1], CYANOCOBALAMIN [VITAMIN B12], PYRIDOXINE HYDROCHLORIDE [VITAMIN B6], RIBOFLAVIN [VITAMIN B2], CHROMIUM POLYNICOTINATE), MAGNESIUM PHOSPHATE, SODIUM ASCORBATE. **CONTAINS MILK AND SOY.**    ¹Source of Protein

Where, as here, "Defendants have failed to establish that the fortification of" the Premier shakes "complies with FDA fortification policy," they have failed to demonstrate express preemption. *See id.*, at *11, *13.

## III.    PLAINTIFFS' CONSUMER FRAUD CLAIMS ARE PLAUSIBLE

"The reasonable consumer standard 'raises questions of fact that are appropriate for resolution on a motion to dismiss only in 'rare situations.'" *Krystofiak*, 2024 WL 3012801, at *7 (quoting *Reid*, 780 F.3d at 958). Moreover, "[i]ssues of what level of lead may be safe or unsafe and what reference level is appropriate to use are question of fact and need not be resolved at the pleading stage." *Id.*, at *2 (citing *Rodriguez v. Mondelez Global LLC*, 703 F. Supp. 3d 1191, 1207-208 (S.D. Cal. 2023); *Bland v. Sequel Natural Ltd.*, 2019 WL 4658361, at *2 (N.D. Cal. Jan. 18, 2019); *Grausz v. Hershey Co.*, 691 F. Supp. 3d 1178, 1191-92 (S.D. Cal. 2023)). Defendants nevertheless argue that "[h]aving failed to add allegations that the lead levels in defendants' shakes exceed a safety threshold (from Prop 65 or otherwise)," Plaintiffs "have

---

4 *See* 21 C.F.R. § 101.65(d)(2)(i) (permitting "healthy" implied nutrient content claims if "[t]he food meets" certain "conditions for fat, saturated fat, cholesterol, and other nutrients" including, for "(F) A food not [otherwise] specifically listed," like the Premier shakes, having "At least 10 percent of the RDI or the DRV per RA of one or more of vitamin A, vitamin C, calcium, iron, protein, or fiber").

20

*Krystofiak et al. v. BellRing Brands, Inc. et al.*, Case No: 3:23-cv-02819-ATG
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

1  not plausibly alleged . . . 'members of the public are likely to be deceived' by the product labeling." Mot. at

2  18, 19 (quoting *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995)).

3      Defendants claim Plaintiffs have neither "identif[ied] a lead level that 'constitutes a high level of

4  lead,'" nor "plausibly connect[ed]' such level to the representations of health and immune health . . . in the

5  product labeling" Plaintiffs challenge. *See id.* at 19-20 (citation omitted). That is wrong. First, Plaintiffs

6  allege that "pursuant to Proposition 65 . . . California has promulgated thresholds for lead exposure,

7  including a maximum allowable dose level (MADL) for lead of just 0.5 µg (micrograms, sometimes

8  expressed mcg) per day." FAC ¶ 22. The Court previously found it "[c]urious[]"Plaintiffs "argue that their

9  claims are independent of Prop 65. . . . then compare measured lead levels" in Defendants' products "to the

10  Prop 65 MADL to support the proposition that the Products 'contain high levels lead.'" *Krystofiak*, 2024

11  WL 3012801, at *8 (record citation omitted). That Plaintiffs refrain from pursuing legal claims for a

12  Proposition 65 violation, however, does not logically or legally preclude them from using its standards to

13  support their claims for other statutory violations—like of the UCL, FAL, CLRA, and New York GBL. *See*

14  *Sciortino v. Pepsico, Inc.*, 108 F. Supp. 3d 780, 794 (N.D. Cal. 2015) (Approving a plaintiff "disclaim[ing]

15  any Proposition 65 violation" while "explain[ing] that 'Proposition 65 is relevant to the extent it provides

16  guidance as to a reasonable consumer's purchasing decisions in California.");* Grausz*, 691 F. Supp. 3d at

17  1190-92.

18      Here, Proposition 65's 0.5 µg per day MADL makes it plausible reasonable consumers could be

19  deceived by health claims on shakes containing up to 1.39 µg per serving.[5] *See In re Lindt & Sprüngli*

20

21  _____

   [5] Plaintiffs allege the WHO "has declared that 'There is no level of exposure to lead that is known to be

22  without harmful effects,' and 'There is no known safe blood lead concentration.'" FAC ¶ 21 (citation

   omitted). The Court held that "using the World Health Organization's declaration . . . as a reference is too

23  conclusory and would render FDA guidance moot in all circumstances, rendering *any* alleged level of lead

   actionable." *Krystofiak*, 2024 WL 3012801, at *8. But "there is no basis on a motion to dismiss to conclude

24  the FDA is so infallible that it is wholly implausible for plaintiffs to contend [lead] presents a health risk"

   at any level. *See In re Quaker Oats Labeling Litig.*, 2012 WL 1034532, at *2 (N.D. Cal. Mar. 28, 2012)

25  ("[E]ven if it were the case that the FDA had clearly and specifically found that trans fats are safe in small

   quantities (notwithstanding the possible consequences of cumulative exposure), that would not justify

26  dismissing the complaint under *Twombly* and *Iqbal* as 'implausible.'"). "At this stage, Plaintiffs have

   plausibly alleged that *no* amount of lead . . . is safe for human consumption," such that, "[a]ccepting

27  Plaintiffs' allegations as true . . . Plaintiffs have adequately shown an injury-in-fact." *See Rodriguez*, 703 F.

28  Supp. 3d at 1205.

1  *(USA), Inc. Dark Chocolate Litig.*, 2024 WL 4107244, at *7 (E.D.N.Y. Sept. 6, 2024) (Where plaintiffs

2  "cite data showing that the defendant's chocolate contained lead and cadmium in excess of MADL,"

3  dismissal was "premature, as '[t]he amount of lead that is "safe" to consume will be . . . a hotly contested

4  issue of fact.'" (alterations in original) (quoting *Levy v. Hu Prods. LLC*, 2024 WL 897495, at *6 (S.D.N.Y.

5  Mar. 1, 2024))).

6      Moreover, as Defendants concede, in addition to the Proposition 65 MADL, Plaintiffs *did* "identif[y]

7  15 µg of lead per day . . . as [a] relevant limit applicable to the Products." Mot. at 20 (citing FAC ¶¶ 23-24).

8  But they argue "plaintiffs have failed to connect this level to the health harms identified in the FAC." *Id.*

9  (citing FAC ¶ 18). While it is true that 15 µg per day is, according to OEHHA, the "intake level associated

10  with lifetime cancer risk," FAC ¶ 23—and thus not necessarily the level associated with the "spectrum of

11  injuries across multiple body systems" lead can cause, *see id.* ¶ 18—cancer risk alone renders Plaintiffs'

12  claims plausible: Anyone purchasing a beverage because it is marketed as a "healthy snack" and supportive

13  of "immune health," then learning the beverage increases the risk of cancer, would rightly feel misled. Thus,

14  that "NSRLs are only identified by OEHHA for cancer risk," Mot. at 20, is not fatal to Plaintiffs' claims.

15      Perhaps recognizing this, Defendants quibble with *how* applicable the NSRL is, pointing out—just

16  as Plaintiffs allege, *see* FAC ¶ 24—that the "highest test result" for a single bottle of Premier Protein "is

17  only 9.3% of the 15 µg/day NSRL[.]" Mot. at 21. Defendants then make a line-drawing argument, asserting

18  that a slippery slope means Plaintiffs claims can only be actionable if a single bottle exceeds the threshold.

19  *See id.* at 22 ("[I]f less than 10% of the alleged threshold can support a claim, any amount above zero fits

20  plaintiffs' deception theory."). The Court previously recognized "[i]ssues of what level of lead may be safe

21  or unsafe and what reference level is appropriate to use are questions of fact and need not be resolved at the

22  pleading stage." *Krystofiak*, 2024 WL 3012801, at *2 (citations omitted). Even more granular issues of

23  fact—such as the line-drawing Defendants invite—are particularly inapt for resolution now. This is

24  especially true where Plaintiffs allege Defendants "encourage consumers to drink multiple Premier Shakes

25  per day . . . compounding the risk created by the lead levels in the Premier Shakes." FAC ¶ 25.[6]

26

27  ─────────────────────

28  [6] If the Court nevertheless still finds Plaintiffs' allegations lacking, Plaintiffs respectfully request leave to amend to allege some of the information set forth in footnote 1. *See also* Susan S. Lang, "Low lead levels, below those once thought safe, pose risk to children's cognitive functioning, Cornell scientists report,"

An analogy can be drawn to a line of cases challenging health and wellness claims on foods containing allegedly high amounts of added sugar. In these cases, the plaintiffs alleged authoritative bodies like the FDA and American Heart Association recommended limiting daily added sugar consumption to less than 10% of calories, equivalent to 50 grams in a 2,000-calorie diet. As Defendants do here, defendants in those cases frequently argued that because a single serving containing less than 50 grams of added sugar did not, on its own, exceed the authoritative recommendations, plaintiffs lacked plausible claims of deception.

This is a classic example of a social psychology phenomenon called diffusion of responsibility, analogous to every restaurant in the country arguing that its individual contribution to the problem of second-hand smoke is *relatively* tiny, and therefore should be exempted from a smoking ban. In reality, each and every source of lead in the diet adds incrementally to the health problems the heavy metal causes; therefore, each should be reduced to solve the problem. But the problem is particularly exasperated where, as here, sources that are *relatively high* in lead—a single serving contributes nearly 10% that which increases cancer risk—are marketed to consumers as "healthy."

Courts in sugary "health" foods cases routinely rejected similar arguments. In *Hadley*, for example, Judge Koh rejected the argument "that Defendant's products cannot be considered unhealthy because to exceed that 10% DRV threshold, consumers would have to engage in overeating of Defendant's products," 273 F. Supp. 3d at 1066. In *Milan v. Clif Bar & Co.*, the court held "[t]he fact that" sugar levels in Clif's products "could theoretically be consistent with the FDA's Daily Value and the AHA's daily recommendation" was "hardly a basis for kicking these claims out at the motion to dismiss stage" where Plaintiffs alleged "how this substantial percentage of added sugars in Clif's products *can contribute to excessive sugar consumption*, which in turn has been linked to many diseases and detrimental health conditions." 2019 WL 3934918, at *2 (N.D. Cal. Aug. 20, 2019) (emphasis added). And in *Krommenhock II*, the court denied summary judgment after finding "plaintiffs have ample, albeit disputed, evidence that

---

Cornell Chronicle (Apr. 14, 2003), *available at* https://news.cornell.edu/stories/2003/04/safe-lead-levels-pose-risk-childrens-intelligence (

> Before 1970, childhood lead poisoning was defined by a blood-lead concentration greater than 60 mcg/dl. The level considered acceptable was set at 40 mcg/dl in 1970 and reduced to 25 mcg/dl in 1985. The current level of 10 mcg/dl was established in 1991 based on finding slinking lead at this level to lowered intelligence and diminished school performance.).

the Products are not 'healthy' given the amounts of added sugar in them *and considering consumer habits regarding serving size and frequency of consumption*." 334 F.R.D. at 569 (emphasis added).

As these decisions suggest, the extent to which the Premier shakes' lead content renders its health and wellness labeling deceptive raises all sorts of complex factual issues not appropriately resolved on a motion to dismiss. *Cf. Hadley*, 273 F. Supp. 3d at 1067 ("While AHA and FDA recommendations may be relevant to the issues in this case, the case is not about whether 5% or 10% of calories from added sugar is a more reasonable threshold . . . but whether it is misleading for Kellogg to label foods with the challenged health and wellness claims when 20%-40% of their calories come from added sugar." (alteration, quotation marks, and record citation omitted)).

## IV.    DEFENDANTS CONCEDE PLAINTIFFS STATE A UCL "UNLAWFUL" PRONG CLAIM

Plaintiffs allege Defendants "misbranded Premier Shakes in violation of California's Sherman Law by . . . failing to disclose the presence of lead on the Premier Shakes' labels as required by 21 U.S.C. § 343, which states that a food is misbranded 'unless its label bears . . . the common or usual name of each ingredient.'" FAC ¶ 103. This statute requires Defendants "to list all ingredients in the food, unless those ingredients are subject to an exemption from this requirement," but "lead is not subject to any exemption under applicable law . . . ." *Id.*

In *Grausz*, as here, the plaintiff asserted "that food regulations require Hershey to list lead . . . in the ingredient list of the Products." 2024 WL 312688, at *5 (record citation omitted). Citing 21 C.F.R. § 101.100(a)(3)(i), "Hershey argue[d] it is not required to list lead . . . as [a] separate ingredient[] in the ingredient list because those metals were already present in the cocoa beans when Hershey 'incorporated [those beans] into' the Products." *Id.* (record citation omitted). Section 101.100 provides some "exempt[ions] from compliance with the requirement[]" to make "a declaration on the label of . . . each ingredient," including for:

> (3)    Incidental additives ***that are present in a food at insignificant levels*** and do not have any technical or functional effect in that food. For the purposes of this paragraph (a)(3), incidental additives are:
>
> (i)    Substances that have no technical effect but are present in a food by reason of having been incorporated into the food as an ingredient of another food, in which the substance did have a functional or technical effect.
>
> (ii)    Processing aids . . . .

24

*Krystofiak et al. v. BellRing Brands, Inc. et al.*, Case No: 3:23-cv-02819-ATG
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

> (iii)    Substances migrating to food from equipment or packaging or otherwise affecting food that are not food additives as defined in section 201(s) of the act; or if they are food additives as so defined, they are used in conformity with the regulations established pursuant to section 409 of the act.

21 C.F.R. § 101.100 (emphasis added).

In *Grausz*, the Court, relying on § 101.100(a)(1)(iii) and the plaintiff's allegations "that lead contamination occurs 'during post-harvest processing,'" found the metals in Hershey's chocolate bars were incidental additives. 2024 WL 312688, at *5 (record citation and emphasis omitted) (citing *Stuve v. Kraft Heinz Co.*, 2023 WL 184235, at *7 (N.D. Ill. Jan. 12, 2023)); *compare* FAC ¶ 33 (Defendants could have "improv[ed] their manufacturing process to eliminate introduction of lead caused by Defendants themselves"). But "whether an additive is present at an 'insignificant level' in the food depends on whether 'consumers care about the amount of [the offending chemical] in [the product],' such that it is possible a substance is *not* present 'at insignificant levels' even when it is present 'in very small amounts.'" *Grausz*, 2024 WL 312688, at *6 (record citation omitted) (quoting *Stuve*, 2023 WL 184235, at *7); *see also* FAC ¶¶ 26, 30, 104-106 (alleging materiality of presence of lead). As a result, "whether these additives are present in insignificant levels is a question of fact, not suited for dismissal at a preliminary stage in the proceeding." *Id.* (quoting *Holt v. Foodstate, Inc.*, 2015 WL 9592534, at *4 (S.D. Cal. Dec. 31, 2015)); *cf. In re Lindt & Sprüngli (USA), Inc. Dark Chocolate Litig.*, 2024 WL 4107244, at *5 (

> Lindt argues that "[b]ecause lead and cadmium are unavoidable in the food supply, plaintiffs cannot plausibly allege that the trace amounts reported in the Products (at levels substantially below the thresholds set by regulators are material" omissions. However, the plaintiffs allege "that the lead content of dark chocolate 'is important to consumers and likely to affect their choice of product,' which 'render[s] the omission material.'" (internal record citation omitted) (quoting *Levy*, 2024 WL 897495, at *6)).

Defendants wholly fail to address the allegation that they misbranded the Premier shakes in this manner, *see* FAC ¶ 103, thus conceding Plaintiffs state a UCL "unlawful" prong claim, *see id.* ¶ 131. Any effort to rectify their failure to address this claim in their Reply would, of course, be improper.

## CONCLUSION

The Court should deny Defendants' motion in its entirety.

1  Dated: September 23, 2024                    Respectfully Submitted,

2                                               /s/  Jack Fitzgerald

3                                               **FITZGERALD MONROE FLYNN PC**
                                                JACK FITZGERALD
4                                               *jfitzgerald@fmfpc.com*
                                                MELANIE R. MONROE
5                                               *mmonroe@fmfpc.com*
                                                TREVOR FLYNN
6                                               *tflynn@fmfpc.com*
                                                PETER GRAZUL
7                                               *pgrazul@fmfpc.com*
                                                2341 Jefferson Street, Suite 200
8                                               San Diego, California 92110
                                                Phone: (619) 215-1471
9
                                                ***Counsel for Plaintiffs***
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Krystofiak et al. v. BellRing Brands, Inc. et al.*, Case No: 3:23-cv-02819-ATG
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT