**KING & SPALDING LLP**
Michael L. Resch (SBN 202909)
mresch@kslaw.com
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1200
Facsimile: (415) 318-1300

**KING & SPALDING LLP**
Dale J. Giali (SBN 150382)
dgiali@kslaw.com
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants
BELLRING BRANDS, INC. and
PREMIER NUTRITION COMPANY, LLC

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PATRICIA KRYSTOFIAK, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>BELLRING BRANDS, INC., et al.,<br><br>          Defendants. | Case No. 3:23-cv-2819-AGT<br><br>**REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date:     November 22, 2024<br>Time:    10 a.m.<br>Dept.:    Ctrm A, 15th Floor. |

**TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................................................... 1

II. ARGUMENT ................................................................................................................. 3

    A. Plaintiffs Lack Standing to Pursue Their Claims ............................................... 3

        1. Plaintiffs Fail to Identify the Products They Purchased ............................... 3

        2. Plaintiffs Fail to Allege Facts Demonstrating Substantial Similarity of Non-Purchased Products ................................................................................................................ 5

        3. Plaintiffs Fail to Demonstrate Standing to Challenge Advertising They Do Not Allege Seeing or Relying On ................................................................................................. 6

    B. Plaintiffs' Challenges to Healthy Snack And Immune Health Are Preempted ................. 6

    C. Plaintiffs Fail to State a Plausible Consumer Protection Claim ....................................... 9

    D. Plaintiffs' Ingredient Theory Defies Common Sense and Contradicts FDA's Regulations and Actions ................................................................................................................ 12

III. THE FIRST AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE ................................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*Allen v. City of Beverly Hills*,
  911 F.2d 367 (9th Cir. 1990) .................................................................................................. 15

*Ascon Props., Inc. v. Mobil Oil Co.*,
  866 F.2d 1149 (9th Cir. 1989) ................................................................................................ 15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................................. 9

*Bruton v. Gerber Prods. Co.*,
  961 F. Supp. 2d 1062 (N.D. Cal. 2013) ................................................................................... 6

*Cannara v. Nemeth*,
  467 F. Supp. 3d 877 (N.D. Cal. 2020) ..................................................................................... 9

*Cohen v. Apple Inc.*,
  46 F.4th 1012 (9th Cir. 2022) ................................................................................................ 13

*Dumas v. Kipp*,
  90 F.3d 386 (9th Cir. 1996) .................................................................................................... 15

*Envtl. L. Found. v. Abbott Lab'ys, et al.*,
  No. CGC-10-503002 (San Francisco Superior Court) ........................................................... 12

*Farina v. Nokia*,
  625 F.3d 97 (3d Cir. 2010) ..................................................................................................... 13

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000) ............................................................................................................... 13

*Gilchrist v. Joshua*,
  2017 WL 2123640 (S.D. Cal. May 16, 2017) .......................................................................... 9

*Grausz v. Hershey Co.*,
  713 F. Supp. 3d 818 (S.D. Cal. 2024) .................................................................................... 14

*Grausz v. Hershey*,
  691 F. Supp. 3d 1178 (S.D. Cal. 2023) .................................................................................. 11

*Hadley v. Kellogg Sales Co.*,
  273 F. Supp. 3d 1052 (N.D. Cal. 2017) ................................................................................. 11

*Husain v. Campbell Soup Company*,
  -- F. Supp. 3d --, 2024 WL 4011959 (N.D. Cal. Sept. 2, 2024) ............................................... 4

*In re Lindt & Sprüngli (USA), Inc. Dark Chocolate Litig.*,
  2024 WL 4107244 (E.D.N.Y. Sept. 6, 2024) ......................................................................... 11

*In re Trader Joe's Co. Dark Chocolate Litig.*,
  -- F. Supp. 3d --, 2024 WL 1319725 (S.D. Cal. Mar. 27, 2024) ............................................ 10

*Krommenhock v. Post Foods, LLC*,
  334 F.R.D. 552 (N.D. Cal. 2020) .................................................................................... 5, 11

*Milan v. Clif Bar & Co.*,
  2019 WL 3934918 (N.D. Cal. Aug. 20, 2019) ...................................................................... 11

*Pardini v. Unilever United States, Inc.*,
  65 F.4th 1081 (9th Cir. 2023) ................................................................................................ 14

*Weaver v. Champion Petfoods USA Inc.*,
  2019 WL 2774139 (E.D. Wis. July 1, 2019) .................................................................... 1, 10

**Statutes**

21 U.S.C. § 343 ............................................................................................................................. 13

21 U.S.C. § 343-1 ............................................................................................................... 7, 8, 9, 13

**Regulations**

21 C.F.R. § 101.4 .......................................................................................................................... 13

21 C.F.R. § 101.9 .......................................................................................................................... 13

21 C.F.R. § 101.13 ........................................................................................................................... 7

21 C.F.R. § 101.65 ................................................................................................................. 7, 8, 9

21 C.F.R. § 101.100 ...................................................................................................................... 14

21 C.F.R. § 165.110(b)(4)(iii)(A) ............................................................................................. 2, 13

27 Cal. Code Regs. § 25721(d) ..................................................................................................... 12

27 Cal. Code Regs. § 25801(b)(1) ............................................................................................ 2, 12

27 Cal. Code Regs. § 25821(c) ..................................................................................................... 12

40 C.F.R. § 141.80(c)(2) ................................................................................................................. 2

**Other Authorities**

Cal. Office of Environmental Health Hazard Assessment, Proposition 65 Safe Harbor ............... 10

FDA, Compliance Program Guidance Manual, Program 7304.019 (Aug. 8, 2023),
  https://www.fda.gov/media/142504/download?attachment ....................................................... 12

FDA, Draft Guidance for Industry: Action Levels for Lead in Food Intended for Babies and
  Young Children (Jan. 2023), https://www.fda.gov/media/164684/download ....................... 2, 13

FDA, Total Diet Study (TDS), https://www.fda.gov/food/reference-databases-and-monitoring-
  programs-food/fda-total-diet-study-tds ...................................................................................... 12

Fed. R. Civ. P. 12(b)(6) ................................................................................................................... 9

Fed. R. Civ. P. 8 ................................................................................................................ 4

Fed. R. Civ. P. 9 ............................................................................................................ 3, 4

## I. INTRODUCTION

On June 14, 2024, the Court dismissed plaintiffs' initial complaint, ruling that plaintiffs did not "plausibly connect the representations of immune health or health(y) to the alleged lead levels they rely on" and failed "to show that the measured lead values exceed some relevant threshold or range that is 'independent of Prop 65.'" Dkt. 38 (June 14, 2024 Order) ("Order") at 15-16. In *this* motion to dismiss (Dkt. 43) ("Mtn."), defendants focused on the language in the Court's Order, devoting the lion's share of the introduction and argument to detailing plaintiffs' failure to cure this deficiency in the First Amended Complaint ("FAC"). *See*, *e.g.*, Mtn. at 1-2. True to form, plaintiffs' opposition does not mention, and certainly does not reconcile, the Court's critical ruling. This glaring omission is no oversight and tells the Court all that it needs to know.

Indeed, in their opposition, plaintiffs don't even try to allege that the trace lead levels in defendants' protein shakes exceed a relevant threshold that is independent of Prop 65. Instead, after disclaiming any reliance on Prop 65 in the first motion to dismiss proceeding (*see* Order at 16), plaintiffs now rely exclusively on two Prop 65 warning safe harbors—namely, Prop 65's No Significant Risk Level ("NSRL") and Maximum Allowable Dose Level ("MADL"). *See* Dkt. 46 (Sept. 23, 2024 Opposition to Motion to Dismiss) ("Opp.") at 21-22. Neither safe harbor comes close to saving plaintiffs' claims.

**Prop 65's NSRL.** As plaintiffs concede, the alleged lead levels in defendants' chocolate, café latte, vanilla, and caramel protein shakes (the "Products") are far below Prop 65's safe harbor level of 15 micrograms (μg) per day for cancer warnings regarding lead. Opp. at 22 (acknowledging that the *highest* result alleged in the FAC is a mere 9.3% of the NSRL). Plaintiffs never square this fact with the Court's requirement that the "measured lead values [must] ***exceed***" a "relevant threshold." Order at 16 (emphasis added). Nor do plaintiffs address the Court's conclusion (and defendants' argument) that permitting a complaint to proceed on a lower lead value—*i.e.,* permitting a claim based on *any* lead level—"could produce a 'preposterous' result." *Id*. at 16 (quoting *Weaver v. Champion Petfoods USA Inc.*, 2019 WL 2774139, at *3 (E.D. Wis. July 1, 2019)). Plaintiffs also never respond to defendants' argument that the NSRL is calculated based on an assumption of 70 years of daily exposure—and plaintiffs cannot and do not allege

such exposure in this case. *See* Mtn. at 2 & 21 n.18.

**Prop 65's MADL.** As an initial matter, the FAC restates *verbatim* the same MADL allegations from the initial complaint (*see* FAC ¶¶ 22, 81). The Court already found these allegations to be insufficient (Order at 16), and plaintiffs provide no basis for the Court to change its ruling. *See* Mtn. at 20, n.17. In any event, as defendants explained in their first motion to dismiss (Dkt. 16 at 5-6), the MADL is a *warning* safe harbor and not a *health harm* threshold. In other words, the MADL is *not* the lead level above which there is a risk of reproductive toxicity. Rather, under Prop 65, the health harm threshold is known as the "No Observed Effect Level" ("NOEL"). The NOEL, not the MADL, is the lowest level that *may* result in reproductive toxicity. Significantly, the NOEL for lead is *500 μg of lead per day*, which is *1,000 times greater than the MADL*.[1] The alleged lead levels in defendants' shakes are (per plaintiffs' testing) a tiny fraction of this amount. *See* Mtn. at 21 (table reflecting levels from 0.498 μg to 1.39 μg); FAC ¶ 81.

In the end, plaintiffs have no response to their failure to address the core deficiency in the initial complaint that the Court identified in its Order: the disconnect between the alleged *trace* lead levels in defendants' protein shakes, on the one hand, and the alleged harms that are associated with *toxic* levels of lead, on the other. Plaintiffs' inability to identify a health harm threshold below the alleged lead levels is not a surprise; indeed, it's what would be expected. The alleged lead levels in the protein shakes are miniscule, *far* below the regulatory standards for bottled water (5 ppb), public drinking water (15 ppb), and baby food (10-20 ppb),[2] and there is no basis (or relevant threshold) supporting a claim that such trace levels cause cancer, reproductive toxicity, or any other harm.[3]

---

[1] *See* 27 Cal. Code Regs. § 25801(b)(1).

[2] *See* Dkt. 16 at 9, Appx. A; 21 C.F.R. § 165.110(b)(4)(iii)(A) (bottled water); 40 C.F.R. § 141.80(c)(2) (public drinking water); FDA, Draft Guidance for Industry: Action Levels for Lead in Food Intended for Babies and Young Children (Jan. 2023), https://www.fda.gov/media/164684/download (baby food).

[3] Plaintiffs have also failed to allege how much of the Products' lead would be absorbed by the body such that it even could have a health impact. While not appropriate (or necessary) for the purposes of a motion to dismiss, the Court will not be surprised to learn that the human body has mechanisms to protect against dietary lead exposure, such that it is scientifically invalid to assume that the entirety of the trace amounts of lead would be absorbed into the bloodstream and capable of having any health impact whatsoever.

1    Defendants also raised separate issues of standing and preemption in their motion (Mtn. at
2  8-18), and plaintiffs' belabored responses to those arguments fare no better. And as a last-ditch
3  effort to save their case, plaintiffs now focus on the dubious argument that lead should have been
4  declared in the list of ingredients. The argument gives the Court far too little credit. Setting aside
5  the practical problems with the rule plaintiffs propose—imagine ingredient lists on food labels
6  having to identify every element on the periodic table—FDA has been monitoring dietary lead for
7  decades and has *never* suggested (or anything remotely close) that lead should be declared in the
8  ingredient statement. Plaintiffs' convoluted theory otherwise is best characterized as confirmation
9  that these matters are best left to FDA.

10 **II.    ARGUMENT**

11   **A.    Plaintiffs Lack Standing to Pursue Their Claims**

12    Defendants detailed in their motion (Mtn. at 6:8-13, 11:12-20) that the FAC challenges
13  only shakes and only four flavors (chocolate, vanilla, caramel, and café latte). Plaintiffs do not
14  dispute the point in their opposition.

15    In their motion, defendants did not repeat the injury-in-fact standing argument, which the
16  Court considered and rejected in its Order. Instead, defendants reasserted standing arguments as
17  to the four shakes that are consistent with the Order (Order at 4, 5, 7), *i.e.*, that plaintiffs fail to (1)
18  sufficiently identify what products they purchased, (2) demonstrate standing to sue on products
19  they did not purchase, and (3) allege exposure to and reliance on vast swaths of the advertising
20  referenced in the FAC. As to these narrow and focused standing arguments—arguments that are
21  independent of defendants' principal argument on this motion that plaintiffs fail to state a
22  plausible consumer deception claim—plaintiffs' opposition arguments quickly collapse.

23       **1.    Plaintiffs Fail to Identify the Products They Purchased**

24    Violating both the rules of standing and Fed. R. Civ. P. 9(b), plaintiffs continue to rely on
25  insufficient purchase allegations, ignoring their deficient allegations of container size and pack
26  size. Opp. at 8. Plaintiffs also fail to provide further details about the alleged chocolate shake
27  16-pack purchased by Carreno, a product/pack size defendants have been unable to identify. All
28  of this is inexplicable considering (i) the Order's mandate (*see, e.g.,* Order at 4 (flavor, container

1  size, and pack size)), (ii) plaintiffs' acknowledgement of the requirement that they clearly allege
2  their purchases (Opp. at 8:15-16), (iii) the differences between and among the labels of the
3  various products (*see, e.g.*, Mtn. at 10 n.11; FAC ¶¶ 49, 75, 93), and (iv) the fact that plaintiffs
4  "regularly purchased the Premier Shakes" (Opp. at 6) and should readily be able to provide
5  complete information about exactly what they purchased.[4]

6  Plaintiffs argue that they have alleged enough as to their purchases because of the manner
7  the Court previously treated the powder products based on Carreno's alleged purchases from the
8  initial complaint. Opp. at 9:11-13.[5] The reliance is particularly rich given that plaintiffs have
9  abandoned the powder allegations altogether in the FAC. Moreover, plaintiffs' reliance on the
10  fact that the powder products were treated similarly by the Court (and so, plaintiffs believe, all the
11  shake packs should be treated similarly) is misplaced given that the label statements on the two
12  *powder* containers were, as plaintiffs alleged, identical in all material respects (*see, e.g.*, Initial
13  Complaint (Dkt. 1) ¶¶ 34, 41, 42), and the labels on *shake* containers and packs, as well as the
14  lead levels between and among the flavors, clearly differ (*see, e.g.*, Mtn. at 10 n.11; FAC ¶¶ 49,
15  75, 81, 93; *see also* Dkt. 1 ¶ 33).[6]

16  Ultimately, neither defendants nor the Court know what containers and packs plaintiffs
17  purchased, and the complaint cannot simply be waved through without this core information.

---

[4] Contrary to plaintiffs' protest, Carreno's current allegations are certainly inconsistent with the initial complaint in the only way that concept makes sense at the pleading stage and under the law and circumstances here. The "particularly important" reason he purchased protein products has changed. The product purchased has changed. These changes are being made under thread-the-needle circumstances that clearly discredit the allegations. Even plaintiffs describe the changes as "tailor[ing]" Carreno's allegations "to the Court's previous order." Opp. at 1:2. Suffice it to say that a complaint should be tailored to the facts, not to overcome a court order.

[5] Plaintiffs argue that there are multiple powder container *sizes* (Opp. at 9:13), which, they assert, is significant because the Court treated them the same. But the containers depicted in the initial complaint (Dkt. 1 ¶ 42) are not different sizes; they simply have different amounts of product (19.7 oz vs. 18.6 oz) in the same containers, that are otherwise materially identical.

[6] Contrary to plaintiffs' argument (Opp. at 10:10-17), what the labels say and don't say or what a consumer can actually see or not see is appropriate for resolution on a motion to dismiss, when, as here, the answers to those questions are evident from the complaint and the advertising itself. *See, e.g., Husain v. Campbell Soup Company*, -- F. Supp. 3d --, 2024 WL 4011959 (N.D. Cal. Sept. 2, 2024) (appeal pending) (motion to dismiss granted with prejudice based on meticulous, context-specific analysis of what the label does and does not say and does and does not convey). Plaintiffs don't obtain a free pass on this motion-to-dismiss principle by failing to make allegations that comply with Rules 8 and 9(b).

### 2. Plaintiffs Fail to Allege Facts Demonstrating Substantial Similarity of Non-Purchased Products

It is undisputed that no plaintiff alleges buying a vanilla or caramel shake. Plaintiffs tested the vanilla shake at 0.498 µg, a level that is orders of magnitude below the relevant NOEL health harm threshold and *below* the standard MADL warning safe harbor (and *well below* the applicable MADL warning safe harbor for this product, *see* n.10, *infra*), and a level that is a mere 35% of a test of a chocolate shake (1.39 µg). FAC ¶ 81; Order at 5. The caramel shake tested at 0.717 µg, a level that is also orders of magnitude below the relevant NOEL health harm threshold and just above the standard MADL warning safe harbor but *well below* the applicable MADL safe harbor for this product, and a level that is a mere 51% of a test of a chocolate shake. *Id*. Plaintiffs acknowledge the variance in test results as "sizeable" (Opp. at 9:26-28), and these differences can and should—on motion to dismiss—be determinative as to plaintiffs' lack of standing to sue on products not purchased.

Plaintiffs' assertion that additional testing could reduce the sizable differences is no answer. Opp. at 10:1. Plaintiffs had that opportunity, prior to filing the FAC and with the benefit of the Court's Order, to do whatever testing they deemed appropriate but made the conscious decision to rest on their original testing. For similar reasons, plaintiffs' assertion that "discovery" could support their claims is equally insufficient. Plaintiffs must come forward now with plausible allegations of actionable wrongdoing. They haven't. And plaintiffs' reliance (Opp. at 10:3) on *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552 (N.D. Cal. 2020) is misplaced. That decision did not address standing at all, whether on a motion to dismiss or otherwise. Rather, it was a class certification decision, with *zero* discussion about how the differences in the added sugar percentage at issue there impacted standing to sue for products not purchased.

Moreover, and contrary to plaintiffs' insinuation, it's not just the lead levels that are different. As the images in the FAC demonstrate, there are plenty of differences between labels of different flavors. *See, e.g.*, FAC ¶¶ 49, 52, 53, 75, 93. As one example, the "healthy" statements and locations are not the same across labels. *See, e.g.*, FAC ¶ 49 ("healthy snack" in different locations for different products, and different language for "immune health" statement).

### 3. Plaintiffs Fail to Demonstrate Standing to Challenge Advertising They Do Not Allege Seeing or Relying On

Consistent with the allegations in the FAC, plaintiffs readily acknowledge that they relied on *label* statements *only*. Opp. at 6, 7, 11, 12. Plaintiffs' primary response regarding non-label advertising is that it may be relevant to issues other than plaintiffs' standing to sue for false advertising. Opp. at 11-12. But that doesn't address defendants' argument. Defendants are not seeking to strike the allegations for other purposes. Defendants are simply addressing plaintiffs' standing to use advertising not seen or relied on to support their false advertising allegations. On that issue, the law is clear. Plaintiffs' arguments that their allegations don't "preclude" possible reliance on non-label advertising misperceives the pleading stage of a lawsuit. Now is the time for plaintiffs to allege their case and defendants have every right to know now what alleged actionable false advertising plaintiffs saw and relied on. On a related point, plaintiffs argue that they may rely on the text appearing in the middle of the image at ¶ 50 of the FAC. Opp. at 1:24-26. But there is no explanation about where that panel and language appears or whether it is on any container or pack purchased by any plaintiff. What's more, no plaintiff alleges seeing or relying on those statements. FAC ¶¶ 104-108. Plaintiffs have no standing to rely on such alleged advertising for their claims.

Ultimately, plaintiffs allege reliance on exactly two label statements (healthy snack, immune health) and lack standing to challenge advertising that they do not allege seeing or relying on (including *label* statements fitting that description, as well as online marketing, social media, YouTube, and advertising regarding kids). Mtn. at 12; *Bruton v. Gerber Prods. Co.*, 961 F. Supp. 2d 1062, 1091-92 (N.D. Cal. 2013) (rev'd and remanded on other grounds) (no standing for claims based on advertisements that plaintiff did not view).

### B. Plaintiffs' Challenges to Healthy Snack And Immune Health Are Preempted

Like standing, defendants' preemption arguments are independent of and not necessary to defendants' principal argument on this motion that plaintiffs fail to state a plausible consumer deception claim.

Plaintiffs' pages-long section on the interpretation and interplay between 21 C.F.R. §§

1  101.13 and 101.65 (Opp. at 12-17) is based on an incorrect understanding of defendants'
2  argument and an erroneous reading of those regulations. First, defendants do not argue that *any*
3  healthy statement on a label is an implied healthy nutrient content claim under § 101.65. As
4  § 101.65 states—and as defendants argued in their motion—the healthy statement has to "suggest
5  that a food *because of its nutrient content* may help consumers maintain a healthy dietary
6  practice." Emphasis added (*accord* 21 C.F.R. § 101.13(b)(2)(ii)). Defendants argue that both the
7  healthy snack and immune health statements *are* associated with the nutrient content of the
8  shakes and, therefore, are § 101.65 implied healthy nutrient content claims.

9  Second, plaintiffs erroneously interpret §§ 101.13 and 101.65 as requiring the nutrient
10  statement, itself, to be a nutrient content claim. But the regulations say that a healthy label
11  statement (*e.g.*, "healthy snack") that is associated with a "claim *or statement about a nutrient*"
12  is an implied healthy nutrient content claim. 21 C.F.R. §§ 101.13(b)(2)(ii), 101.65(d)(1)(ii)
13  (emphasis added). There is no requirement that the statement about a nutrient, itself, be a nutrient
14  content claim. Nor is there any question that the nutrition information that is immediately
15  adjacent to all healthy snack statements and the multiple nutrient statements immediately adjacent
16  to[7] or associated with the immune health statements are "statement[s] about a nutrient." Indeed,
17  as plaintiffs concede (Opp. at 17:23-25), "the nutrition label clearly contains information about
18  nutrient content." Put another way, the nutrition label is "clearly" a *statement about nutrients*.

19  So, however §§ 101.13 and 101.65 are interpreted, the healthy snack and immune health
20  statements are clearly associated with a claim or statement about a nutrient. That's all that's
21  needed even under plaintiffs' interpretation.

22  Plaintiffs also assert that the immune health statement is a structure-function claim and,
23  therefore, is not governed by § 101.65, and, moreover, there is no express preemption under 21
24  U.S.C. § 343-1 that applies to structure-function claims on food labels. Plaintiffs' argument fails
25  for at least two reasons. First, the immune health statement is—at best for plaintiffs—a hybrid
26  label statement. While it does have characteristics of a structure-function claim, it also—via an

---

[7] FAC ¶¶ 49 (pages 11, 12), 53, and 75 clearly depict numerous nutrient statements immediately adjacent to the immune health statement, including 30g protein, 160 calories, 1g sugar, 24 vitamins and minerals, high protein, and antioxidants vitamins C & E.

asterisk—is associated with the statement "Antioxidants Vitamins C&E. ***Enjoy as part of a healthy diet and lifestyle***." FAC ¶ 49 (p. 12) (emphasis added). That statement, positioning the shake as a healthy snack associated with Vitamins C & E, fits the definition of an implied healthy nutrient content claim set out in § 101.65.

Second, by arguing that the immune health statement is a structure-function claim, plaintiffs argue way too much. Or, put another way, plaintiffs can't have it both ways. As plaintiffs readily acknowledge, "[s]tructure/function claims 'describe the ***role of [a] nutrient*** . . . intended to affect normal structure or function in humans' or 'characterize the means by which ***a nutrient . . . acts*** to maintain such structure or function.'" Opp. at 19:5-7 (emphasis added). The specific nutrients that are the focus of the immune health statement are Vitamins C & E. Accordingly—and fully crediting plaintiffs' structure-function argument—the immune health statement relates, and necessarily *only* relates, to the association of Vitamins C & E to immune health. That's it. Plaintiffs do not allege that the specific association is any way false, *i.e.*, plaintiffs do not dispute (nor could they) that the antioxidants vitamins C & E *are*, in fact, associated with a healthy immune system.

Significantly, as a structure-function claim, the statement says absolutely nothing about *other* nutrients' or constituents' relationship with a healthy immune system or, more to the point, about lead. Again, plaintiffs cannot argue that the statement relates *exclusively* to Vitamins C & E (*i.e.*, to avoid it being an implied healthy nutrient content claim), and at the same time argue that the same statement somehow is a representation about the amount of lead in the product. The reasonable consumer would not plausibly conclude that the very specific and specialized structure-function statement says anything about lead and, moreover, the presence of lead does not in any way undermine the specific association being declared, *i.e.*, antioxidants vitamins C & E *are* associated with a healthy immune system.

Finally, and contrary to plaintiffs' argument (Opp. at 1, 19-20), express preemption under 21 U.S.C. § 343-1 relates *solely* to whether plaintiffs are attempting to impose (as to a select set of FDA labeling regulations) non-identical or additional requirements under state law. 21 U.S.C. § 343-1. Here, that means whether plaintiffs are imposing non-identical requirements relating to

1  lead levels and disclosures. Preemption does *not* address or concern itself with whether the
2  defendant is *complying* with the subject regulation. Here, that means that defendants do not need
3  to demonstrate compliance with § 101.65 before availing themselves of 343-1 preemption relating
4  to plaintiffs' lead claims regarding implied healthy nutrient content claims. In any event, the
5  Products fully comply with FDA labeling regulations regarding the challenged statements and
6  otherwise.

### C.   Plaintiffs Fail to State a Plausible Consumer Protection Claim

Plaintiffs' consumer protection claims fail under Rule 12(b)(6) because the FAC does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Gilchrist v. Joshua*, 2017 WL 2123640, at *1 (S.D. Cal. May 16, 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Order gave plaintiffs a clear directive that any amended complaint must "plausibly connect the representations of immune health or health(y) to the alleged lead levels they rely on in the complaint." Order at 15. "The plausibility analysis is 'context-specific' and not only invites, but 'requires the reviewing court to draw on its judicial experience and common sense.'" *Cannara v. Nemeth*, 467 F. Supp. 3d 877, 882 (N.D. Cal. 2020) (quoting *Iqbal*, 556 U.S. at 679).

Plaintiffs have had sufficient opportunity to identify an applicable *health*-related (*not* Prop 65 *warning*-related) lead level threshold that is connected to the harms they allege in the FAC and have failed to do so. In the FAC, plaintiffs appear to land on Prop 65's NSRL of 15 µg of lead per day as the relevant health threshold applicable to defendants' Products. FAC ¶ 23-24. In their opposition, however, plaintiffs curiously appear to revert to reliance on the Prop 65 MADL warning safe harbor of 0.5 µg of lead per day. But the MADL allegations are *verbatim* the same as those contained in the initial complaint that *plaintiffs* disavowed, and the Court properly found to be insufficient. Opp. at 21-22; Order at 16-17. In any event, mere reference to either the NSRL or MADL is insufficient because plaintiffs have failed to connect these levels to the health-related claims or harms identified in the FAC. Opp. at 22; FAC ¶ 18.

**NSRL.** Plaintiffs assert in their opposition that the 15 µg/day NSRL is connected to a harm—"lifetime cancer risk"—while conceding that it is "not necessarily the level associated

1   with the 'spectrum of injuries across multiple body systems' lead can cause." Opp. at 22; FAC
2   ¶ 18. There are two fundamental flaws in plaintiffs' reliance on the NSRL. *First*, the NSRL is
3   over ten times higher than the alleged lead levels in the Products. Therefore, even assuming
4   *arguendo* that the 15 µg/day NSRL is associated with cancer-related harms, the alleged lead
5   levels in defendants' shakes do not come anywhere near the 15 µg/day NSRL. *See* Order at 16
6   (alleged lead levels must "exceed" the relevant threshold); *In re Trader Joe's Co. Dark Chocolate*
7   *Litig.*, -- F. Supp. 3d --, 2024 WL 1319725, at *11 (S.D. Cal. Mar. 27, 2024) (plaintiffs must
8   connect the alleged health risks to the levels of metals identified in the products). Plaintiffs
9   attempt to resolve this issue by alleging that defendants "encourage consumers to drink multiple
10  Premier Shakes per day . . . compounding the risk created by the lead levels in the Premier
11  Shakes." Opp. at 22; FAC ¶ 25. But as defendants explained, a consumer would need to consume
12  at least 11 chocolate shakes in a single day to reach the NSRL. Mtn. at 21 n.18. Having no
13  response, plaintiffs ignored the point entirely in their opposition.

14      *Second*, plaintiffs mischaracterize the 15 µg/day NSRL. The NSRL is a daily intake level
15  calculated to result in, at most, one excess case of cancer in an exposed population of 100,000
16  *assuming lifetime (i.e., 70 years) exposure*.[8] The NSRL is not a level associated with "lifetime
17  cancer risk" as plaintiffs state; rather, it is a level that is calculated assuming daily exposure over
18  a person's lifetime. Even if the shakes did contain 15 µg of lead (which they don't), plaintiffs'
19  cumulative exposure would not trigger the conservative cancer risk associated with the NSRL's
20  70 years' exposure—and allowing plaintiffs' claims to proceed would be tantamount to endorsing
21  a theory that *any* amount of lead is actionable, something the Court already agreed would be
22  "preposterous." Order at 16 (quoting *Weaver*, 2019 WL 2774139, at *3).

23      Perhaps recognizing their NSRL theory does not comply with the Order's requirement
24  that plaintiffs allege lead levels that *exceed* a relevant health threshold, plaintiffs argue that the
25  lead levels do not need to reach the relevant threshold of 15 µg/day NSRL. In doing so, they

---

[8] *See* Cal. Office of Environmental Health Hazard Assessment, Proposition 65 Safe Harbor Levels: No Significant Risk Levels for Carcinogens and Maximum Allowable Dose Levels for Chemicals Causing Reproductive Toxicity (Jan. 2008), at 1, https://oehha.ca.gov/media/downloads/crnr/feb2008statusreport.pdf.

reference a line of cases challenging health and wellness claims on products containing excess added sugar. Opp. at 23-24. Such cases have no application here.

For example, decisions like *Krommenhock v. Post Foods, LLC*, 255 F. Supp. 3d 938 (N.D. Cal. 2017), *Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052 (N.D. Cal. 2017), and *Milan v. Clif Bar & Co.*, 2019 WL 3934918 (N.D. Cal. Aug. 20, 2019), relate to alleged deceptive claims due to significant amounts of added sugar in the products—an intentionally added ingredient present at a material level and incorporated into the defendants' design of the product. There is nothing about the added sugar decisions that allows plaintiffs here to avoid their burden to make plausible allegations that the amount of lead in defendants' Products exceeds health thresholds and can cause health outcomes that are inconsistent with defendants' labeling. Put another way, if the alleged trace lead levels are benign (which they are), then there's nothing about the labeling that could be perceived to be misleading—and plaintiffs' sugar cases do not suggest otherwise.[9]

**MADL.** Plaintiffs have not identified *any* harms associated with the 0.5 µg/day MADL warning safe harbor. *See Grausz v. Hershey*, 691 F. Supp. 3d 1178, 1195 (S.D. Cal. 2023) ("MADLs are not cutoffs indicating the point where lead . . . content becomes a health risk"). This Court already held that the Prop 65 MADL "itself is not alleged as connected to any other threshold," therefore "no reasonable inference can be drawn." Order at 16. Plaintiffs do not address, let alone reconcile, this language from the Order at all, and the FAC still fails to connect the MADL to "any other threshold" relevant to the alleged lead levels or alleged harms.

In fact, the MADL warning safe harbor is conservatively derived by first determining the NOEL for reproductive toxicity and dividing that level by 1,000 to arrive at the MADL. 27 Cal. Code Regs. § 25801(b)(1). Therefore, the MADL is orders of magnitude below the NOEL—*i.e.*,

---

[9] Plaintiffs also rely on *In re Lindt & Sprüngli (USA), Inc. Dark Chocolate Litig.*, 2024 WL 4107244 (E.D.N.Y. Sept. 6, 2024). *See* Opp. 21-22, 25. The reliance is misplaced. The *In re Lindt* court—just like plaintiffs here—did *not* assess or address the specific deficiency in this case highlighted by the Court's Order and raised by defendants on this motion, *i.e.*, whether plaintiffs have "plausibly connect[ed] the representations of immune health or health(y) to the alleged lead levels they rely on in the complaint" and "show[ed] that the measured lead values exceed some relevant threshold or range that is 'independent of Prop 65.'" To the contrary, *In re Lindt* rested on two issues not raised in or relevant to this motion, *i.e.*, (i) regulations governing lead levels in other products (*see, e.g.*, Dkt. 16 at 4-5), and (ii) the ubiquitousness and unavoidability of lead in the food supply. *See* Opp. 25:18-21.

where reproductive toxicity could even be observed (1,000 x 0.5 µg/day, or 500 µg/day). The alleged lead levels, in turn, are also orders of magnitude below the 500 µg/day NOEL. Additionally, the MADL does *not* refer to total lead content in a single serving of a food; it refers to exposure to lead over time, calculated based on reasonably anticipated rate of intake or exposure for average users over time. *See* 27 Cal. Code Regs. §§ 25721(d), 25821(c).[10]

### D.     Plaintiffs' Ingredient Theory Defies Common Sense and Contradicts FDA's Regulations and Actions

As a final effort to save their claims, plaintiffs argue that defendants' labeling is unlawful because lead is not identified *as an ingredient* on the Product labels. Opp. at 24-25. Tellingly, plaintiffs never raised this dubious theory in the first motion to dismiss proceedings. For good reason.

***First***, plaintiffs' ingredient theory defies common sense. Taken to its logical conclusion, every element, mineral, and vitamin that are naturally contained within fruits, vegetables, grains, and other ingredients need to be listed in the ingredient list. Food labels are not large enough to contain the sizeable number of "ingredients" that would need to be identified under this periodic-table approach to food labeling.

***Second***, plaintiffs' ingredient theory contradicts FDA's regulations and actions. As a preliminary matter, for decades, FDA has been monitoring dietary lead in the U.S. food supply through its Total Diet Study and Toxic Elements Program.[11] Nevertheless, plaintiffs do not and cannot allege or identify a single example where FDA has ever taken such an absurd approach to ingredient labeling (and defendants are aware of none). To the contrary, knowing full well that

---

[10] To make plaintiffs' reliance on the MADL even more legally dubious, the MADL they use is not even the warning threshold that applies to the Products given that it was replaced by the consent judgment in *Envtl. L. Found. v. Abbott Lab'ys, et al.*, No. CGC-10-503002 (San Francisco Superior Court). *See* Dkt. 16 at 5-7 (judicial notice granted, Order at 27). The consent judgment has a warning threshold of 3-4 µg/day, and all of the alleged lead levels fall below this threshold. So, to the extent this case were about warnings under Prop 65, plaintiffs still could not prevail. If successful, plaintiffs' cavalier displacement of a consent judgment would entirely undermine the process (and related policy reasons) for Prop 65 consent judgments.

[11] *See* FDA, Total Diet Study (TDS), https://www.fda.gov/food/reference-databases-and-monitoring-programs-food/fda-total-diet-study-tds; FDA, Compliance Program Guidance Manual, Program 7304.019 (Aug. 8, 2023), https://www.fda.gov/media/142504/download?attachment.

food labels do not identify lead as an ingredient and without ever suggesting that (the permitted) lead should be identified in the ingredient list, FDA has established specific action levels for lead in products such as baby food (10-20 ppb)[12] and bottled water (5 ppb).[13] If FDA wanted lead to be listed as an ingredient or otherwise on food labels, it could easily issue that requirement. Because plaintiffs' ingredient theory is so fundamentally inconsistent with FDA's considered judgment about the labeling of lead in food, the theory is barred by the doctrine of implied preemption. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881-82 (2000); *Cohen v. Apple Inc.*, 46 F.4th 1012, 1029 (9th Cir. 2022); *Farina v. Nokia*, 625 F.3d 97, 132-34 (3d Cir. 2010).

Plaintiffs' ingredient theory is also inconsistent with FDA regulations and, therefore, is expressly preempted. FDA regulations provide for how elements, minerals, and vitamins are to be identified on a product label. Specifically, the regulations provide that food labels must list four elements, minerals, and vitamins: Vitamin D, calcium, iron, and potassium. 21 C.F.R. § 101.9(c)(8)(ii). Significantly, FDA requires food labels to list these four elements, minerals, and vitamins *outside of the ingredient statement*. *Id*. While food companies can voluntarily list other elements, minerals, and vitamins (and often do so), there is no requirement or practice of listing such items in the ingredient statement.

The ingredient statement is governed by its own regulation that requires ingredients to be listed by their "common or usual" name. *Id*. § 101.4(a)(1). Plaintiffs have not alleged that defendants mislabeled any of the ingredients in the shakes' ingredient lists under this regulation.

In pursuing a theory that seeks to impose requirements that are not identical to § 101.9 (vitamin and mineral labeling) and § 101.4 (ingredient labeling), plaintiffs' claim is expressly preempted. *See* 21 U.S.C. § 343-1(a)(3)-(4) (express preemption provision incorporating 21 U.S.C. § 343(i)(1) & (q)); *Pardini v. Unilever United States, Inc.*, 65 F.4th 1081, 1084–85 (9th Cir. 2023).

***Third***, plaintiffs' interpretation and application of the incidental additive rule (21 C.F.R.

---

[12] FDA, Draft Guidance for Industry: Action Levels for Lead in Food Intended for Babies and Young Children (Jan. 2023), https://www.fda.gov/media/164684/download

[13] 21 C.F.R. § 165.110(b)(4)(iii)(A).

1  § 101.100(a)(1)) is flatly wrong. The alleged lead in defendants' shakes does not fall within any
2  of the three prongs of the incidental additive definition. 21 C.F.R. § 101.100(a)(3)(i)-(iii). To the
3  extent lead is present in any ingredient of the Products, it does not have and never had any
4  "functional or technical effect," and therefore § 101.100(a)(3)(i) does not apply. Additionally,
5  lead is not added as a "processing aid." *Id.* § 101.100(a)(3)(ii). Finally, lead is not a substance
6  migrating from equipment or packaging to the Products. *Id.* § 101.100(a)(3)(iii). Accordingly, any
7  lead in defendants' Products does not constitute an incidental additive as defined by FDA, and
8  plaintiffs cannot and do not allege otherwise.[14]

9  In support of their ingredient theory, plaintiffs rely on *Grausz v. Hershey Co.*, 713 F.
10 Supp. 3d 818 (S.D. Cal. 2024), which permitted the plaintiff there to pursue a theory that lead and
11 cadmium were incidental additives in the products at issue there. Setting aside that *Grausz* did not
12 address all of the particular arguments defendants make here, *Grausz* involved allegations that
13 contamination in the raw ingredient occurs "during post-harvest processing," thereby arguably
14 causing lead and cadmium to fit within the definition of incidental additives as "[s]ubstances
15 migrating to food from equipment or packaging or otherwise affecting food." *Id.* at 829; 21
16 C.F.R. § 101.100(a)(3)(iii). There is no such allegation about lead in the Products, either in the
17 FAC or otherwise. To the contrary, plaintiffs here allege that lead is present in the shakes due to
18 "sourcing ingredients grown in soil contaminated with lead." FAC ¶ 33. Therefore, and even after
19 ignoring defendants' other arguments, the reasoning in *Grausz* does not support plaintiffs'
20 ingredient theory.

21 Finally, compounding their ingredient theory errors, plaintiffs make the argument that
22 defendants somehow conceded this argument. Opp. at 24-25. Once again, plaintiffs give this
23 Court too little credit. Plaintiffs never raised this theory in the first motion to dismiss proceedings
24 even though all along defendants have consistently argued that *any* theory that defendant had a
25 duty to disclose lead on the label fails for numerous reasons. *See, e.g.*, Mtn. at 22. At best for

---

[14] Even if lead were an incidental additive (which it is not), it would be exempt from disclosure in the ingredient list given that by any measure, it is present at "insignificant levels." 21 C.F.R. § 101.100(a)(3). The Court, however, need not reach this question, because the alleged lead content does not fall within the incidental additive definition in the first instance.

1  plaintiffs, this theory is buried as a conclusory allegation in their 48-page, 205-paragraph
2  amended complaint, but defendants cannot be expected to specifically address every deficient
3  theory—especially given that defendants all along have argued there is no duty to disclose lead in
4  the Products and given the page limit for motions in this district.

5        Try as they might with inapt references to Prop 65 warning safe harbors and ingredient
6  labeling, plaintiffs cannot avoid the consequence of their failure to allege that the alleged trace
7  levels of lead in defendants' shakes exceed a relevant health harm threshold.

8  **III.   THE FIRST AMENDED COMPLAINT SHOULD BE DISMISSED WITH**
9        **PREJUDICE**

10       A complaint should be dismissed without leave to amend when further amendments
11 would be futile. *See Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996) (affirming district court's
12 dismissal without leave to amend where plaintiff continued to allege insufficient facts); *Allen v.*
13 *City of Beverly Hills*, 911 F.2d 367, 373-74 (9th Cir. 1990) (affirming district court's dismissal
14 and denying plaintiff leave to amend amended complaint where further amendment would be
15 futile). A district court's "discretion to deny leave to amend is particularly broad where plaintiff
16 has previously amended the complaint." *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160
17 (9th Cir. 1989). Plaintiffs in this case were given the opportunity to amend their complaint with
18 clear direction from the Court about the deficiency that needed to be addressed. Having failed to
19 do so, plaintiffs have no basis to seek another opportunity to amend and their claims should be
20 dismissed with prejudice.

Dated: October 8, 2024

**KING & SPALDING LLP**
Dale J. Giali
Michael L. Resch

By: */s/ Dale J. Giali*
    Dale J. Giali
    Attorneys for Defendants
    BELLRING BRANDS, INC. and
    PREMIER NUTRITION COMPANY, LLC